Roger Sullivan
McGARVEY LAW
345 1st Avenue East
Kalispell, MT 59901
(406) 752-5566
rsullivan@mcgarveylaw.com

Philip L. Gregory*
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
(650) 278-2957
pgregory@gregorylawgroup.com

Julia A. Olson*
Andrea K. Rodgers*
Nathan Bellinger*
OUR CHILDREN'S TRUST
1216 Lincoln St.
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org

Daniel C. Snyder*
Haley Nicholson*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Attorneys for Plaintiffs*
*\* Counsel to seek admission pro hac vice*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| **EVA LIGHTHISER**; **RIKKI HELD**; **LANDER BUSSE**; **OLIVIA VESOVICH**; **KATHRYN GRACE GIBSON-SNYDER**; **GEORGIANNA FISCHER**; **TALEAH HERNÁNDEZ**; **B.B.**, a minor, by and through his guardian S.B.; **J.K.**, a minor, by and through his guardian L.A.; **N.K.**, a minor, by and through his guardian L.A.; **ULA JONES**; **RIPLEY CUNNINGHAM**; **J.M.**, a minor, by | Case No: <u>CV-25-54-BU-DLC</u><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

and through her guardian C.M.; **J.H.,** a
minor, by and through his guardian
M.H.; **I.H.,** a minor, by and through his
guardian M.H.; **KALĀLAPA
WINTER**; **C.M.,** a minor, by and
through her guardian E.M.; **DELANEY
REYNOLDS**; **AVERY McRAE**;
**MIKO VERGUN**; **ISAAC VERGUN**;
and **JOSEPH LEE**,

                              Plaintiffs,

    v.

**DONALD J. TRUMP**, in his official
capacity as President of the United
States; **EXECUTIVE OFFICE OF
THE PRESIDENT**; **OFFICE OF
MANAGEMENT AND BUDGET**;
**RUSSELL VOUGHT**, in his official
capacity as Director of the Office of
Management and Budget; **JEFFREY
BOSSERT CLARK,** in his official
capacity as Acting Administrator of the
Office of Information and Regulatory
Affairs; **UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY**; **LEE ZELDIN**, in his
official capacity as Administrator of the
United States Environmental Protection
Agency; **UNITED STATES
DEPARTMENT OF THE
INTERIOR**; **DOUG BURGUM**, in his
official capacity as Secretary of the
Interior; **UNITED STATES
DEPARTMENT OF ENERGY**;
**CHRIS WRIGHT**, in his official
capacity as Secretary of Energy;
**UNITED STATES DEPARTMENT
OF TRANSPORTATION**; **SEAN
DUFFY**, in his official capacity as

Secretary of Transportation; **UNITED STATES ARMY CORPS OF ENGINEERS**; **LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR**., in his official capacity as Chief of Engineers and Commanding General of the United States Army Corps of Engineers; **NATIONAL AERONAUTICS AND SPACE ADMINISTRATION**; **JANET PETRO**, in her official capacity as acting NASA Administrator; **UNITED STATES DEPARTMENT OF COMMERCE**; **HOWARD LUTNICK**, in his official capacity as Secretary of Commerce; **NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION**; **LAURA GRIMM**, in her official capacity as acting NOAA Administrator; **NATIONAL SCIENCE FOUNDATION**; **BRIAN STONE**, in his official capacity as Acting Director of NSF; **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR**., in his official capacity as Secretary of HHS; **NATIONAL INSTITUTES OF HEALTH; JAYANTA BHATTACHARYA**, in his official capacity as Director of NIH; and the **UNITED STATES OF AMERICA**,

                           Defendants.

## **TABLE OF CONTENTS**

NATURE OF THE CASE ...................................................................................1

JURISDICTION AND VENUE .........................................................................4

PLAINTIFFS......................................................................................................5

DEFENDANTS.................................................................................................30

STATEMENT OF FACTS................................................................................38

    President Trump's Unconstitutional EOs .........................................................38

    President Trump's EOs Infringe Youth Plaintiffs' Fundamental Rights to
    Life, Liberty, and Personal Security.................................................................43

    DEFENDANTS' METHODICAL IMPLEMENTATION OF THE EOs...........53

        President Trump, the Office of the President, and OMB Issue Directives
        to Implement the Unconstitutional EOs.......................................................53

        Defendants are Scrubbing, Suppressing, and Dismantling Climate
        Science to Implement the Unconstitutional EOs ..........................................56

        Defendant EPA is Implementing the Unconstitutional EOs ........................61

        Defendant DOI is Implementing the Unconstitutional EOs ........................69

        Defendant DOE is Implementing the Unconstitutional EOs .......................73

        Defendant DOT is Implementing the Unconstitutional EOs .......................76

        Defendant USACE is Implementing the Unconstitutional EOs ..................78

        Defendant NASA is Implementing the Unconstitutional EOs.....................79

        Defendant DOC is Implementing the Unconstitutional EOs .......................82

        Defendant NOAA is Implementing the Unconstitutional EOs ....................83

        Defendant NSF is Implementing the Unconstitutional EOs ........................87

        Defendant NIH is Implementing the Unconstitutional EOs ........................89

The United States Has the Affordable Energy Resources It Needs to Power the Nation and Also End Fossil Fuel Pollution ...................................................91

CLAIMS FOR RELIEF..........................................................................................95

CLAIM 1: SUBSTANTIVE DUE PROCESS VIOLATION OF RIGHT TO LIFE (Against All Defendants) ..........................................................................95

CLAIM 2: SUBSTANTIVE DUE PROCESS VIOLATION OF RIGHT TO LIBERTY (Against All Defendants) ...................................................................98

CLAIM 3: ULTRA VIRES PRESIDENTIAL ACTION TO "UNLEASH" FOSSIL FUEL POLLUTION AND DEBILITATE EPA (Against President Trump, the Office of the President, OMB, Director Vought, EPA, Administrator Zeldin, and Acting Administrator Clark) ..................................100

CLAIM 4: ULTRA VIRES PRESIDENTIAL ACTION TO "UNLEASH" FOSSIL FUELS BY TERMINATING THE NCA (Against President Trump, the Office of the President, NASA) .................................................................111

CLAIM 5: ULTRA VIRES PRESIDENTIAL ACTION TO "UNLEASH" FOSSIL FUELS BY DISMANTLING, SUPPRESSING, AND SCRUBBING SCIENCE (Against All Defendants) .......................................112

CLAIM 6: SUBSTANTIVE DUE PROCESS STATE-CREATED DANGER (Against All Defendants)................................................................................116

PRAYER FOR RELIEF ......................................................................................119

## TABLE OF ACRONYMS

| | |
|---|---|
| BLM | Bureau of Land Management |
| $CO_2$ | carbon dioxide |
| $CO_2e$ | carbon dioxide equivalent |
| DOC | United States Department of Commerce |
| DOE | United States Department of Energy |
| DOI | United States Department of the Interior |
| DOT | United States Department of Transportation |
| EIA | United States Energy Information Administration |
| EO | executive order |
| EPA | United States Environmental Protection Agency |
| EV | electric vehicle |
| GGRF | Greenhouse Gas Reduction Fund |
| GHG | greenhouse gas |
| GHGRP | Greenhouse Gas Reporting Program |
| GSA | General Services Administration |
| GW | gigawatt |
| HHS | United States Department of Health and Human Services |
| IEA | International Energy Agency |
| IPCC | Intergovernmental Panel on Climate Change |
| IRA | Inflation Reduction Act |
| LNG | liquified natural gas |
| MMT | million metric tons |
| MSU | Montana State University |
| NASA | National Aeronautics and Space Administration |
| NCA | National Climate Assessment |
| NEPA | National Environmental Policy Act |
| NEVI | National Electric Vehicle Infrastructure |
| NIH | National Institutes of Health |
| $NO_2$ | nitrogen dioxide |
| NOAA | National Oceanic and Atmospheric Administration |
| NSF | National Science Foundation |
| OMB | United States Office of Management and Budget |
| PM2.5 | particulate matter 2.5 micrometers or less in diameter |
| SERC | Smithsonian Environmental Research Center |
| UM | University of Montana |
| USACE | United States Army Corps of Engineers |
| USGCRP | United States Global Change Research Program |

## NATURE OF THE CASE

1.      This is an action for declaratory and injunctive relief brought by 22 children and youth against Defendants' unconstitutional directives to "Unleash Fossil Fuels" set forth in (a) Executive Order 14154 §§ 1–3, 5, 7 (a true and correct copy of Executive Order 14154 is attached hereto as Exhibit 1); (b) Executive Order 14156, which directs federal agencies to invoke emergency powers to accelerate the use of fossil fuels (a true and correct copy of Executive Order 14156 is attached hereto as Exhibit 2); and (c) Executive Order 14261 §§ 2–3, 5–7 which directs agencies to increase the utilization and export of coal (a true and correct copy of Executive Order 14261 is attached hereto as Exhibit 3) (collectively, "the EOs").[1] The EOs violate the Fifth Amendment substantive due process clause on their face by depriving Plaintiffs of their fundamental rights to life and liberty and are ultra vires in assuming powers reserved to and exercised by Congress through Article I. The EOs are also unconstitutional and ultra vires as applied.

2.      From day one of the current administration, President Trump has issued directives to increase fossil fuel use and production and block an energy transition to wind, solar, battery storage, energy efficiency, and electric vehicles ("EVs").

---

[1] Plaintiffs reserve the right to amend this Complaint to the extent Defendants issue additional unconstitutional directives to "unleash" fossil fuels or other unconstitutional orders and actions that deny Plaintiffs access to critical information about climate change science.

President Trump's EOs falsely claim an energy emergency, while the true emergency is that fossil fuel pollution is destroying the foundation of Plaintiffs' lives. These unconstitutional directives have the immediate effect of (a) slowing the buildout of U.S. energy infrastructure that eliminates planet-heating fossil fuel greenhouse gas pollution ("GHGs" or "climate pollution"); and (b) increasing the use of fossil fuels that pollute the air, water, lands, and climate on which Plaintiffs' lives depend.

3.    The science that Defendants seek to suppress confirms that every additional ton of GHG pollution that the EOs and Defendants' directives cause, and every ton of GHG pollution deliberately not avoided, is a constitutional injury to Plaintiffs' Fifth Amendment rights to life and liberty, their pursuit of happiness, and their fundamental liberties protected by Plaintiffs' state constitutions. Plaintiffs' lives are presently harmed by the "unleashing" of fossil fuel pollution, and their injuries will get worse as the directives continue to be implemented.

4.    Without the EOs being both necessary to achieve a compelling government interest and narrowly tailored to achieve legitimate objectives while limiting the constitutional injuries the directives impose on young citizens of the United States today and for the remainder of their lives, the EOs and Defendants' implementation thereof are unconstitutional and should be so declared and enjoined.

5.    Defendants are "unleashing" dangers upon Plaintiffs while simultaneously dismantling the congressionally mandated "warning system" of

climate science and pollution control systems that are essential to protect Plaintiffs' fundamental rights. Defendants are unconstitutionally altering the statutory mandates of Defendant Environmental Protection Agency ("EPA") and shutting down the U.S. Global Change Research Program and the congressionally-required National Climate Assessment. Defendants are erasing information and scientific data about climate change across federal government websites and databases. Defendants are eliminating critical scientific research and data on climate change across governmental and private institutions by ending programs, staffing, leases, grants, and funds, hamstringing efforts to disseminate information, warn about, and address climate change. Defendants are penalizing public and private scientific speech containing the word "climate," creating a culture of fear and intimidation for those working, researching, studying, and advocating in the field of climate change. These Executive directives impede Plaintiffs from accessing the very resources and taking the actions needed to protect their lives and other fundamental rights secured by their federal and state constitutions. By accelerating the danger to Plaintiffs caused by fossil fuel pollution and simultaneously sabotaging the best available means for notifying Plaintiffs of and protecting Plaintiffs from the danger, the EOs and Defendants' directives are deliberately indifferent and conscience-shocking.

6.    Absent intervention from this Court, the EOs, which are already being implemented, will increase the development of and reliance on fossil fuels and slow

the scaling of wind, solar, storage, energy efficiency, and EVs, thereby worsening the air pollution and climate conditions that immediately harm and endanger Plaintiffs' lives and personal security. The EOs will also permanently damage the scientific and environmental protection institutions whose congressionally-mandated activities are vital to notifying Plaintiffs of and protecting Plaintiffs from fossil fuel pollution. Plaintiffs bring this action to prevent the unconstitutional use of Executive powers that deprive them of their fundamental rights under the U.S. Constitution and their freedom to vindicate fundamental rights recognized and protected by their respective state constitutions, including as beneficiaries to their state public trust resources.

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction because the claims arise under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because the individual Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

8.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

9.      Venue lies in this District under 28 U.S.C. § 1391(e) because the majority of Plaintiffs reside in and are harmed in this District, state public trust resources of the Montana Plaintiff beneficiaries are situated in this District, actions to implement the challenged EOs and resulting directives are occurring in this District, climate science is being defunded and suppressed in this District, and Defendants are officers and employees of the United States or any agency thereof acting in their official capacities, some of whom have offices in this District.

## **PLAINTIFFS**

10.     **Eva Lighthiser** is a 19-year-old United States citizen from Livingston, Montana. Outdoor activities, including backpacking, biking, skiing, swimming and rafting on the Yellowstone River, and recreating in Montana's national parks and public lands, including Yellowstone and Glacier National Park, are central to Eva's way of life. Destruction to roads and bridges caused by climate change-induced extreme flooding events forced Eva and her family to relocate from their home outside of Livingston to a new home in town. Even in town, extreme flood events continue to harm Eva, flooding or blocking access to public lands Eva regularly visits. Eva's health and safety are harmed by climate-induced wildfires and wildfire smoke, which causes her shortness of breath, headaches, sore throats, and eye and nose irritation. She is forced to stay inside on days of smoke and poor air quality to protect her health. Climate change-induced heatwaves not only disrupt Eva's sleep

but also increase the risk of early wildfire seasons. The effects of climate change cause Eva persistent stress and anxiety about her future. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Eva more harm. Every ton of GHG pollution avoided will prevent her further injuries. Defendant EPA is aware of Eva's injuries. Eva plans to study environmental studies in college and will be harmed by her lack of access to climate science and data resulting from Defendants' directives.

11.    **Rikki Held** is a 24-year-old United States citizen from Broadus, Montana. She grew up on her family's ranch 20 miles outside of Broadus and spent most of her time outdoors—caring for livestock, haying, fencing, camping, hiking, swimming in the Powder River, and riding horses. Her family's home, ranch, and motel business are already significantly degraded and devalued by climate change impacts, including flooding, severe storms, wildfires, declining snowpack, and drought. These climate disruptions cause economic losses for the ranch and motel family businesses and endanger Rikki's home and ranch. As a fifth-generation Montanan, Rikki is committed to protecting a clean and healthful environment and stable climate system, which the viability of her family's ranch depends on, for future generations. Climate change and fossil fuel air pollution also harm Rikki's physical and mental health because her work on the ranch is increasingly in extreme heat, with air filled with climate-induced wildfire smoke, and fossil fuel pollution from

the Colstrip generating station and surrounding oil and gas development. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Rikki more harm. Every ton of GHG pollution avoided will prevent her further injuries. Defendant EPA is aware of Rikki's injuries. Rikki majored in environmental science for her undergraduate degree and is going to study climate change and glaciology in graduate school to protect her home state. Rikki's opportunities to pursue those graduate programs to help protect Montana and her home are harmed by Defendants' assault on climate science and cutting of funding for climate-related research.

12.    **Lander Busse** is a 20-year-old United States citizen from Kalispell, Montana. Hunting and fishing are important cultural and family traditions for Lander and his family's primary source of protein. Extreme heat, wildfires, wildfire smoke, and drought conditions limit or foreclose his ability to hunt and fish. Some rivers Lander fishes are too warm, or water levels are too low to fish, resulting in fishery closures. Lander has seasonal pollen allergies, which are worsening due to the increased pollen count and impair Lander's health. Lander is an accomplished musician and theater performer, and often performs outdoors. Increased temperatures and smoke from wildfires impair his ability to perform music and theater and negatively impact his health and well-being. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Lander more

harm. Every ton of GHG pollution avoided will prevent his further injuries. Defendant EPA is aware of Lander's injuries.

13.    **Olivia Vesovich** is a 21-year-old United States citizen from Missoula, Montana. Olivia has exercise-induced asthma, which worsens from the increasingly smoke-filled air in Montana. In smoky conditions, Olivia experiences feelings of suffocation and is forced to stay inside and reduce and eliminate the outdoor activities she enjoys. Olivia also suffers from spring pollen allergies, which force her to stay indoors and prevent her from engaging in the recreational activities she enjoys. Olivia's spring allergies cause her eyes to swell shut and can cause eye pain for weeks at a time. Olivia's allergies become progressively worse as pollen counts increase. Olivia experiences psychological harms from worsening climate conditions and her government knowingly causing more fossil fuel pollution when there are clean energy alternatives at lower cost that do not harm her health and home state. There are days when Olivia feels paralyzed by the devastation wrought by climate change to her state and community. Olivia's climate anxiety is like an elephant sitting on her chest; it feels like a crushing weight, making it hard for her to breathe. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Olivia more harm. Every ton of GHG pollution avoided will prevent her further injuries. Defendant EPA is aware of Olivia's injuries.

14.    **Kathryn Grace Gibson-Snyder ("Grace")** is a 21-year-old United States citizen from Missoula, Montana. She is a sixth-generation Montanan, deeply committed to protecting Montana's environment, natural resources, citizens, and economy for both present and future generations of Montanans. Grace's identity and well-being are inextricably intertwined with Montana's environment, including its rivers, forests, glaciers, and national parks, and she is distressed to see her state degraded by climate change and fossil fuels. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Grace more harm. Every ton of GHG pollution avoided will prevent her further injuries. Grace is committed to protecting Montana's environment and natural resources and supporting its communities in transitioning away from fossil fuels, but her career opportunities to do so are limited as the Trump administration eliminates jobs and funding for clean energy, climate research, long-term transition planning, and decarbonization. During the summer of 2025, Grace planned to work on transition planning in coal communities but found that work opportunities were limited due to funding cuts from the Trump administration, and ultimately, she took a job with a different focus. Her ability to protect Montana's clean and healthful environment and its communities from the dangers of fossil fuel and climate change is hindered by Defendants' actions challenged herein. Defendant EPA is aware of Grace's health injuries.

15.    **Georgianna Fischer ("Georgi")** is a 23-year-old United States citizen from Bozeman, Montana. Georgi was a competitive Nordic skier in high school and college, and skiing remains an important part of her life. Declining snowpack and snow melting at faster rates limit Georgi's ability to ski, harming her physical and mental health and well-being. When recreating and exercising outdoors, extreme heat and wildfire smoke have caused Georgi to feel dizzy, nauseous, generally unwell, and have caused persistent nosebleeds requiring medical attention. Georgi has seasonal allergies, which get worse as climate change worsens. Due to her allergies, Georgi experiences symptoms including sneezing, itchy eyes, a puffy face, and difficulty breathing. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Georgi more harm. Every ton of GHG pollution avoided will prevent her further injuries. Defendant EPA is aware of Georgi's injuries. Georgi plans to go to graduate school to study the impacts of climate change on aquatic ecosystems and will be harmed by the lack of access to climate science and data and related federal research grants resulting from Defendants' directives.

16.    **Taleah Hernández** is a 21-year-old United States citizen from Polson, Montana. Rising temperatures and climate change-induced wildfire smoke increasingly forces her to stay indoors and prevents her from engaging in paddle boarding, sailing, outdoor ice skating on Flathead Lake, and other recreational activities. Wildfires stoked by more heat and drought will pose an increasing threat

to her childhood home and she has already been forced to evacuate her home once, which was a terrifying experience. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Taleah more harm. Every ton of GHG pollution avoided will prevent her further injuries. Defendant EPA is aware of Taleah's injuries.

17.     **B.B.** is a 17-year-old United States citizen from Kalispell, Montana. Extreme heat and drought conditions limit or foreclose his ability to hunt and fish, including of upland birds which are an important food source for him and his family. Wildfires have destroyed and degraded areas important to B.B.'s life and his recreation, including the forest he was named after. Other forests important to B.B., where he hunts and recreates, are at increased risk of burning with additional GHG pollution. Wildfire smoke harms B.B.'s health and well-being, triggering a cough and eye irritation. B.B. has anxiety about the future that he will inherit because of fossil fuel pollution. Every additional ton of GHG pollution and increment of heat Defendants cause will cause B.B. more harm. Every ton of GHG pollution avoided will prevent his further injuries. Defendant EPA is aware of B.B.'s injuries.

18.     **J.K.** and **N.K.** are brothers aged 11 and 7, respectively. J.K. and N.K. are United States citizens, grew up in Montana City, Montana, and currently live in Upland, California. They continue to spend time in Montana during summer break depending on smoke conditions. An important reason J.K. and N.K. moved away

from Montana was to escape the poor air quality from wildfire smoke during the summers. They moved to an area where their family thought they would be safer from smoke. But J.K. and N.K. cannot escape the lasting effect the wildfire smoke has had on their lungs. J.K. was diagnosed with pulmonary sequestration (an abnormal mass of lung tissue) before he was born, and he was warned by his doctor that he would be uniquely susceptible to respiratory infections. Luckily, he has so far escaped any serious respiratory complications. N.K., on the other hand, has frequent upper respiratory infections that on multiple occasions have required emergency room and hospital care. He was recently hospitalized for several days with double pneumonia. Not long after, he again found himself spending the night in the emergency room requiring supplemental oxygen. J.K. and N.K. were born into climate change-induced smoke seasons that did not exist for older generations and which compromise their health. The increasing length and severity of the wildfire season, and degraded air quality, first in Montana, and now in Southern California, harms J.K. and N.K's lungs, and their general health and well-being, especially given their young age and pre-existing respiratory health conditions. When they lived in Montana, J.K. experienced nosebleeds, sore throats, headaches, tiredness, coughing, trouble breathing, and eye irritation from wildfire smoke. J.K. and N.K. have missed camp and school because they were feeling ill from poor air quality due to wildfire smoke. Climate-induced wildfire smoke has harmed J.K.'s and N.K.'s health and

well-being literally their entire lives. Cuts to medical research on climate change, wildfire smoke, and respiratory health in children harms J.K. and N.K. Every additional ton of GHG pollution and increment of heat Defendants cause will cause J.K. and N.K. more days of poor air quality, more smoke, and thus, more harm to their lives, health, and safety. Every ton of GHG pollution avoided will prevent their further injuries. Defendant EPA is aware of J.K. and N.K.'s injuries.

19.    **Ula Jones** is an 18-year-old United States citizen from Red Lodge, Montana. During the school year, she lives, and goes to school, in Billings. Ula runs year-round and competes in cross-country and track in the fall and spring. As fossil fuel pollution causes Montana's climate to warm and increases the length and severity of the wildfire and smoke season, Ula is increasingly exposed to air pollution and her physical health suffers and her athletic performance is diminished. Climate-induced heat and wildfire smoke make it hard for Ula to breathe, causing her to feel sick for weeks at a time, and lead to constant bouts of coughing. Fossil fuel infrastructure in and around Billings, including refineries, gas and coal-fired power plants, and nearby fossil fuel extraction activities, contaminate the air Ula breathes and pollutes the Yellowstone River, preventing her from swimming. Ula has seasonal allergies to pollen, which have been worsening in recent years. Climate change-induced flooding of Rock Creek in Red Lodge has damaged her community and family's property, permanently altered the flow of the creek, and destroyed trails

that Ula used to hike but no longer can. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Ula more harm. Every ton of GHG pollution avoided will prevent her further injuries. Ula has relied on NOAA to gather scientific information and data for school research projects, but since January 2025, data she used to access is no longer available from NOAA. Ula will be attending college in the fall and intends to double major in Environmental Studies and Government, with an emphasis in pre-law. She has been told by professors that some of the environmental studies classes she plans to take are at risk of being eliminated due to directives from the Trump administration.

20.     **Ripley Cunningham** is an 18-year-old United States citizen from Livingston, Montana. Ripley's life and well-being are deeply intertwined with Montana's environment and she has been backpacking, hiking, rafting, and skiing in Montana her whole life. Climate-induced wildfires have forced Ripley to prepare to evacuate her home, a distressing and panic-attack-inducing experience for her, causing dangers to her personal safety and home that will worsen with more fossil fuel pollution. Wildfire smoke and rising temperatures harm Ripley's physical and mental health and increasingly force her indoors during the summer and fall months, preventing her from recreating and exercising outside. Growing up, Ripley regularly fished and floated the Yellowstone River with her family, but flooding, extreme fluctuations in water levels, and fish kills have limited her access to the river. Ripley

14

has recently started suffering from allergies, which climate change makes worse. Ripley wanted to have children and pass down her family's outdoor Montana traditions to her own family, but Defendants' actions are the primary obstacle preventing her from safely starting a family given the worsening (rather than recovering) climate destabilization and the Defendants' actions to "unleash" more fossil fuels and make living conditions even more dangerous for children and future generations. The deprivation of the right to bring a child safely into the environment in her home state harms Ripley's family and cultural autonomy, dignity, life, and liberty. Coal trains coming from Spring Creek Mine or on their way to Colstrip Generating Station regularly pass through Livingston, obstructing Ripley's ability to get from her house to town and polluting the air she breathes with coal dust. Until age 12 Ripley lived a mere 1,000 feet from the train tracks, and she now lives two miles from the tracks, within the impact radius of coal dust, given the windy conditions of Livingston. Extending the life of Spring Creek Mine and the Colstrip Generating Station causes Ripley more harm to her health and lifespan. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Ripley more harm. Every ton of GHG pollution avoided will prevent her further injuries.

21.     **J.M.** is a 17-year-old United States citizen from Livingston, Montana. Climate-induced wildfires have forced J.M. to prepare to evacuate her home and

pose an ongoing and worsening danger to her home, her family's 40-acre property, and her animals. Exposure to extreme heat and unhealthy air quality from wildfire smoke are a persistent and worsening injury for J.M., and harm her health when she's working outside and caring for horses and other animals on her family's property. J.M. has started suffering from seasonal allergies recently, which cause symptoms including itchy eyes and throat, and congestion. Her family owns a veterinary clinic that has been damaged by climate-induced floods and remains at risk from future flooding. In 2022, J.M. and her family spent significant time and money trying to protect the clinic from rising waters from the Yellowstone River by surrounding the clinic with sandbags, but water still flooded the clinic, forcing it to close while the water was cleaned up and the clinic dried out (resulting in lost income for J.M.'s family). Coal trains pass through Livingston regularly, contaminating the air J.M. breathes while she waits up to 30 minutes at a time for long coal trains to pass. As extreme heat, unhealthy air quality, floods, and lack of snow restrict J.M.'s outdoor activities, her mental health suffers, and she experiences anxiety and depression. J.M. helped raise $5,000 to install an electric school bus charging station at her school and helped secure a $400,000 EPA Clean School Bus Program grant to provide her school with two electric buses. The school has not yet received the money, or the buses, and upon information and belief, the EPA is considering rescinding funding for the Clean School Bus Program, which would mean J.M.'s

school would not get the two electric buses it was previously awarded money for, and the air quality around the school, which J.M. breathes and is monitoring with air quality sensors, would remain polluted by diesel buses. Every additional ton of GHG pollution and increment of heat Defendants cause will cause J.M. more harm. Every ton of GHG pollution avoided will prevent her further injuries.

22.    **J.H.** and **I.H.** are brothers aged 12 and 16, respectively. J.H. and I.H. are United States citizens from Missoula, Montana. Climate-induced wildfire smoke results in Missoula having some of the worst air quality in Montana and is harming J.H. and I.H.'s physical and mental health. I.H. runs year-round and competes in cross-country and track. Wildfire smoke causes I.H. to suffer headaches, burns his lungs, and leads to weeks of missed training that hinder his performance at races. Smoke exacerbates migraines for I.H. which can be debilitating for a day at a time. For J.H., wildfire smoke and extreme heat makes his body and soul feel contaminated, brings down his mood, and makes it harder for him to concentrate at school, especially when the heat and smoke result in canceled recess and after-school sports. J.H. and I.H. feel a deep sense of interconnectedness with Montana's natural environment and spend time every summer camping and hiking with their family. Wildfires and smoke have caused them to cancel trips and have devastated forests where they used to camp and hike. Both J.H. and I.H. are passionate about skiing but changing precipitation patterns and declining snowpack limit their opportunities

to ski in Montana. Seeing and experiencing the harms from climate change is devastating for J.H. and I.H. and results in mental anguish and suffering. Policies that "unleash" fossil fuels, extend the life of Colstrip, and attack climate science exacerbates J.H. and I.H.'s mental anguish because they understand that these actions will increase their exposure to the conditions that are already causing them harm. J.H. recently wrote a poem calling for government officials to "fight for everything the Earth stands for" and to stop putting so many GHGs into the air that are "polluting this beautiful Earth" and "going to increase the world's temperature." Every additional ton of GHG pollution and increment of heat Defendants cause will cause J.H. and I.H. more days of poor air quality, more smoke, and thus, more harm to their lives, health, and safety. Every ton of GHG pollution avoided will prevent their further injuries.

23.     Plaintiffs Eva, Rikki, Lander, Olivia, Grace, Georgi, Taleah, B.B., J.K., and N.K. were Plaintiffs in *Held v. State of Montana* ("the *Held* plaintiffs"). The state district court found the evidence of their fossil fuel pollution and climate injuries, including their trial testimony and that of their experts, to be credible and undisputed by the State of Montana. The state district court found and concluded each of them has been, and continues to be, injured by climate change and air pollution from fossil fuels. *Held v. Montana*, CDV-2020-307, Findings of Fact, Conclusions of Law, and Order, ¶¶ 195–96, 199, 200–01, 204, 206 (Mont. 1st Jud. Dist. Ct. Aug. 14, 2023)

("*Held* District Court Order"). These Findings were not challenged by the State and were affirmed on appeal to the Montana Supreme Court. *Held v. Montana*, 560 P.3d 1235 (Mont. 2024). Each of the state constitutional injuries Eva, Rikki, Lander, Olivia, Grace, Georgi, Taleah, B.B., J.K., and N.K. are currently experiencing get worse with each additional ton of GHG pollution. *Held* District Court Order, Findings of Fact ¶¶ 91-92; Conclusions of Law ¶ 6. EPA is aware of this Order and these Plaintiffs' fossil fuel pollution climate injuries.

24.    Under Montana's Constitution, Plaintiffs Eva, Rikki, Lander, Olivia, Grace, Georgi, Taleah, B.B., J.K., N.K., Ula, Ripley, J.M., J.H., and I.H. have an explicit right to "a clean and healthful environment," which includes a right to a stable climate system. Mont. Const. art. II, § 3, art. IX, § 1; *Held v. Montana*, 560 P.3d 1235, 1249 (Mont. 2024). Plaintiffs Eva, Rikki, Lander, Olivia, Grace, Georgi, Taleah, B.B., J.K., N.K, Ula, Ripley, J.M., J.H., and I.H. are also beneficiaries of Montana's public trust resources, including waters, the atmosphere, and fish and wildlife. *See, e.g.*, Mont. Const. art. IX, § 3. Defendants' directives harm Montana Plaintiffs' liberties to receive the benefits of their state constitutional rights to a healthful environment and a stable climate system with use and enjoyment of and access to healthy public trust resources, including state waters, fish and wildlife, and atmosphere. Defendants' directives specifically seek to extend coal mining and

burning in Montana that would be foreclosed by the State's constitutional ruling in *Held v. Montana*.

25.     **Kalālapa Winter** is a 21-year-old United States citizen born and raised in Hawai'i, with roots on both the islands of Kaua'i and O'ahu. Kalālapa has dedicated much of her young life to protecting the public trust natural resources of Hawai'i, her 'āina, including subsistence fishing areas where she practices traditional and customary place-based knowledge. Kalālapa has been harmed by the most extreme flooding conditions in Hawai'i's recorded history, known as the climate-induced "rain bomb," which destroyed her local lo'i subsistence crops, damaged her main natural water source, and cut off access into and out of her community for a year. The flooding also severely depleted coral and urchin populations, and emaciated fish in the area which negatively impacted the ability for her community to feed itself. Tropical cyclones, fueled by rising temperatures, are a new and growing danger for Kalālapa on the islands, which have already forced her to board up her home and prepare for extreme flooding. Sea level rise blocks Kalālapa's movement and access around the island, is eroding the beaches on which she recreates, and alters traditional surf breaks on O'ahu at Queen's Beach where she surfs. That combined with warming oceans is destroying coral reefs and local fish populations important to Kalālapa's culture and subsistence. Rising temperatures have also reduced the abundance of healthy coral in Hā'ena, Kaua'i,

which are important for the health of the reefs and fisheries which her, her family, and community subsist on. Kalālapa currently attends college in Los Angeles and delayed her return to school due to the LA Fires in January 2025. Upon her return to a red sky, she wore an N-95 mask for three weeks on campus because of the smoke and school warnings about breathing in heavy metals and other hazardous particulate matter. The smoke inhalation prevented her outdoor activities and caused her to lose her voice during times of auditions important for her BFA degree and job prospects. Fossil fuel pollution and poor air quality increasingly harm Kalālapa's life, health, safety, cultural traditions, public trust resources, and her pursuit of happiness. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Kalālapa more harm. Every ton of GHG pollution avoided will prevent her further injuries.

26.    **C.M.** is a 15-year-old United States citizen and resident of Kailua, Oʻahu. Her home is in a low-lying area where extreme precipitation and flooding can isolate her from key transportation corridors that she and her family rely on for access to school and work. During past heavy rain events, C.M. has been unable to leave the neighborhood for activities and to get to her former school. Outdoor activities like surfing, swimming, and snorkeling are important to C.M. and her family and are one way that they bond and share time together. Extreme precipitation events have led to brown water events that prevent C.M. and her ʻohana from

accessing and enjoying the ocean. Climate change is also causing the beaches and reefs C.M. regularly visits for recreation, education, and personal well-being to disappear. Warming ocean temperatures and sewage runoff have degraded and destroyed reefs and corals on Oʻahu where C.M. snorkels. The destruction of coral reefs makes the coastline where C.M. lives more vulnerable to storms and further coastal erosion and inundation, putting her home in harm's way. In the summer of 2020, C.M. was on Hawaiʻi Island when an unprecedented 62-square-mile wildfire, fueled by drought conditions, approached the area where she and her family were staying. They were forced to shelter in place and close all the doors and windows to reduce their exposure to particulate matter in the air. Watching ash fall from the darkening sky around her, C.M. feared the fire would trap her family and block their escape routes. This terrifying experience has fueled C.M.'s fear and anxiety about how climate change will continue to alter, affect, and ultimately degrade the landscape of her home. Every additional ton of GHG pollution and increment of heat Defendants cause will cause C.M. more harm. Every ton of GHG pollution avoided will prevent her further injuries.

27.    Under Hawaiʻi's Constitution, Plaintiffs Kalālapa and C.M. have an explicit fundamental state right to "a clean and healthful environment," which includes the right to a life-sustaining climate system, and are beneficiaries of Hawaiʻi's public trust which explicitly includes "all natural resources, including . . .

air." Haw. Const. art. XI, §§ 1, 9. The State of Hawaiʻi has committed in a court-ordered settlement agreement for the benefit of all Hawaiʻi's children, including Plaintiffs Kalālapa and C.M., to eliminate fossil fuel GHG emissions from their domestic transportation sector by 2045. *Navahine v. Dep't of Transp.*, No. 1CCV-22-0000631, Joint Stipulation and Order re: Settlement (Haw. 1st Cir. Ct. June 20, 2024), attached hereto as Exhibit 4. Defendants' directives harm Hawaiʻi Plaintiffs' liberties to receive the benefits of their state fundamental constitutional rights to a healthful environment and a life-sustaining climate system with enjoyment and use of and access to healthy public trust resources, including but not limited to land, air, and water. Defendants' directives specifically seek to impede the EV adoption needed to achieve the terms of the settlement agreement. Upon information and belief, Defendants including DOT, are aware of the *Navahine* settlement agreement and the fossil fuel pollution and climate injuries of the *Navahine* Plaintiffs.

28. **Delaney Reynolds** is a 25-year-old United States citizen who lives in Miami and No Name Key, Florida. Delaney is a fourth-generation resident of Miami-Dade County, Florida, who began advocating for her climate rights at age 14. Atmospheric and oceanic heat waves expose Delaney to harmful land and ocean temperatures, posing direct physical threats to Delaney. Extreme heat, with government warnings to stay inside, has forced Delaney to regularly curtail outdoor activities preventing her from riding her bike and hiking and impeding mobility.

Increasing fossil fuel pollution harms Delaney's safety, life, and longevity, and puts her at greater risk of death or serious physical harm. In Delaney's short lifetime, she has been exposed to a discernible increase in the number of stronger Category 4 and 5 hurricanes forming during hurricane season and threatening Southeast Florida than occurred when she was a child. Flooding from rising seas blocks Delaney from accessing and enjoying important recreational and culturally-important natural areas in Miami-Dade County and in the Florida Keys. Ocean acidification and surface temperature warming driven by climate change has caused widespread bleaching and death of coral reefs in Florida's waters, where Delaney snorkels and conducts research, causing Delaney severe psychological harm and distress. The decimation of Florida's coral reefs subjects Delaney to heightened physical security and safety risks from storm surge, coastal flooding, and coastal erosion because healthy, thriving barrier reefs dissipate wave energy and mitigate against storm surge, coastal flooding, and coastal erosion, whereas bleached and/or dead coral reefs do not. Being exposed to more fossil fuel pollution will further impair Delaney's movement, quality and enjoyment of life, decision-making autonomy, and ability to enjoy and defend her life. "Unleashing" fossil fuels and blocking clean renewable energy will prevent the survival and regeneration of healthy coral reefs and endanger Delaney's life.

24

29.    Delaney started her own non-profit at age 15, and is getting her Ph.D. on climate resilience strategies in vulnerable coastal regions, such as South Florida, analyzing the interplay between law, ecology, infrastructure and public engagement. In pursuing her degree, Delaney utilizes federal government documents and climate change research and data, including the National Climate Assessment. Delaney conducts field-based ecological research about marine biodiversity, and uses standardized biodiversity indices and ecological metrics informed by the National Oceanic and Atmospheric Administration ("NOAA") and EPA coastal ecosystem data. Any restriction or denial of access to climate change-related data will inhibit Delaney's progress towards her Ph.D. Delaney has dedicated her childhood, educational, and professional career to addressing climate change and has made numerous personal lifestyle changes to protect the environment, including only eating fish that are sustainably sourced or from fisheries with healthy population sizes. Upon information and belief, Defendants' staffing cuts to NOAA will irreparably harm the maintenance of heathy, sustainable fisheries around Florida—thereby limiting the types of fish available for Delaney to consume.  Every additional ton of GHG pollution and increment of heat Defendants cause will cause Delaney more harm. Every ton of GHG pollution avoided will prevent her further injuries.

30.    **Avery McRae** is a 19-year-old United States citizen from Eugene, Oregon who is attending college in Florida. Avery grew up spending considerable

time outside, caring for and riding horses at a local stable, caring for her pets and egg-laying chickens and those of others in her community, swimming in rivers and lakes, hiking in the Pacific Northwest forests, and recreating at the ocean and studying marine life. Avery has experienced physical harm evacuating and caring for farm animals during climate change-induced wildfire and ice storm events in Oregon. These extreme climate events cause emotional distress and anxiety for Avery because of the responsibility she takes to care for the animals that cannot escape from harm, and because of the personal harm to her own body. Wildfires have destroyed important places where Avery grew up, learned to swim, learned to ride a bike, and made some of her core childhood memories with her family. She now dreads the summer when wildfire smoke requires wearing masks and prevents her from safely participating in outdoor activities, including engaging in outdoor farm work. Avery has allergies, which are getting worse as climate change worsens. In college, Avery is studying environmental studies. Her college education has been disrupted by multiple hurricane evacuations and flooding events. First, Avery was forced to evacuate during Hurricane Idalia in 2023, forcing her to flee inland for five days. In 2024, she had to evacuate from Hurricanes Helene and Milton, again disrupting her education and forcing her to incur significant expenses. Her school sustained significant damage, so Avery had to return home to Oregon for online classes for five weeks. Because of her major, Avery is being harmed by the lack of

access to climate science and data resulting from Defendants' directives, which she needs to have access to in order to complete her studies. Avery first began utilizing Defendants' science resources when she was in middle school, when she did a science experiment on ocean acidification and its impact on shellfish in Oregon. Since then, she has relied on government climate science, data, and ongoing research to inform herself and advocate for protection for the climate system and clean renewable energy. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Avery even more harm. Every ton of GHG pollution avoided will prevent her further injuries. President Trump, Acting Administrator Clark, Defendants OMB, EPA, DOT, DOE, DOI, NOAA, and the United States have known of Avery's fossil fuel pollution climate injuries for nearly a decade. Defendants have taken Avery's deposition to discover her injuries.

31.    **Miko Vergun** is a 24-year-old United States citizen from Beaverton, Oregon. Miko was born in the Marshall Islands, a low-lying nation whose land, people, and culture are part of Miko's heritage and are at risk of inundation from sea level rise. Being able to access information about how the Marshall Islands is being affected by climate change is important for her to communicate about what is happening to the place of her birth. If that information is taken away, it makes it hard to connect with her culture and disconnects her from her own people. Extreme heat, worsening wildfire season, and wildfire smoke in Oregon have harmed Miko's

27

health and safety. When Miko was in college and living on her own for the first time, an approaching wildfire forced her to prepare for evacuation. Miko experiences anxiety that Defendants keep making the climate emergency worse instead of fixing it. Miko has been advocating for climate protection since she was 12 years old, and she is anxious, frustrated, and depressed that she is still experiencing the same kinds of climate change impacts, only worse, than she faced as a younger child. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Miko more harm. Every ton of GHG pollution avoided will prevent her further injuries. President Trump, Acting Administrator Clark, Defendants OMB, EPA, DOT, DOE, DOI, NOAA, and the United States have known of Miko's fossil fuel pollution climate injuries for nearly a decade. Defendants have taken Miko's deposition to discover her injuries.

32. **Isaac Vergun** is a 23-year-old United States citizen from Beaverton, Oregon. Wildfire smoke and extreme heat have harmed Isaac's health by worsening his asthma and requiring him to stay indoors to protect his health. Increases in extreme climate heat and smoke events make it harder for Isaac to breathe and do anything outside. Spending time outside in nature and exercising are vital to Isaac's life, health, and longevity. Wildfire smoke, flooding, and extreme snowstorms impacted Isaac's college education by affecting his ability to attend classes or resulted in classes being moved online or canceled. Isaac's work through a

fellowship to record personal climate injury stories to educate the public about climate change is being limited by Defendants' actions to impede climate science research and access to climate science data. When he cannot access climate science data and information, it inhibits Isaac's ability to educate and communicate with the public on climate change. Isaac began advocating for climate protection in the 5th grade and he is anxious, frustrated, and stressed that he is still experiencing the same kinds of climate change harms, only more severe, that he faced as a younger child. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Isaac more harm. Every ton of GHG pollution avoided will prevent his further injuries. President Trump, Acting Administrator Clark, Defendants OMB, EPA, DOT, DOE, DOI, NOAA, and the United States have known of Isaac's fossil fuel pollution climate injuries for nearly a decade. Defendants have taken Isaac's deposition to discover his injuries.

33. **Joseph Lee** is a 19-year-old United States citizen from Fullerton, California. Joseph spent the first years of his life in a California neighborhood plagued by air pollution from nearby fossil fuel wells. Joseph was diagnosed with asthma at age three, causing his family to move to a less-polluted city. Nevertheless, Joseph cannot escape the wildfire smoke that continues to infiltrate his home and school, causing spasms in his lungs. Climate-change-induced extreme heat caused Joseph to be rushed to the emergency room and intubated for three days. Joseph has

a deep love of nature and is an avid outdoorsman, though on hot days his heat sensitivity restricts his physical activity, negatively impacting his mental health. When Joseph cannot be physically active, his mental health suffers. Climate change-induced heatwaves disrupt his sleep, making summers nightmarish for him. Every additional ton of GHG pollution and increment of heat Defendants cause will cause Joseph more harm. Every ton of GHG pollution avoided will prevent his further injuries. Joseph relied on government climate science and data, including the Keeling Curve, to compete in the Climate Science Olympiad. Now as an Environmental Policy major, Joseph plans to continue to rely on this science and data in his future career to communicate the state of climate change. Since January 20, 2025, however, Joseph has seen the short-term and long-term career opportunities in his field evaporate due to the federal government's attacks on climate science. Because of Defendants' cuts to and suppression of climate research, Joseph is switching his major to Economics to maintain his future career prospects.

## **DEFENDANTS**

34.    Defendant **Donald J. Trump** is the President of the United States and is sued in his official capacity. As head of the Executive Branch, he is responsible for the actions, including, but not limited to, the EOs and directives being challenged by Plaintiffs.

35.    Defendant **Executive Office of the President of the United States** ("Office of the President") is an office of agencies and officials within the White House immediately advising and assisting the President with matters of policy, politics, administration, and management.

36.    Defendant **Office of Management and Budget** ("OMB") is an office within the Office of the President. OMB is the implementation and enforcement arm of Presidential policy, including budget development and execution, coordination, and management of programs derived from significant federal regulations and executive orders.

37.    Defendant **Russell Vought** is the Director of OMB and, in his official capacity, is responsible for all actions of OMB, including, but not limited to, issuing the President's EOs and enforcing the EOs across agency and departmental Defendants. He is sued in his official capacity.

38.    Defendant **Jeffrey Bossert Clark** is the Acting Administrator of the Office of Information and Regulatory Affairs at OMB and, in his official capacity issues guidance and directives to Defendant agencies to comply with the EOs. He is sued in his official capacity.

39.    Defendant **United States Environmental Protection Agency** ("EPA") is an independent agency within the executive branch of the United States government. EPA's congressionally-authorized mission is to abate and prevent

pollution to protect human health and the environment. EPA must execute this mission by (1) "establish[ing] and enforc[ing] of environmental protection standards," (2) "conduct[ing] of research on the adverse effects of pollution and on methods and equipment for controlling it, the gathering of information on pollution, and the use of this information in strengthening environmental protection programs and recommending policy changes," (3) "[a]ssisting others, through grants, technical assistance and other means in arresting pollution of the environment," and (4) "developing and recommending to the President new policies for the protection of the environment."[2]

40.    Defendant **Lee Zeldin** is the Administrator of the EPA and its highest-ranking official. He is charged with the supervision and management of all decisions and actions of EPA, including, but not limited to, implementing the EOs. He is sued in his official capacity.

41.    Defendant **United States Department of the Interior** ("DOI") is a department within the executive branch of the United States government. DOI's mission is to manage the Nation's natural resources in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; provide scientific and other information about those resources; and honor its trust responsibilities or special

---

[2] 5 U.S.C. § App., Reorg. Plan No. 3 of 1970 (Message of the President).

commitments to American Indians, Alaska Natives, Native Hawaiians, and affiliated Island Communities.

42.    Defendant **Doug Burgum** is the Secretary of the Interior and, in his official capacity, is charged with the supervision and management of all decisions and actions of DOI, including, but not limited to, implementing the EOs. He is sued in his official capacity.

43.    Defendant **United States Department of Energy** ("DOE") is a department within the executive branch of the United States government. Congress established DOE to establish a coordinated energy policy which includes provisions for energy conservation, research and development, and major emphasis on development and commercial use of renewable energy sources.

44.    Defendant **Chris Wright** is the Secretary of Energy, and in his official capacity is charged with the supervision and management of all decisions and actions of DOE, including, but not limited to, implementing the EOs. He is sued in his official capacity.

45.    Defendant **United States Department of Transportation** ("DOT") is a department within the executive branch of the United States government. DOT oversees the nation's aviation, road, highway, railway, truck, and marine transportation infrastructure. By statute, DOT must maintain an Office of Climate Change and Environment to "plan, coordinate, and implement -- department-wide

research, strategies, and actions under [DOT's] statutory authority to reduce transportation-related energy use and mitigate the effects of climate change; and department-wide research strategies and actions to address the impacts of climate change on transportation systems and infrastructure." 49 U.S.C. § 102(g).

46. Defendant **Sean Duffy** is the Secretary of Transportation, and in his official capacity is charged with the supervision and management of all decisions and actions of DOT, including, but not limited to, implementing the EOs. He is sued in his official capacity.

47. Defendant **United States Army Corps of Engineers** ("USACE") is housed in the Department of Defense in the executive branch of the United States government. USACE has a mission to deliver vital engineering solutions, to secure the Nation, energize the economy, and reduce disaster risk. USACE is congressionally required to issue permits jointly with the EPA under the Clean Water Act's Section 404.

48. Defendant **Lieutenant General William H. Graham, Jr**. is Chief of Engineers and Commanding General of USACE and, in his official capacity, is responsible for all actions of USACE, including, but not limited to, implementing the EOs. He is sued in his official capacity.

49. Defendant **National Aeronautics and Space Administration** ("NASA") is an independent agency within the executive branch of the United States

government. NASA's mission includes "expansion of human knowledge of the Earth and of phenomena in the atmosphere and space." 51 U.S.C. § 20102.

50.     Defendant **Janet Petro** is acting as NASA Administrator and, in her official capacity, is responsible for all actions of NASA, including, but not limited to, implementing the EOs. She is sued in her official capacity.

51.     Defendant **United States Department of Commerce** ("DOC") is a department within the executive branch of the United States government that brings the application of science to industry, and since World War II, has provided meteorological projections and other atmospheric, oceanic, and scientific data to the public and industry.

52.     Defendant **Howard Lutnick** is the Secretary of Commerce, and in his official capacity is charged with the supervision and management of all decisions and actions of DOC, including, but not limited to, implementing the EOs. Secretary Lutnick is responsible for "forecasting of weather, the issue of storm warnings, the display of weather and flood signals for the benefit of agriculture, commerce, and navigation, the gauging and reporting of rivers, . . . the display of frost and cold-wave signals, the distribution of meteorological information in the interests of agriculture and commerce, and the taking of such meteorological observations as may be necessary to establish and record the climatic conditions of the United

35

States," as have his predecessors since 1890. 15 U.S.C. § 313. He is sued in his official capacity.

53.    Defendant **National Oceanic and Atmospheric Administration** ("NOAA") is an agency housed within the U.S. Department of Commerce. NOAA is charged with researching, studying, analyzing, and predicting changes in climate, weather, inland flooding, oceans, and coasts, and sharing that knowledge and information with others, and to conserve and manage coastal and marine ecosystems and resources.

54.    Defendant **Laura Grimm** is acting as NOAA Administrator and, in her official capacity is responsible for all actions of NOAA, including, but not limited to, implementing the EOs. She is sued in her official capacity.

55.    Defendant **National Science Foundation** ("NSF") is an independent agency within the executive branch of the United States government. NSF was established by Congress to promote the progress of science; provide a central clearinghouse for the collection, interpretation, and analysis of data on scientific resources; provide a source of information for policy formulation by other agencies of the Federal Government; and advance the national security, health, prosperity, and welfare.

56.    Defendant **Brian Stone** is the Acting Director of NSF. In his official capacity he is responsible for all actions of NSF, including, but not limited to, implementing the EOs. He is sued in his official capacity.

57.    Defendant **United States Department of Health and Human Services** ("HHS") is an agency in the executive branch of the United States government. HHS's mission is to enhance the health and well-being of all Americans by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services.

58.    Defendant **Robert F. Kennedy, Jr.** is the Secretary of Health and Human Services. In his official capacity he is responsible for all actions of HHS, including, but not limited to, implementing the EOs. He is sued in his official capacity.

59.    Defendant **National Institutes of Health** ("NIH") is housed in the Department of Health and Human Services in the executive branch of the United States government. NIH's mission is to research and disseminate fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability.

60.    Defendant **Jayanta Bhattacharya** is the Director of NIH. In his official capacity he is responsible for all actions of NIH, including, but not limited to, implementing the EOs. He is sued in his official capacity.

61.    The **United States of America** is responsible for the exercise of executive action by the named Defendants and all other agencies that are directed by the EOs to act in violation of the Constitution and laws of the United States.

## STATEMENT OF FACTS

### President Trump's Unconstitutional EOs

62.    On January 20, 2025, President Trump signed **Executive Order 14154,** ***Unleashing American Energy***. Section 1 of Executive Order 14154 falsely states that: "In recent years, burdensome and ideologically motivated regulations have impeded the development of these [fossil fuel] resources, limited the generation of reliable and affordable electricity, reduced job creation, and inflicted high energy costs upon our citizens."

63.    Section 2 of Executive Order 14154 declares the policy of the United States "to encourage [fossil fuel] energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf" and "to eliminate the 'electric vehicle (EV) mandate.'" Section 2 also declares it the policy of the United States "that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law."

64.    Section 3 of Executive Order 14154 directs heads of "all agencies" to "begin implementing action plans to suspend, revise, or rescind all agency actions"

that place an "undue burden" on "identification, development, or use of domestic energy resources—with particular attention to oil, natural gas, [and] coal[.]"

65.    Section 5 of Executive Order 14154 directs Defendants and "any other relevant agencies" to "undertake all available efforts to eliminate all delays within their respective permitting processes" for fossil fuel energy projects.

66.    Section 7 of Executive Order 14154 instructs all agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program," as well as several programs designed to expand the use of wind, solar, and storage of renewable energy.

67.    Programs designed to improve energy efficiency and increase sources and access to renewable forms of energy that are subject to the funding freeze include the Empowering Rural America ("New ERA") program, the Rural Energy for America Program, the Solar for All program, Climate Pollution Reduction Grants, the Greenhouse Gas Reduction Fund ("GGRF"), and Clean Communities Investment Accelerator programs.

68.    Executive Order 14154's policy directives to "unleash American energy" intentionally exclude offshore wind, onshore wind, all forms of solar energy, energy efficiency measures, and battery storage.

69.    On January 20, 2025, President Trump signed **Executive Order 14156, *Declaring a National Energy Emergency***. Executive Order 14156, Section 1, declares the national energy emergency and falsely states: "The energy and critical minerals ('energy') identification, leasing, development, production, transportation, refining, and generation capacity of the United States are all far too inadequate to meet our Nation's needs."

70.    Executive Order 14156 defines "energy" or "energy resources" to include fossil fuels like crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, and coal. Executive Order 14156 intentionally excludes offshore wind, onshore wind, all forms of solar energy, battery storage, energy efficiency measures, and EVs from the definitions of energy at Section 8 and does not include them as means to increase energy capacity in the United States.

71.    Section 2 of Executive Order 14156 directs agencies to invoke emergency powers "to facilitate the identification, leasing, siting, production, transportation, refining, and generation of [fossil fuels], including, but not limited to, on Federal lands."

72.    Section 3 of Executive Order 14156 directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of [fossil] energy in and through the West Coast of the United States, Northeast of the United States, and Alaska" and to expedite the completion of fossil fuel energy projects.

73.    Executive Order 14156 commands the executive branch to expedite on an emergency basis the approval of fossil fuel energy projects.

74.    On April 8, 2025, President Trump signed **Executive Order 14261,** ***Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241***, which builds on President Trump's "promise to once again unleash American energy."[3]

75.    Section 2 of Executive Order 14261 directs agencies to prioritize coal and "support the domestic coal industry by removing Federal regulatory barriers that undermine coal production, encouraging the utilization of coal to meet growing domestic energy demands, increasing American coal exports, and ensuring that Federal policy does not discriminate against coal production or coal-fired electricity generation."

---

[3] The White House, *Fact Sheet: President Donald J. Trump Reinvigorates America's Beautiful Clean Coal Industry* (Apr. 8, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-reinvigorates-americas-beautiful-clean-coal-industry.

76.     Section 3 of Executive Order 14261 "designate[s] coal as a 'mineral' as defined in section 2 of Executive Order 14241 of March 20, 2025," entitling coal to the emergency measures required by Executive Order 14241.

77.     Section 5 of Executive Order 14261 directs the Secretary of the Interior and the Secretary of Agriculture to "prioritize coal leasing and related activities" on federal lands and "expedite coal leasing in these areas" through emergency powers.

78.     Section 6 of Executive Order 14261 directs agencies to review and rescind "any guidance, regulations, programs, and policies within their respective executive department or agency that seek to transition the Nation away from coal production and electricity generation."

79.     Section 7 of Executive Order 14261 directs the Secretary of Commerce to "take all necessary and appropriate actions to promote and identify export opportunities for coal and coal technologies and facilitate international offtake agreements for United States coal."

80.     Executive Order 14261's directives prioritize coal over and intentionally exclude offshore wind, onshore wind, all forms of solar energy, battery storage, and energy efficiency measures to increase energy capacity in the United States.

81.     President Trump's directives to "unleash" fossil fuels through emergency tools "to make America energy dominant" will be carried out "[b]y

utilizing our amazing national assets, including our crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, . . . coal, . . . ." (Executive Order 14213), unless enjoined.

### President Trump's EOs Infringe Youth Plaintiffs' Fundamental Rights to Life, Liberty, and Personal Security

82.    It took millions of years for Earth to fossilize the carbon President Trump's directives are "unleashing" for energy production. Once extracted or burned, large quantities of that fossilized carbon pollution, in the form of carbon dioxide ("$CO_2$") molecules, remains in the air, trapping heat for the rest of Plaintiffs' lives on Earth. Some smaller portion will stay in the atmosphere for many millennia. Some gets taken up by carbon sinks, predominantly the ocean, contributing to acidifying waters.

83.    Plaintiffs were born into and now live in a destabilized climate system. Fossil fuel pollution has created this emergency—a dangerous situation for Plaintiffs requiring immediate action. Disregarding unrefuted government evidence of the devastating harm of burning more fossil fuels on young people's lives, and the availability of alternative clean energy sources, President Trump has directed the "unleashing" of more fossil fuel production and pollution, including here in Montana, and directed the suppression of wind, solar, storage, energy efficiency, and EVs, which are an antidote to dangerous fossil fuel pollution. The EOs irreparably augment climate instability and the climate emergency Plaintiffs live in.

43

84.    There is overwhelming scientific consensus that Earth is warming as a direct result of GHG pollution, primarily from the burning of fossil fuels.

85.    Science is unequivocal that dangerous impacts to the climate are occurring due to human activities, primarily from the extraction and burning of fossil fuels. The production and combustion of oil, gas, and coal are responsible for nearly 90% of human-caused $CO_2$ emissions and approximately 79% of total GHG pollution.

86.    A substantial portion of every ton of $CO_2$ emitted by human activities persists in the atmosphere for centuries to a millennium; as a result, $CO_2$ steadily accumulates in the atmosphere. The atmospheric $CO_2$ concentration has risen from 350 ppm in 1988 to over 424 ppm in 2024. For most of human life on the planet, $CO_2$ levels hovered no higher than 285 ppm. Atmospheric $CO_2$ concentrations above 350 ppm mark the threshold of climate instability.

87.    Fossil fuel pollution has caused Earth to have an energy imbalance. Earth's energy imbalance is the amount of energy from the Sun arriving at Earth minus the amount radiated back to space. As long as there is an energy imbalance, Earth will continue to heat, ice sheets and glaciers will continue to lose mass, sea-ice area will decrease, and weather patterns will become even more extreme. If more GHGs are added to the atmosphere, then more incoming energy received from the Sun is trapped on Earth, causing Earth's climate system to continue to heat up.

88.     Every ton of $CO_2$ emitted contributes to global warming and climate change and increases the exposure of Plaintiffs to more harms now and additional harms in the future.

89.     Defendants know the particularized injuries of many of these Plaintiffs and the dangers the EOs will cause them.

90.     Implementation of the unlawful EOs will increase fossil fuel pollution, threatening Plaintiffs' lives, health, and safety. Increasing fossil fuel production and pollution is already beginning and is imminent. As a result of the EOs, the U.S. Energy Information Administration ("EIA") forecasts that carbon dioxide ($CO_2$) emissions will increase in 2025, largely from a forecasted 6 percent increase in coal-fired electricity generation. U.S. crude oil output is expected to increase in 2025 to a record peak of 15 million barrels per day from 13.5 at present. The International Energy Agency ("IEA") has repeatedly stated that to achieve climate stability, countries must not approve any new fossil fuel projects. The EOs shifting the status quo to "unleash" even more fossil fuel production is deadly.

91.     One analysis found that under Defendants' directives, GHG emissions would increase by nearly 260 million metric tons of carbon dioxide equivalent ("MMT $CO_2$e") in 2030, and more than 530 MMT $CO_2$e in 2035, which is the equivalent of adding GHG pollution from 116 million more gas-powered cars on the road.

92.    Defendants' efforts to prevent clean energy projects in Montana in favor of fossil fuels would increase Montana's fossil fuel pollution by approximately 1 MMT of $CO_2$ in 2030 and 2035. It would also increase average annual household energy costs in Montana by approximately $80 per year in 2030 and $150 per year in 2035.

93.    Rising atmospheric $CO_2$, the primary pollutant from extracting and burning fossil fuels, has caused and if fossil fuels are "unleashed" will continue to cause temperatures to rise in Montana, California, Oregon, Hawai'i, and Florida, exposing the Plaintiffs to a variety of life-threatening conditions.

94.    Montana is heating faster than the global average because higher latitudes are heating more quickly.

95.    The year 2024 was the warmest year on record, and the ten warmest years on record have all occurred since 2015, during Plaintiffs' childhoods. Temperature increases are accelerating faster today than they did during the 20th century.

96.    The EOs require EPA to increase fossil fuel pollution. Experts project the EOs will cause an additional 195,857 deaths over the next 25 years, and will increase heart, respiratory, and other health problems caused by pollution. This is likely an underestimate as the EPA's assessment of health impacts does not account

for health injuries due to wildfires, floods, storms, and other extreme weather events made worse due to fossil fuel pollution.

97.    Children and youth, including Plaintiffs, are uniquely vulnerable to the consequences of fossil fuel pollution and climate change, which harms their physical and psychological health and safety, interferes with family and cultural foundations and integrity, and causes economic deprivations.

98.    EPA has found that children are at a critical development stage in life, as their capacities evolve, and their physiological and psychological maturity develops more rapidly than at any other time in life.

99.    The physiological features of children, including their still developing lungs, heart, and brain, make them disproportionately vulnerable to the impacts of climate change and air pollution.

100.    The brains and lungs of children and youth are not fully developed until around age 25.

101.    Children breathe in more air per unit of time than adults and consume more food and water proportional to their body weight, making children more susceptible to polluted or contaminated air, water, or food.

102.    Typical child behavior and physiology—which involves spending more time recreating outdoors and more difficulty self-regulating body temperature—render children more susceptible to excess heat, poor air quality, and other climate

47

change impacts. Each Plaintiff will experience more heat-related injuries and an increased risk of harm as the EOs increase fossil fuel production and pollution. Plaintiff Joseph has already been hospitalized once from dangerous heat exposure and is sensitive to any increase in extreme heat that more fossil fuel pollution will cause. Heat-related deaths and hospitalizations are highest among children and older youth.

103.    Children exposed to wildfire smoke and particulate matter have higher risks of respiratory symptoms, decreased lung function, substantial eye symptoms, worsening asthma, increased sinus issues, development of chronic bronchitis, heart failure, and premature death.

104.    "Unleashing" fossil fuels exposes Plaintiffs to more air pollution, including wildfire smoke, which harms their health and shortens their lifespan. Plaintiffs with pre-existing respiratory illnesses, including Olivia, J.K., N.K., Isaac, and Joseph, are especially vulnerable to health injuries from more fossil fuel pollution.

105.    Plaintiffs will experience more physical and psychological harm from increasing wildfires or wildfire smoke due to increased fossil fuel pollution.

106.    Pollen season in North America has grown 13-27 days longer since 1995 due to higher temperatures and greater $CO_2$ levels. Longer pollen seasons lead

to more asthma episodes, doctor visits, physical discomfort, limitations on time spent outside, and prescriptions for allergies for children and youth.

107. "Unleashing" fossil fuel pollution also unleashes longer pollen seasons, which threatens Plaintiffs Lander, Olivia, Georgi, Ripley, Avery, Ula, and J.M.'s health as their bodies have increased allergic reactions with longer exposure to pollen.

108. Fossil fuel burning from vehicles, power plants, and industrial sources, emits a complex mixture of air pollutants including nitrogen dioxide ("$NO_2$"), fine particulate matter ("PM2.5"), black carbon, and ozone precursors. These pollutants disproportionately affect children. Fossil fuel-driven air pollution is a major contributor to adverse pediatric health outcomes, and reducing such emissions is critical to protecting children's health and development. Increased pollution from unleashing more coal production, transport, and burning harms Montana Plaintiffs Eva, Rikki, Ula, Ripley, and J.M. Blocking electric school buses and other electric vehicles leaves children breathing in more exhaust that harms their health.

109. In Montana, 92% of reporting counties had an "F" grade for particle air pollution according to the American Lung Association State of the Air 2025 Report.

110. All children, even those without pre-existing conditions or illness, are sensitive to exposure to fossil fuel pollution because their bodies and minds are still

developing. Exposure to diesel and gasoline exhaust increases risk of reduced lung function even in healthy children without asthma.

111. Reductions in air pollution are associated with clinically significant improvements in lung function among children.

112. The physical and psychological harms are both acute and chronic and accrue from impacts to the climate, such as heat waves, droughts, wildfires, particulate matter pollution, extreme weather events, the loss of wildlife, watching glaciers melt, and the loss of familial and cultural practices and traditions.

113. As ocean temperatures warm with more GHG pollution, it will drive more intense hurricanes. South Florida and Hawai'i are experiencing, and will increasingly experience, hurricanes or tropical cyclones of increased frequency, greater intensity, and more rapid intensification.

114. Plaintiffs Kalālapa, C.M., Delaney, and Avery face increasing extreme weather events, including hurricanes and tropical cyclones due to increased fossil fuel pollution.

115. Warmer temperatures lead to higher moisture content in the air and swifter snowmelt, increasing the likelihood of more extreme flooding that will injure Plaintiffs Eva, Rikki, Ripley, J.M., Kalālapa, C.M., and Isaac.

116. As fossil fuel pollution increases, Plaintiffs Rikki, Georgi, Ripley, J.M., J.H., and I.H. will continue to see decreases in snowpack and snowfall, which is

foundational for their lives, from the water source it provides to their physical activities and enjoyment of life.

117.    More fossil fuel pollution will exacerbate changing precipitation patterns and increasing drought conditions endangering Rikki's ability to sustain her family's ranch operations or Kalālapa to harvest and access traditional subsistence crops.

118.    Plaintiffs Kalālapa's, Miko's, and Delaney's homes and cultural lands are threatened by sea level rise. Marine heat waves and ocean acidification, both caused by fossil fuel pollution, degrade and destroy the coral reefs where Delaney, C.M., and Kalālapa recreate and study. Additional fossil fuel pollution and heat will push remaining coral colonies over the brink of extinction.

119.    Fisheries and other wildlife that Plaintiffs rely upon for subsistence, hunting and fishing, including traditional cultural practices are declining as temperatures rise.

120.    EPA has identified "climate anxiety" among children as a chronic stressor that will have adverse effects on children's lives. EPA has acknowledged that children who understand the likelihood of experiencing climate change effects throughout their lives are more predisposed to experiencing climate anxiety and feel hopelessness and trauma.

121.    EPA reports that climate change effects, including heat, displacement, financial or food insecurity, loss of recreation, loss of sleep, and risk of PTSD, harm children's health. A small increase in PM2.5 pollution from wildfires is associated with higher emergency department visits for mental conditions, depression, other mood-affective disorders, and anxiety.

122.    The psychological harms caused by the impacts of climate change, and government actions that knowingly cause them harm, are compounding and can result in a lifetime of hardships for children and youth.

123.    Plaintiffs Eva, Olivia, Ripley, B.B., J.H., I.H., Miko, and Joseph's mental health is threatened by increased fossil fuel pollution.

124.    Because of their unique vulnerabilities, their stages of development as youth, and their average longevity on the planet in the future, Plaintiffs face lifelong hardships resulting from climate pollution.

125.    The Nation's economic costs of damage from increased extreme climate events, increased health care costs, property losses, lost work and school productivity, and ecosystem harms resulting from "unleashed" fossil fuel pollution are enormous. Some economists put the price tag at $185 per ton of GHG pollution.

126.    Energy directives today and for years to come will have profound impacts on global climate, ecosystems, human societies, and Plaintiffs' health and

safety. Short-term directives that increase fossil fuel use and climate pollution limit options young people have to combat increasing climate instability and its effects.

### DEFENDANTS' METHODICAL IMPLEMENTATION OF THE EOs

127.   Pursuant to the EOs, Defendants are methodically acting to "unleash" fossil fuel energy and the GHG pollution that accompanies it by dismantling government policies and restrictions that prevent GHG pollution. Defendants are obstructing clean renewable energy projects that would replace fossil fuel energy. And Defendants are dismantling the climate science and climate change warning infrastructure of the Nation. Examples of these EO implementation efforts are summarized below. More occur each day.

### President Trump, the Office of the President, and OMB Issue Directives to Implement the Unconstitutional EOs

128.   On January 20, 2025, President Trump issued the *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects* ("Wind Memorandum"), which withdrew all areas of the Offshore Continental Shelf to any "wind energy leasing for the purposes of generation of electricity" and prohibited any approvals, rights of way, permits, leases, or loans for such wind projects. The "withdrawal does not apply to leasing related to any other purposes such as, but not limited to, oil, gas, minerals . . ." The Wind Memorandum placed a moratorium on the Lava Ridge Wind Project in Idaho, which would have

generated 1,000+ megawatts of electricity without GHG pollution for use in the West, prompting Governor Little of Idaho to issue his own executive order, "Gone with the Lava Ridge Wind Project Act," directing state compliance with President Trump's Wind Memorandum. The Wind Memorandum also instituted additional environmental review processes for wind projects, at the same time Defendants are actively decreasing environmental review for fossil fuel activities. In his post-inaugural speech, President Trump told his audience, "We're not going to do the wind thing."[4] After he was inaugurated, President Trump said, "We don't want windmills in this country." He also said, "You know what else people don't like? Those massive solar fields."[5]

129.    On April 8, 2025, in conjunction with Executive Order 14621, President Trump issued a Proclamation, *Regulatory Relief for Certain Stationary Sources to Promote American Energy*, to extend the longevity of coal-fired power plants by granting stationary sources burning fossil fuels throughout the country exemptions from EPA's hazardous air pollutant rules. These exemptions will enable fossil fuel

---

[4] Donald Trump, Remarks and a Document Signing Ceremony Following the Inaugural Parade at Capitol One Arena (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/DCPD-202500152/pdf/DCPD-202500152.pdf.

[5] Interview by Sean Hannity with President Donald Trump, on Fox News, at 3:07–3:30 (Jan. 23, 2025) (https://youtu.be/RN0nR8Rx0KI).

companies to extend their operations beyond July 2027, emitting millions of metric tons of $CO_2$ and other hazardous air pollutants annually.

130.   On April 9, 2025, President Trump directed Defendant agencies to immediately repeal regulations they determined to be "unlawful" and inconsistent with his EOs, including regulations that regulate fossil fuels and fossil fuel pollution.

131.   In Memorandum M-25-13, OMB directed all agencies to "align Federal spending and action with . . . the President's policies and requirements," including the "Unleashing American Energy" EO, by "paus[ing] all . . . agency activities that may be implicated by the executive orders, including, but not limited to, . . . the green new deal," meaning the parts of the Inflation Reduction Act that supported wind, solar, battery storage, energy efficiency, and EVs. M-25-13 was later rescinded based on an administrative stay of a federal judge.

132.   OMB also ordered agencies to implement Executive Order 14154 ("Unleashing American Energy") by freezing congressionally appropriated funds that purportedly contravene the policies established in the EOs. The freeze on funds includes funds supporting programs, projects, or activities related to "Terminating the Green New Deal," meaning the Inflation Reduction Act.

133.   On May 5, 2025, Acting Administrator of OMB's Office of Information and Regulatory Affairs, Jeffrey Bossert Clark, directed all Defendant agencies to cease considering GHG emissions as part of decision-making pursuant to Executive

Order 14154, and to deliberately ignore government reports about the health, safety, security, and economic risks climate change places on young people and their future. Acting Administrator Clark also directed Defendant agencies to disregard the environmental, health, life, and social costs and externalities of fossil fuel GHG pollution, and stated that if federal courts ordered agencies to consider GHG pollution pursuant to statute, "then the agencies affected by such a decision should consult with the Department of Justice to consider the agency's options under the nonacquiescence doctrine."

134.   On or before May 2, 2025, Defendant Office of the President directed the General Services Administration ("GSA") to terminate leases for 25 of DOI U.S. Geological Survey's scientific centers that monitor U.S. waters for flooding and drought, and GSA complied. DOI's data is used by state and local officials, FEMA, and other emergency responders to identify and respond quickly to flooding and drought, and was crucial to curtailing loss of life from Hurricane Helene in 2024, including Plaintiff Avery's.

### Defendants are Scrubbing, Suppressing, and Dismantling Climate Science to Implement the Unconstitutional EOs

135.   President Trump has expressed animus toward climate scientists and science, activists, and advocates—and outright denied climate science—on numerous occasions while a candidate for the presidency and as President. For

example, President Trump stated that "one of the most urgent tasks, not only for our movement, but for our country" is "to decisively defeat the climate hysteria hoax."[6]

136.  To implement the EOs, Defendants are engaging in a wholesale scrubbing, suppression, and dismantling of government agencies' climate science, thereby blinding the government—including Congress and regulators—about the dangers of fossil fuel pollution and the need to protect Plaintiffs from fossil fuel pollution, worsening climate change, and the enormous injuries and risk of danger they enhance.

137.  In implementing the EOs, Defendants are denying Plaintiffs and other members of the public access to critical climate change science and data by actively removing it from their websites.

138.  Named Defendant officials implemented the EOs by ordering orally or in writing that the word "climate" be eliminated across federal government websites and communications, and Defendant agencies are complying. Defendants' agents have repeatedly instructed federal employees to eliminate mentions of climate change and related speech in their work.

139.  The chart below is illustrative of the written and oral directives Defendants and their agents are issuing to federal employees related to climate:

---

[6] Donald Trump, Keynote Address at Heritage Foundation Event (Apr. 21, 2022) (transcript available at https://www.rev.com/transcripts/donald-trump-delivers-keynote-speech-in-florida-4-21-22-transcript).

RESOURCES
* *Unleashing American Energy* EO

LANGUAGE GUIDANCE

| Eliminate and/or limit communications and phraseology on |
| --- |
| "climate" as an identifier, especially linked with words like "change" or "crisis" or "action" |
| "climate foundations," "climate programming," or "climate core competency" |
| "environmental justice," "climate justice," or programming/training linked to these topics |
| "clean energy" (e.g., clean cars and trucks) or "renewable energy" |
| "greenhouse gases," "greenhouse gas emissions," "carbon emissions," "emissions reductions," or "social cost(s) of carbon/methane/nitrous oxide" |
| "Federal sustainability" or programming linked to this topic |
| "climate strategy" or "climate initiative" references |
| "Strategy to Secure a Resilient Global Future" references or "sustainable climate pathway" |
| "the President's Emergency Plan for Adaptation and Resilience (PREPARE)," "PREPARE Initiative," or "PREPARE Action Plan" references |

140.    To implement the EOs, Defendants are halting progress on all national climate models developed by the United States, including by freezing the NSF's research grant for National Center for Atmospheric Research, on information and belief—one of the most widely-used models in the world to project climate change, which NSF has been funding since 1960. Plaintiffs will be endangered without high quality models whose outputs serve as warning systems to evaluate risk, inform personal life choices, advocate for policies, and prepare for and adapt to unavoidable climate change.

141.    Defendants have removed thousands of climate change-related datasets from federal websites, and information on climate and the environment has been deleted.

142.    Climate information, data, and scientific studies that have been deleted have been available to the public, including the scientific community and students,

for decades, often pursuant to federal law. *See, e.g.*, 33 U.S.C. § 893a(a); 51 U.S.C. §§ 60505, 60506.

143.   Defendant agencies are implementing the EOs and Defendant OMB's and Vought's directives pursuant thereto by summarily freezing grants related to climate change. So far, over $50 million in climate science research grants have been frozen or canceled.

144.   President Trump and Defendant Office of the President are dismantling climate science at universities and private research institutions by eliminating the material basis—the institutes, buildings, equipment, research programs, staffing, and funding—necessary for climate scientists and students, including Plaintiffs Delaney, Georgi, Avery, Joseph, Rikki, and Ula to conduct climate research.

145.   Director Vought is utilizing the EOs to attack what he calls the "secular, woke religion" of climate change by withdrawing federal funds from work on climate change. On May 2, 2025, pursuant to the EOs, Director Vought sent Congress President Trump's "line-by-line" budget recommendations to eliminate "climate ideologies" from the federal budget, including by cutting all funds for NSF general research and education relating to "climate" and "clean energy."[7]

---

[7] Letter from Russell Vought to Susan Collins (May 2, 2025) (enclosing OMB Major Discretionary Funding Changes, Fiscal Year 2026).

146.   Defendants' implementation of the EOs has already caused at least 50 climate-related projects at Montana State University ("MSU") in Bozeman to be frozen or canceled. At the University of Montana in Missoula ("UM"), many other climate-related research projects were also canceled. Both MSU and UM have important climate science research and study programs, including the Montana Climate Office, the Global Climate and Ecology Lab, the Research Education on Air and Climate Change Health, the National Center for Landscape Fire Analysis ("FireCenter"), and the Climate Change Studies program at UM, and the Climate Solutions Group, Montana Climate Assessment, Landscape Climate Change Vulnerability Project, and Climate Smart Montana at MSU.

147.   In response to the EOs and Defendants attack on climate science, professors and students across the country, including Plaintiffs and scientists they work with to advocate for their constitutional rights, are removing "climate change" and "greenhouse gas" from scientific research papers, grant proposals, and other public documents.

148.   Whistleblower scientists who are alerting the public and Plaintiffs to Defendants' scrubbing, suppression, and dismantling of climate science will not disclose their identities due to fear of retaliation by Defendants.

149.   Defendants' purpose in taking the above-mentioned actions is to dismantle climate science as a field of scientific study and inquiry in the United

States, in order to support the "unleashing" of fossil fuels and end policies and permits that restrict GHG pollution, even though doing so is known by Defendants to cause dangerous conditions that disproportionately harm children's and youths' lives.

150.   Once funding for labs and scientific research is frozen or revoked, it can take years to find other sources of funding and to resume scientific research. Such delays will cause irrevocable harm to critical climate scientific research unless reversed quickly.

151.   Two thousand scientists in the National Academies of Sciences, Engineering and Medicine, representing the best scientific minds in America, initiated an "SOS" warning of the "real danger" of the Trump administration's "censorship" and destruction of scientific free inquiry by threatening funding and "blocking research on topics it finds objectionable, such as climate change[.]"[8]

### Defendant EPA is Implementing the Unconstitutional EOs

152.   Defendants EPA and Zeldin are at the epicenter of implementing the EOs. Administrator Zeldin has closed EPA offices that had the responsibility of regulating GHG pollution. Administrator Zeldin is using what remains of EPA's workforce to repeal dozens of regulations and policies in order to "unleash" fossil

---

[8] Letter from Members of the National Academies to the American People (Mar. 31, 2025), https://docs.google.com/document/d/13gmMJOMsoNKC4U-A8rhJrzu_xhgS51PEfNMPG9Q_cmE/.

fuels without restrictions on GHG pollution and other hazardous air pollution that harm children and youth most.

153.   On February 4, 2025, in doing "its part" in implementing the EOs, Administrator Zeldin announced the "Powering the Great American Comeback" initiative to redirect EPA's focus away from controlling fossil fuel pollution and toward supporting the fossil fuel industry's growth and revitalizing the gas-powered vehicle industry. This initiative exceeds and conflicts with EPA's statutory purpose to protect the environment and human health and welfare by preventing pollution. The initiative is being implemented to increase the fossil fuel industry's business and will recklessly and unnecessarily increase climate pollution.

154.   In response to Executive Order 14154, on March 12, 2025, Administrator Zeldin directed EPA to reconsider its 2009 Endangerment Finding that the current and projected concentrations of GHG emissions threaten the public health and welfare of current and future generations, which would thwart EPA's ability to regulate GHG pollution. Defendants' stated intent is to "drive[] a dagger straight into the heart of the climate change religion."[9] EPA is fast-tracking its effort to eliminate the Endangerment Finding for GHGs, even though Congress amended

---

[9] Press Release, EPA, Trump EPA Kicks Off Formal Reconsideration of Endangerment Finding with Agency Partners (Mar. 12, 2025), https://www.epa.gov/newsreleases/trump-epa-kicks-formal-reconsideration-endangerment-finding-agency-partners.

the Clean Air Act to define GHGs as "pollutants" under the statute, and despite Defendants, including the Office of the President and EPA, knowing for over fifty years that GHG pollution endangers human health and welfare and the Nation.

155.   On March 13, 2025, Administrator Zeldin stated "to fulfill President Trump's promise to unleash American energy, revitalize our auto industry," and "lower the cost of living by making it more affordable to purchase a car, heat your home, and operate a business," "[w]e at EPA will do our part to power the Great American Comeback."[10]

156.   On March 10, 2025, Administrator Zeldin announced his offices began implementing the EOs by revoking hundreds of federal grants related to addressing climate change, preventing grantees from developing and building crucial technologies used to limit GHG emissions into Plaintiffs' airspace, many of which were awarded under IRA section 60103. Between January 20 and March 7, 2025, EPA terminated at least 21 grants that had been awarded under IRA section 60201 to lower GHG emissions in the steel, cement, glass, and other industries.

157.   On information and belief, the wide-spread cuts to EPA funded research have resulted in termination of almost 800 projects across the United States directly

---

[10] EPA, *EPA Administrator Lee Zeldin Launches the Greatest Day of Deregulation in American History*, YouTube (Mar. 12, 2025), https://www.youtube.com/watch?v=qae9bhymH50.

targeting community level actions to reduce the impacts of climate change on health, including in some of Plaintiffs' communities.

158.   On January 28, 2025, EPA dismissed all members of EPA's Clean Air Scientific Advisory Committee, which is statutorily mandated to provide "independent" scientific review to the agency on air quality standards and sources of air pollution, and EPA's Science Advisory Board, which advises EPA on proposed actions.

159.   On or before February 3, 2025, EPA warned more than 1,100 probationary EPA employees working on climate change, air pollution, and environmental enforcement that they could be fired at any time. On May 2, 2025, Administrator Zeldin announced that to meet President Trump's goal to "unleash American energy," the EPA would dissolve its Office of Research and Development, cut up to 75% of the staff, and shift scientific research to a new office of applied science which will align research with the political appointee's policy priorities. The Office of Research is the scientific arm of EPA with 1,155 chemists, biologists, toxicologists, physicians, and other scientists who provide the scientific backbone for EPA's pollution-control policies. Eliminating the experts and dissolving EPA's independent research office will undermine scientific integrity, pollution control, and leave the federal government and states ill-equipped to deal with public health risks from air pollution and climate change.

160.    On information and belief, to fulfill "President Trump's Day One executive orders" including his "promise to unleash American energy," EPA will eliminate the congressionally-mandated Greenhouse Gas Reporting Program ("GHGRP"), which tracks the amount of GHGs emitted by individual facilities. This publicly available data guides policy decisions at the federal, state, and local levels. Losing the data will deny the Plaintiffs access to how much climate-warming gas an economic sector or factory is emitting and to track GHG pollution over time.

161.    On March 12, 2025, pursuant to the EOs, EPA's Office of Enforcement and Compliance Assurance directed that EPA's "enforcement and compliance will no longer focus on methane emissions from oil and gas facilities."[11] The Assistant Administrator for the Office of Enforcement and Compliance Assurance must now pre-approve "[a]ny proposed order or other enforcement action that would unduly burden or significantly disrupt energy production or power generation, shut down any facility engaged in energy production or power generation, or severely restrict capacity for energy production or power generation."[12]

162.    On March 14, 2025, EPA withdrew the air pollution permit it had issued for the fully permitted 2.6-gigawatt ("GW") Atlantic Shores Offshore Wind Project,

---

[11] Memorandum from Jeffrey A. Hall re Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities (Mar. 12, 2025), https://www.epa.gov/system/files/documents/2025-03/necimemo-20250312.pdf.
[12] *Id.*

which is set to be built off the coast of New Jersey. EPA remanded the permit to reevaluate the Project and its environmental impacts in light of President Trump's January 20 Wind Memorandum, which implements his EOs.

163.   On March 12, 2025, EPA announced the revision of "costly wastewater regulations for coal burning power plants issued in 2024," "to deliver[ ] on [President Trump's] vision for American energy dominance" and make it more likely that coal will be increasingly used as an energy source.[13]

164.   Defendants' implementation efforts are already perpetuating avoidable fossil fuel pollution close to Plaintiffs' homes and communities. For example, on March 24, 2025, EPA invited regulated facilities, including fossil fuel facilities that emit hazardous air pollutants and are subject to 89 Fed. Reg. 38508 or eight other hazardous air pollutant rules, to request presidential exemptions under 42 U.S.C § 7412(i)(4) by email. Presidential exemptions are only statutorily permitted if the President finds that the technology required to meet the standard is unavailable and the exemption would be in the United States' security interests. The purported "determinations" in the President's April 8 Proclamation on *Regulatory Relief for Certain Stationary Sources to Promote American Energy* are unfounded and are in

---

[13] Press Release, EPA, EPA Announces It Will Reconsider 2024 Water Pollution Limits for Coal Power Plants to Help Unleash American Energy (ELG: Steam Electric) (Mar. 12, 2025), https://www.epa.gov/newsreleases/epa-announces-it-will-reconsider-2024-water-pollution-limits-coal-power-plants-help.

service of the unconstitutional EOs, not the Clean Air Act. Neither the President nor EPA provided the public any access to the issued presidential exemptions or support for the prerequisite findings.

165.   Shortly thereafter, NorthWestern Energy and Talen Montana applied for a hazardous air pollutant exemption via email for Colstrip power plant in Colstrip, Montana, near Plaintiff Rikki's home, which was granted by EPA. Defendants' efforts to extend the operation of Colstrip implement the directives of EPA's "Power the Great American Comeback" initiative and Executive Order 14156. Plaintiff Rikki is injured by this action and will suffer an increased risk of harm as a result.

166.   The aging Colstrip power plant is near the end of its life, with two of its four units, Units 1 and 2, already shut down. NorthWestern Energy and Talen Montana have said that Colstrip Units 3 and 4 would likely be retired by 2027, given the financial implications of complying with the Mercury and Air Toxics Standards rule.

167.   The Colstrip power plant emits more harmful fine particulate matter pollution than any other power plant in the Nation. Colstrip is contributing to worsening air pollution and climate harms in Montana and the Nation. In 2023 alone, the Colstrip power plant emitted 11,325,831 metric tons of $CO_2$. On information and belief, instead of working to close the plant, Colstrip will begin investing in

extending the life of the coal plant and therefore the related coal mining in the Powder River Basin.

168.    In addition to Colstrip, at least 531 other facilities nationwide applied for email presidential exemptions from hazardous air pollutant rules. Sixty-eight coal plants have already been exempted from the hazardous air pollution rules.

169.    Reviving the Colstrip coal-burning power plant from impending 2027 closure is just one example of Defendants' ongoing cumulative acts to implement the EOs and dismantle restraints on fossil fuels while limiting access to wind, solar, and storage, causing irreparable harm to Plaintiffs' health and safety, their liberties, and threatening their very lives.

170.    EPA is currently working to eliminate all GHG pollution limits on coal and gas-fired power plants in the U.S.

171.    Defendants EPA and Zeldin are utilizing EPA resources and a self-imposed vastly reduced workforce to eliminate the regulatory programs that exist to study and limit the effects of fossil fuel pollution. EPA's time spent undoing pollution controls will result in more fossil fuel pollution and delay critical efforts to implement regulatory actions consistent with EPA's mission to abate pollution to protect Plaintiffs' lives, health, safety, and well-being.

172.    EPA's implementation of the EOs is cumulatively resulting in additional—and avoidable—fossil fuel pollution in the United States. Each

additional ton of fossil fuel pollution results in avoidable injury and an increased risk of harm to all Plaintiffs' lives, health, bodily integrity, cultural practices, personal security and ability to use state public trust resources.

### Defendant DOI is Implementing the Unconstitutional EOs

173.    On February 3, 2025, pursuant to Section 3 of Executive Order 14154, Secretary Burgum issued Secretarial Order 3418 and directed DOI to take action "to offer more parcels of the public land for oil and gas leasing," increase use of Federal lands for fossil fuel development, and "ensure" that DOI "rules, guidance and policies . . . do not bias government or private-sector decision making in favor of renewable energy projects as compared to" fossil fuel resources in energy development. Secretary Burgum has directed: "Under the national energy emergency, which President Trump has declared, we've got to keep every coal plant open." These directives are being implemented.

174.    On February 3, 2025, pursuant to Section 2 of Executive Order 14156, Secretary Burgum issued Secretarial Order 3417 and directed DOI to immediately identify all emergency authorities to facilitate extraction of fossil fuels and expedite completion of fossil fuel energy projects.

175.    Defendant DOI's Bureau of Land Management ("BLM") has already leased 34 parcels totaling 25,038 acres in its first quarter of fiscal year for oil and gas, including six parcels in Montana.

176.    On March 13, 2025, Defendant DOI announced approval of a mining plan modification for the Spring Creek Mine in Big Horn County, Montana. Absent that modification, which extends coal production in several lease tracts by 16 years, enabling the production of approximately 39.9 million tons of federal coal, no further coal mining would have been allowed in the lease tracts under review. Secretary Burgum said the expansion "aligns with the Trump-Vance administration's agenda to reduce regulatory burdens and promote energy production, as outlined in Executive Order 14154," and that, "Under President Trump's leadership, we're . . . unleashing American energy. . . ."[14]

177.    According to DOI's 2025 environmental impact statement, the Spring Creek Mine is projected to emit 3,680,328 tons of $CO_2$ annually, and thus DOI's approval will irreparably expose the Plaintiffs to substantially more fossil fuel pollution compared to the status quo. Coal from Spring Creek Mine travels on long trains through Livingston to Colstrip Coal Power Generation Station putting coal dust in Plaintiffs Eva, Ripley, and J.M's air, causing injury and an increased risk of harm. Long coal trains also go through Missoula, harming the air quality of the Plaintiffs who live there.

---

[14] Press Release, DOI, Interior Advances Energy Independence with Spring Creek Mine Expansion Approval (Mar. 13, 2025), https://www.doi.gov/pressreleases/interior-advances-energy-independence-spring-creek-mine-expansion-approval.

178.   DOI is fast-tracking coal projects that will not provide more energy resources for the United States but instead will be exported out of the country. For example, Warrior Met's Blue Creek mine expansion in Alabama, which DOI is fast-tracking, produces coal almost entirely exported overseas.

179.   DOI and BLM are also attempting to open the Powder River Basin, including in Montana, for new coal leasing and extraction, a basin which was closed to new coal leasing.

180.   On May 13, 2025, Secretary Burgum directed BLM to expedite oil and gas leases by introducing a process that cuts lease parcel reviews to 6 months rather than the 8-15 months they required previously. Wind and solar are excluded from expedited review.

181.   On April 10, 2025, DOI announced it will no longer require BLM to prepare an environmental impact statement under the National Environmental Policy Act ("NEPA") for approximately 3,244 oil and gas leases in seven Western states including Montana, fast-tracking that development and eliminating any assessment of how the resulting fossil fuel pollution will harm human health and the environment. Wind and solar are excluded from fast-tracking.

182.   On April 23, 2025, DOI announced it is invoking emergency provisions of NEPA to reduce the time to complete environmental assessments for fossil fuel

projects from 1-2 years to 14-28 days based on the type of project. Wind and solar are excluded from the emergency NEPA exemptions.

183.   On January 20, 2025, DOI imposed a 60-day pause on permitting for all "onshore or offshore renewable energy" projects, including solar energy.

184.   Since January 20, 2025, DOI has consistently excluded wind and solar from its expedited energy permitting processes.

185.   On information and belief, pursuant to the EOs, DOI and BLM will continue to disfavor or reject wind and solar power generation projects in favor of permitting fossil fuel projects unless enjoined.

186.   Pursuant to President Trump's Wind Memorandum, on April 16, 2025, Secretary Burgum issued a stop work order and acting Director of the Bureau of Ocean Energy Management, Walter Cruickshank, sent a letter to Empire Offshore Wind, LLC "to halt all ongoing activities related to the Empire Wind Project on the outer continental shelf" "as an outgrowth of the review that the Department is engaged in related to offshore wind projects" pursuant to Interior's temporary withdrawal of all areas on the outer continental shelf from offshore wind leasing.[15] 30 Fed. Reg. 8363 (Jan. 20, 2025). The Empire wind power generation project was

---

[15] Letter from Walter Cruickshank to Matthew Brotmann re: Director's Order (Apr. 16, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Director%26%23039%3Bs%20Order%20Empire%20Wind.pdf.

fully permitted and funded and 30% complete when Defendants stopped it. On information and belief, on May 20, 2025, Defendants lifted the stop work order in exchange for the New York Governor's agreement not to oppose a new gas pipeline (the Constitution Pipeline) from Pennsylvania to New York that had been canceled in 2020 over environmental concerns. The same day, Secretary Burgum wrote the false statement that "Americans who live in New York and New England would see significant economic benefits and lower utility costs from increased access to reliable, affordable, clean American natural gas."[16] Defendants are using federal power to coerce states into allowing the "unleashing" of fossil fuel projects.

### Defendant DOE is Implementing the Unconstitutional EOs

187.  On February 5, 2025, pursuant to the EOs, Secretary Wright directed the DOE to "unleash the great abundance of American energy," specifically prioritizing fossil fuels.

188.  On May 23, 2025, pursuant to Section 2 of Executive Order 14156, Secretary Wright ordered the 1,560-megawatt J.H. Campbell coal power plant in Michigan to abandon its plans to shut down on May 31 and instead continue operating through at least late August, causing more unnecessary fossil fuel pollution.

---

[16] Secretary Doug Burgum (@SecretaryBurgum), X.com (May 19, 2025, 9:32 PM ET), https://x.com/SecretaryBurgum/status/1924639319622393919.

189.   Secretary Wright is already approving more liquified natural gas ("LNG") projects to increase LNG exports. On February 14, 2025, for example, Secretary Wright approved the first major U.S. liquefied natural gas project to receive an export authorization for non-free trade agreement countries since President Trump lifted the Biden-Harris freeze on LNG export permit approvals. Since January 2025, DOE has approved applications for projects that will export more than 9.5 billion cubic feet of LNG per day, endangering Plaintiffs, and illustrating the fallacy of President Trump's domestic "energy emergency."

190.   A 2024 DOE study found that a single LNG project exporting 4 billion cubic feet of gas per day emits more greenhouse gases in one year than 141 of the world's countries each did in 2023.

191.   A 2024 DOE study found that the amounts of already approved LNG projects are already sufficient to meet global demand for U.S. LNG for decades to come.

192.   In February and March 2025, DOE flouted mandates in 42 U.S.C. §§ 6295(m)(1) and 6293(b)(1)(A) by repeatedly postponing effective dates on congressionally-mandated energy efficiency standards on gas instantaneous water heaters and test procedures for energy efficiency of air conditioners and heat pumps. As part of DOE's "largest deregulatory effort in history," DOE has begun the process of eliminating and modifying congressionally-required energy conservation or

efficiency standards on other household appliances, including microwaves, cooking tops, ovens, washing machines, dishwashers, faucets, spray valves, and dehumidifiers. Eliminating efficiency standards tells companies that they can produce appliances that consume more energy and increase fossil fuel pollution.

193.    DOE reports that appliance standards implemented in 2021-2024 alone cumulatively reduce GHG pollution by approximately 2 billion metric tons and save the average family at least $100 a year in utility bills. Eliminating these regulations will increase fossil fuel pollution that the Plaintiffs are exposed to.

194.    In violation of a congressional mandate under the Energy Independence and Security Act of 2007, on May 5, DOE delayed the compliance date for federal buildings to phase out fossil fuel energy. The delayed rule was expected to reduce GHG pollution by 2 million metric tons, with net benefits to the public expected to range from $52M to nearly $134M. The longer the compliance date is delayed, the greater the amount of fossil fuel pollution that injures Plaintiffs.

195.    On January 20, 2025, there were approximately 30 GW of renewable energy projects in the DOE permitting pipeline that had not yet been approved, including 25 GW of solar, 2.8 GW of wind, and 1.5 GW of transmission lines to connect renewable energy to the grid. The EOs prevent these projects from being approved, meaning more fossil fuels will be burned instead, harming Plaintiffs.

75

**Defendant DOT is Implementing the Unconstitutional EOs**

196.  On January 28, 2025, Secretary Duffy, pursuant to Executive Order 14154, directed DOT to review all fuel economy standards and replace or rescind any standards that do not comply with Executive Order 14154 to prolong the use of internal combustion engine vehicles instead of EVs.

197.  On January 29, 2025, Secretary Duffy, pursuant to Executive Order 14154, issued a directive to staff "to rescind, cancel, revoke, and terminate all DOT orders, directives, rules, regulations, notices, guidance documents, funding agreements, programs, policy statements, or portions thereof" "which reference or relate in any way to climate change, [and] 'greenhouse gas' emissions . . . ." The directive is being implemented.

198.  On February 6, 2025, pursuant to Executive Order 14154 §§ 2 and 7, DOT rescinded all previous guidance for implementation of the National Electric Vehicle Infrastructure ("NEVI") Formula Grant Program, which provides funding to states for EV charging infrastructure, and suspended all state NEVI plan approvals, thereby freezing the rollout of congressionally-approved funding to states to install fast EV chargers along Interstate Highway corridors. Substantially delaying or ending the rollout of the NEVI Program would result in 1.85 million fewer EVs on the road and cause an additional 8.4 million metric tons of $CO_2$ being emitted into the atmosphere by 2030.

199.   On March 12, 2025, pursuant to Executive Order 14154 §§ 2 and 7, Secretary Duffy instructed DOT to "identify project scope and activities that are allocating funding to advance climate . . . priorities counter to the Administration's Executive Orders," especially activities that include "bicycle infrastructure, EV and/or EV charging infrastructure," and to review those projects for removal and cancelation.[17]

200.   The congressionally created DOT Office of Climate Change and Environment ("Climate Change Center") has a mandatory statutory duty to "establish a clearinghouse of solutions, including cost-effective congestion reduction approaches, to reduce air pollution and transportation-related energy use and mitigate the effects of climate change." The Climate Change Center and its clearinghouse of solutions has been removed from DOT's website and its operations have been shuttered. The Climate Change Center maintained information on GHG inventories, analytic methods and tools, GHG reduction strategies, potential impacts of climate change on transportation infrastructure, approaches for integrating climate change considerations into transportation decision making, and comprehensive assistance for state and local governments for obtaining transportation-related grants. Removing such resources limit Plaintiffs' ability to advocate for reducing

---

[17] Memorandum from DOT Office of the Assistant Secretary for Transportation Policy to Heads of Secretarial Offices and Operating Administrations re: Guidance on Competitive Award Selections (Mar. 12, 2025).

emissions in the transportation sector, the largest GHG producing sector in the United States. This closure directly harms the *Navahine* Plaintiffs who are working with their state transportation department to decarbonize transportation in their state.

201.   Tons of GHG pollution that could be avoided this year will not be due to DOT's implementation of the EOs. This further injures Plaintiffs and increases their risk of harm from added GHG pollution.

**Defendant USACE is Implementing the Unconstitutional EOs**

202.   Defendant USACE has approved the use of special "emergency" permit processing procedures for fossil fuel projects, but not wind and solar projects, pursuant to Executive Order 14156 Section 4, making hundreds of fossil fuel projects eligible for expedited decisions. USACE adopted the reasoning in Executive Order 14156 Sections 1 and 4 as its sole basis for approving the use of emergency procedures. USACE has begun issuing expedited permit decisions under the emergency procedures. For example, USACE implemented emergency permit procedures for a tunnel on the Line 5 oil pipeline in Michigan and for the Mountain Valley natural gas pipeline in Virginia, which will lead to more unnecessary and dangerous fossil fuel pollution.

203.   Conversely, since February 5, 2025, USACE has paused permitting for wetland impacts for all onshore wind energy projects, making it impossible for these projects to be constructed and substitute clean energy for fossil fuel energy.

78

**Defendant NASA is Implementing the Unconstitutional EOs**

204.   Congress enacted a statutory framework requiring the U.S. Global Change Research Program ("USGCRP"), a federal initiative across fifteen federal agencies, to develop and coordinate a comprehensive and integrated United States research program to assist the Nation and the world to understand, assess, predict, and respond to human-induced global climate change. This statutory scheme requires USGCRP to release a new National Climate Assessment ("NCA") every four years to provide actionable guidance to U.S. citizens, governments, and companies responding to and planning for global warming. Defendants Office of the President and NASA are dismantling the USGCRP and NCA to carry out the EOs directives.

205.   Congress mandated that USGCRP publish its next (sixth) NCA by 2027. Work on the 2027 NCA was underway and in February 2025, government scientists submitted a detailed outline of the report to the White House.

206.   The USGCRP runs out of the White House, and NASA manages GCRP's contracts. On February 10, 2025, NASA terminated the contract for the technical support unit for Working Group III (mitigation) for the Intergovernmental Panel on Climate Change ("IPCC"). NASA barred NASA's Chief Scientist and Chief Climate Officer, co-chair of the IPCC Working Group III, from traveling to a

Working Group III meeting in February 2025. On March 10, 2025, NASA eliminated the position of Chief Scientist and Chief Climate Officer.

207.   On or before April 9, 2025, NASA canceled the contract with the private consulting firm coordinating the USGCRP's associated agencies and hundreds of researchers to write the 2027 NCA. The cancelation permanently severed climate change work occurring across agencies and means the sixth NCA will not move forward or be published, despite the congressional mandate.

208.   On or before April 28, 2025, on information and belief, the Office of the President ordered the USGCRP to dismiss all researchers around the country who were working on the NCA. On April 28, USGCRP's Acting Director dismissed all researchers working on the NCA from their role on the NCA, effectively ending the 2027 NCA. The same day, all remaining USGCRP staff were fired, including the Acting Director.

209.   Without a 2027 NCA, Plaintiffs, their professors, their experts, and their state and local governments will be forced to rely on the increasingly outdated information from the 2023 NCA. Outdated information leaves Plaintiffs, their communities, and their elected representatives unable to protect Plaintiffs from climate change, whose risks are rapidly escalating.

210.   Plaintiff Delaney has relied on the NCA in the past as part of her studies and work to combat climate change. She is immediately harmed by the canceling of

the NCA because she planned to consult the 2027 NCA to create strategies for reducing GHG emissions, educating others, and restoring a stable climate system.

211.    The *Held* Plaintiffs relied on the NCA to present constitutional claims under the Montana Constitution and hold their government accountable for violating their fundamental rights. The *Navahine* Plaintiffs relied on the NCA to achieve a settlement agreement with the State of Hawaiʻi to protect their state constitutional rights.

212.    Plaintiffs are immediately harmed by the cancelation of this vital report and their inability to access congressionally-mandated information that supports their efforts to protects their rights from government action that threatens their climate.

213.    Defendants are aware that by dismantling USGCRP, they are eliminating one of the most crucial information tools for protecting Plaintiffs from the dangers of climate change. Defendants are aware they are eliminating this tool at a time when Defendants' directive to "unleash" fossil fuels is escalating the magnitude of the dangers and climate risk to Plaintiffs.

214.    NASA houses the Goddard Institute of Space Studies ("GISS"), a laboratory which leads important research on climate change. GISS's primary objective is to study the environmental changes that affect the habitability of our planet and to predict the future course of global climate change. GISS is one of the

most important scientific bodies studying and warning about the dangers of climate change since the late 1970s. On April 24, 2025, NASA terminated the lease of GISS's laboratory space effective May 31, 2025. Without laboratory space, the laboratory cannot operate.

### Defendant DOC is Implementing the Unconstitutional EOs

215.   Secretary Lutnick is personally reviewing all NOAA grants and contracts over $100,000—including leases, partnerships with universities, and contracts with NOAA-affiliated staff who are contractors rather than NOAA employees—for possible termination to comply with the EOs. Secretary Lutnick is ordering NOAA personnel to terminate NOAA grants and contracts for reasons that do not meet NOAA's termination criteria: due to misalignment with President Trump's "Unleashing American Energy" EO. There is no appeals process for the terminated grants and contracts.

216.   On information and belief, Defendants DOC and Lutnick's review process creates a bottleneck that causes grants and contracts that would otherwise be renewed, to expire——including contracts for conducting NOAA's core scientific work and hurricane forecasting, hampering NOAA's climate work.

**Defendant NOAA is Implementing the Unconstitutional EOs**

217.   At DOC's direction, NOAA is implementing the EOs by terminating staff, partnerships, funding, and knowledge-sharing with climate science research programs at universities, nonprofit research institutes, and the public at large.

218.   Regulators, communities, and individuals, including Plaintiffs, depend on NOAA for accurate forecasts and emergency information. Nevertheless, in February 2025, NOAA fired or pressured hundreds of employees into early retirement, including at NOAA's Office of Oceanic and Atmospheric Research; the Geophysical Fluid Dynamics Laboratory which produces internationally regarded climate models; NOAA's satellites division, which produces crucial data for monitoring and forecasting climate change; the National Hurricane Center and the Hurricane Research Division; and NOAA's Climate Fisheries and Ecosystems Initiative. NOAA dismissed 25% of the staff at the Environmental Modeling Center and other divisions responsible for monitoring and forecasting disasters from climate change. The firings reduced NOAA's ability to inform Plaintiffs, the public, and regulators of imminent climate risks, such as the paths of approaching hurricanes and the timing of expected algal blooms, forcing regulators and communities to make decisions without crucial environmental information, thereby increasing the likely death toll from upcoming hurricanes and the likelihood that currently-sustainable fisheries, including in Florida, will collapse. These reductions in staff

impair Avery's, Delaney's, C.M.'s, and Kalālapa's ability to protect themselves from approaching hurricanes or tropical cyclones, increasing their risk of harm, and reduce Delaney's, Kalālapa's, and C.M.'s access to sustainable fisheries, causing them injury.

219.  Since April 1, 2025, NOAA has stopped updating dozens of climate datasets and stopped providing support to the scientists who use them, including NOAA's snow and ice dataset. Climate scientists use NOAA's snow and ice data to measure and project the escalating impacts of climate change, especially in the Arctic, which is warming nearly four times faster than the rest of the planet. NOAA's snow and ice data has been crucial to understanding climate change at the poles and the extent of global warming. On May 8, 2025, NOAA announced the retirement of its database of billion-dollar climate disasters, which has allowed policymakers, taxpayers, media, economists, insurance companies, property owners, business owners, and researchers to track the sharply rising frequency and cost of extreme weather events since the 1980s. The database cannot be replicated by private scientists because it relies on non-public data shared with the government by insurance companies. The same day, NOAA also decommissioned its public Hurricane Satellite Data service, which will harm Avery's, Delaney's, Kalālapa's, and C.M.'s ability to protect themselves from hurricanes. NOAA has additionally deleted data Ula has used for school.

220.  NOAA developed the Atlas 15 project because, for years, civil engineers had asked NOAA to update its Atlas 14 rainfall maps to include projections from climate models, rather than reflecting only historical rainfall patterns which are increasingly outdated. Engineers need updated projections to build infrastructure that can reduce or withstand flooding from climate change. NOAA completed the pilot of Atlas 15, covering only Montana, in 2024. After January 20, 2025, NOAA canceled the contract for Atlas 15 for the rest of the country insofar as it would update projections to account for climate change, because that aspect of the project did not align with President Trump's directive to "unleash" fossil fuels. Plaintiffs Avery, Isaac, Miko, Kalālapa, C.M., Joseph, and Delaney will endure an increased risk of harm from flooding because engineers designing infrastructure in their states will not have access to Atlas 15 projections for precipitation from climate change.

221.  Defendants have threatened to cancel the lease for the Mauna Loa observatory, which could happen imminently. Between January 20 and March 31, 2025, dozens of NOAA contracts and leases were terminated, including contracts for basic climate science research, technical support for climate science, communication of climate data to the public, and closure of Mauna Loa Observatory's Hilo office effective August 2025. Closing the Hilo office would significantly hamper Mauna Loa Observatory's data collection in the near term and make data collection

impossible in the long term. The NOAA-funded Mauna Loa Observatory on the Big Island of Hawai'i has been taking ongoing $CO_2$ readings since C. David Keeling of the Scripps Institute of Oceanography began taking samples in 1958, making it the single most crucial set of climate data, and the longest complete record, in the world. Mauna Loa's data are widely considered the single most important vital sign of Earth's climate. Measuring atmospheric carbon dioxide levels is essential for understanding the impact of burning fossil fuels on climate change. This dataset is unique and irreplaceable due to Mauna Loa's location and the length of its data record. Scientists, students, policymakers, and the broader public and private sectors rely on this data. Plaintiffs Joseph has used, and Delaney uses, this NOAA dataset in their studies, research, or jobs. All Plaintiffs use this data in their advocacy to protect their fundamental rights.

222.  On April 8, 2025, Secretary Lutnick announced the June 30, 2025, termination of NOAA's cooperative agreements with Princeton University to run three basic climate data collection programs because scientific study of changing water availability with global warming "does not align with the priorities of this Administration."[18]

---

[18] Press Release, DOC, Ending Cooperative Agreements' Funding to Princeton University (Apr. 8, 2025), https://www.commerce.gov/news/press-releases/2025/04/ending-cooperative-agreements-funding-princeton-university.

### Defendant NSF is Implementing the Unconstitutional EOs

223.   Congress has enacted a statutory framework requiring NSF to robustly support and strengthen basic scientific research and science education in all fields of science, and to work with NOAA to establish a coordinated program of ocean and atmospheric research that will promote United States leadership in ocean and atmospheric science.

224.   Since NSF's founding in 1950, NSF has built the entire scientific system at universities and nonprofit research institutes nationwide to rely on NSF funding for the basic necessities and day-to-day operation of scientific research and education in all fields of science, including climate science. Dismantling NSF funding irreparably harms climate science that is necessary for Plaintiffs' safety and to secure their fundamental constitutional rights.

225.   Both the 2017 Montana Climate Assessment and the 2021 Climate Change and Human Health in Montana reports were funded by NSF grants. Those reports would not have been published absent NSF funding. The *Held* Plaintiffs and their experts relied on those reports to win their case at trial.

226.   NSF initially implemented the EOs by freezing all grant proposals and all current, already-awarded grants that use the word "climate" until each proposal and grant can be reviewed to determine whether it is in the field of climate science and thus will be permanently denied or canceled. This resulted in the cancelation of

grants, including an NSF "Research Experience for Undergraduates" grant which funds paid internships at the Smithsonian Environmental Research Center ("SERC"), an internship program to which Plaintiff Joseph applied in the fall. Cancelation of this grant resulted in SERC canceling the internship program this year, denying Joseph the internship opportunity.

227.    NSF is required to award grants for scientific research according to the statutorily mandated criteria of intellectual merit and broader impacts on society, based on evaluations of each proposal by three to ten experts in the relevant scientific field. In April 2025, NSF announced a new process to carry out the EOs. On information and belief, NSF will deny funding to science that is at odds with President Trump's, Director Vought's, Secretary Wright's, and Secretary Duffy's beliefs that climate change is a hoax and wind, solar, energy efficiency, storage, and EVs are contrary to the President's policies.

228.    On February 18, 2025, NSF fired 10% of its staff. Between April 21 and May 8, 2025, NSF terminated nearly 1,400 science grants worth over $1 billion, at least some of which were for climate-related research.

229.    On May 8, 2025, NSF announced the abolishment of all 37 of NSF's divisions. NSF's announcement was accompanied by mass layoffs and the termination of additional NSF grants.

230.   Two NSF-funded undergraduate research programs Plaintiff Joseph applied to for Summer 2025 were canceled. Also, an internship opportunity at the Scripps Institute that Joseph applied to—and that he planned to continue applying to in the future until successful—was canceled due to a hiring freeze precipitated by Defendants' actual and threatened cuts to NSF grants for science, including climate science.

231.   Plaintiffs attend, or will attend, colleges or universities that receive NSF grants and their educational opportunities are being diminished as NSF continues freezing and canceling grants. Olivia, Lander, Taleah, Eva, Grace, Ula, Joseph, and Delaney attend universities and colleges that together receive at least 226 NSF grants. Additionally, Plaintiffs Rikki and Georgi plan to go to graduate school to study glaciology and aquatic ecosystems, respectively, but funding at graduate schools for research in these fields is already being cut by the NSF, harming Rikki and Georgi's ability to pursue graduate degrees.

## Defendant NIH is Implementing the Unconstitutional EOs

232.   Congress tasked the NIH with "conduct[ing] . . . and encourage[ing], cooperat[ing] with, and render[ing] assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research . . . and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man, including"

those stemming from environmental "pollution." 42 U.S.C. § 241(a); *see also* § 281 (b)(16) (establishing the National Institute of Environmental Health Science). Research funded by NIH includes basic research on the effects of climate pollution and climate change on human health.

233.   NIH implemented the EOs by freezing all grant proposals and all current, already-awarded grants that use the word "climate" until each proposal and grant can be reviewed to determine whether it is in the field of climate science and thus will be permanently denied or canceled. NIH's new policy is "not to prioritize" research related to climate change. This has already resulted in the cancelation of grants for the first-ever study to inform policymakers, for each county in the U.S., of the future costs of today's GHG emissions decisions due to poorer sleep quality from heat, such as Plaintiff Joseph is already experiencing, and from reduced physical activity due to heat and smoke, such as all Plaintiffs are already experiencing. The NIH also canceled grants for a groundbreaking study of the full long-term health impacts of tropical cyclones in the United States, such as Plaintiffs Delaney, Avery, and Kalālapa are already experiencing, and to develop an improved extreme-heat warning system for use by local governments, which would help Plaintiff Joseph protect himself from future repeats of his past hospitalization from extreme heat.

234.  In implementing the EOs, NIH has ceased funding research on how climate change affects human health, including its Climate Change and Health Initiative, having a devastating impact on research that is needed to protect Plaintiffs' lives. Former director of the National Institute of Environmental Health Sciences, Linda Birnbaum, who worked as a federal scientist for four decades said, "If NIH doesn't study the health impacts of climate, we are not going to be able to prevent some of those health impacts, and we aren't going to be able to find ways to deal with them." For instance, NIH has funded research on the effects of wildfires and extreme heat on children's cardiovascular health and the effects of climate change on children's mental health, research that will be cut as the EOs are implemented, harming all Plaintiffs.

235.  All Defendants' cumulative actions listed above and new actions nearly every day to implement the EOs' directives are resulting in, and will continue to result in, additional fossil fuel pollution that injures the lives, health, and safety of Plaintiffs.

**The United States Has the Affordable Energy Resources It Needs to Power the Nation and Also End Fossil Fuel Pollution**

236.  The United States has ample energy resources to meet its needs now and into the future without "unleashing" additional fossil fuels. The United States is already the largest producer of oil and gas. The United States is far below its renewable energy generation capacity.

237.    President Trump's declaration of an energy emergency is a lie and a tool being used to promote fossil fuels. There is no energy emergency requiring fossil fuel "unleashing" and "dominance." Defendants' conduct described above establishes as much. Blocking energy infrastructure like wind and solar, increasing energy consumption by eliminating efficiency measures, and blocking EVs—which are far more energy efficient than internal combustion engine vehicles—is the opposite of what any rational actor would do in an "energy emergency." And it is deliberately indifferent to the dangers of fossil fuel pollution.

238.    The United States has adequate petroleum and gas at the current rate of production to support U.S. energy needs during the transition to substitute clean renewable energy for fossil fuel.

239.    U.S. fossil fuel companies export and import petroleum to make profits, not because of any energy emergency. The U.S. exports more petroleum than it imports.

240.    U.S. fossil fuel companies seek to expand liquified natural gas ("LNG") infrastructure in order to export LNG to make a profit.

241.    Much of the coal production Defendants want to "unleash" would not be used for U.S. energy generation, but would rather be exported.

242.   One-hundred percent (100%) of the United States' electricity needs across all sectors could be generated by wind and solar energy using less acreage of federal public lands than the BLM currently leases for oil and gas production.

243.   If wind turbines were installed on the 99% of the 3,059,648 abandoned oil and gas wells in the U.S., which are conducive to wind power generation, they would generate approximately 13,551 GW of electricity. The U.S. current energy generation capacity from all technologies is 1,190 GW. Using just abandoned wells for windmills would increase U.S. generating capacity by over 1000%, while eliminating fossil fuel pollution.

244.   Wind and solar energy are the cheapest forms of energy in the United States today, especially when considering the levelized cost of energy.

245.   Defendant DOE, the U.S.'s expert agency on energy, admits that "[t]he rise of renewable power, which comes from unlimited energy resources, like wind, sunlight, water, and the Earth's natural heat, has the potential to vastly improve the reliability of the American energy system."[19]

246.   Technology giants of artificial intelligence, like Google, want to power their data centers on clean renewable energy to meet their own GHG emission reduction goals, and would choose to do so if governments stopped blocking clean

---

[19] DOE, *Energy Reliability and Resilience*, https://www.energy.gov/eere/energy-reliability-and-resilience (last visited May 28, 2025).

renewable energy. The EOs are significantly increasing the likelihood that large AI data centers will be powered by gas-fired generation units, causing Plaintiffs more harm from more climate pollution.

247. Venture capitalists across the country want to invest in clean renewable energy projects and hyper-scale the substitution of clean energy for fossil fuel energy. The EOs and Defendants are blocking their efforts causing venture funds to dismantle and put their funding elsewhere. The EOs will cause clean renewable energy businesses to fail or never start because of President Trump's directives to unleash fossil fuels and stop wind, solar, storage, efficiency, and EVs.

248. Supporting clean renewable energy will provide for the energy needs of the Nation, lower energy bills for consumers, help clean our air and water, avoid countless deaths and harms to human health, slow climate change and its destructive consequences, begin to stabilize the climate, improve American energy security, grow jobs that are safer for workers and their families, enhance American prosperity, and put an end to the government endangerment of Plaintiffs' lives.

249. Substituting clean renewable energy for fossil fuel energy will save lives and hundreds of billions of dollars each year.

250. This case is not about policy preferences among different constitutionally-compliant choices. It is about life and death. It is about the

fundamental rights of children and youth, many of whom have no vote in our democracy and depend on the courts to protect their fundamental rights.

## CLAIMS FOR RELIEF
## CLAIM 1: SUBSTANTIVE DUE PROCESS VIOLATION OF RIGHT TO LIFE
### (Against All Defendants)

251.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

252.   The Due Process Clause of the Fifth Amendment provides that Defendants shall not deprive any person of the fundamental right to life, liberty, or property without due process of law.

253.   The EOs deprive Plaintiffs of their fundamental rights to life and are facially unconstitutional. Strict scrutiny applies.

254.   Defendants' implementation of the EOs as described above deprives Plaintiffs of their fundamental rights to life, and the EOs are, therefore, unconstitutional as applied. Strict scrutiny applies.

255.   A government's deprivation of the fundamental right to life does not occur only at death. The fundamental right to life, as the Framers intended, includes the right of living, breathing persons to enjoy this terrestrial existence and pursue happiness in living. At the time of the Nation's founding, terrestrial existence was predicated on a life-sustaining, stable climate system. The fundamental right to life includes vitality, or health, and a person's natural lifespan. By natural extension, for

children and youth whose organs and bodies are still developing, the right to life includes their ability to develop healthfully into their full adult living form.

256.   A deprivation of the fundamental right to life occurs when the government affirmatively threatens essential aspects of a plaintiff's terrestrial existence, interfering with their health, safety, or natural lifespan, including a livable future. A deprivation of the right to life of a child occurs when the government affirmatively disrupts in a medically significant way the healthy physiological and psychological growth and functioning of a child to adulthood, causing them a lifetime of hardship or exposing them to heightened risk of illness or death.

257.   President Trump's EOs and Defendants' implementing actions that "unleash" fossil fuel pollution into the air deprive Plaintiffs of essential aspects of their terrestrial existence, including their health and safety, and threaten and interfere with their natural lifespans and livable future. As children and still-developing youth, the EOs and Defendants' implementing actions deprive Plaintiffs of their right to life by disrupting their healthful development into full adulthood, exposing them to significant risks of illness or death, and leaving them with an accumulating lifetime of danger and hardship. The increased risk of harm to life from additional "unleashed" fossil fuel pollution is irreparable.

258.   There is no justification for the infringement of Plaintiffs' rights to life because the EOs, on their face and as applied, are not necessary to achieve a

compelling governmental interest, nor have the EOs been narrowly tailored to achieve a compelling interest.

259.  A secure, jobs-producing, prosperous national economy can be powered with non-fossil fuel energy at lower energy costs, with fewer service disruptions and greater reliability than a fossil fuel-based energy system. An energy system that eventually does not run on fossil fuels will also save the Nation trillions of dollars in avoided health care, climate disasters, loss of natural resources, and lost infrastructure costs. There is no necessary and compelling government interest in "unleashing" and preferencing dangerous and climate-destabilizing fossil fuels and their pollution over clean renewable energy, endangering the Nation's terrestrial life-support system and Plaintiffs' rights to life.

260.  The EOs can only be, and are being implemented, by: "unleashing" America's fossil fuels, and thus their pollution on young people; blocking the adoption of wind and solar energy, energy efficiency measures and battery storage— the cheapest forms of energy today; blocking the transition away from internal combustion engine vehicles to EVs; turning EPA into a pro-fossil fuel agency instead of a pollution-control agency; and denying the fundamentals of climate science that inform Plaintiffs' terrestrial existence.

261.  As a result of Defendants' unconstitutional EOs and implementation thereof, Plaintiffs are entitled to injunctive relief to protect the status quo from

increasing danger to their lives and their terrestrial existence during the pendency of the case, declaratory relief, and further relief as necessary to enforce the judgment.

## CLAIM 2: SUBSTANTIVE DUE PROCESS VIOLATION OF RIGHT TO LIBERTY
### (Against All Defendants)

262.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

263.   The EOs deprive Plaintiffs of their fundamental rights to liberty and are facially unconstitutional. Strict scrutiny applies.

264.   Defendants' implementation of the EOs deprives Plaintiffs of their fundamental rights to liberty, and the EOs are, therefore, unconstitutional as applied. Strict scrutiny applies.

265.  Defendants' EOs and their implementation deprive Plaintiffs of recognized unenumerated liberty interests, including their personal security, bodily integrity, dignity, opportunity to pursue happiness, the right to practice culture, and the right to form families.

266.   The U.S. Constitution does not explicitly define all protected liberty interests and the Ninth Amendment guarantees that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The U.S. Supreme Court has recognized some, but not all, liberties protected by the Fifth and Fourteenth Amendments.

267.   The right to access, enjoy, and utilize state public trust resources is a liberty retained by the people of the various states in perpetuity and protected by the Fifth Amendment. The U.S. Supreme Court recognizes that the public trust doctrine is a matter of state law. The Montana and Hawaiʻi Constitutions explicitly protect Plaintiffs' rights as beneficiaries of their state public trust resources, including air, water, land, fish and wildlife, and other natural resources. Their state public trust resources also include a life-sustaining or stable climate. For Plaintiff Kalālapa, the Hawaiʻi Constitution also protects her Native Hawaiian cultural and traditional practices connected to those trust resources, which for her is protected liberty. The EOs are depriving Plaintiffs from Montana and Hawaiʻi of their Fifth Amendment liberty to access, enjoy, and use their constitutionally-protected state public trust resources.

268.   All Plaintiffs have a Fifth Amendment liberty interest as beneficiaries of their state public trusts to enjoy, access, and use state public trust resources free from substantial impairment, alienation, or deprivation by Defendants. Plaintiffs' state public trust resources will be increasingly and irreparably impaired by the EOs and their implementation as more fossil fuel pollution causes more heat.

269.   Plaintiffs who live in Montana and Hawaiʻi also have a Fifth Amendment unenumerated liberty interest in their state constitutional fundamental rights to a clean and healthful environment and a stable life-sustaining climate

system, which their state courts have recognized. Defendants' EOs violate Montana and Hawai'i Plaintiffs' state-defined substantive due process liberty interests by "unleashing" fossil fuels and blocking wind, solar, storage, efficiency, and EVs in Montana and Hawai'i, exacerbating GHG pollution in Plaintiffs' environment and worsening a destabilized climate system, where both States' courts have found that additional GHG pollution causes constitutional injuries.

270.   For the same reasons as Claim 1, there is no justification for the deprivation of Plaintiffs' rights to their liberties because the EOs are not necessary to achieve a compelling governmental interest, nor have the EOs been narrowly tailored.

271.   As a result of Defendants' unconstitutional EOs and implementation thereof, Plaintiffs are entitled to injunctive relief to protect the status quo from increasing harm to Plaintiffs' liberties during the pendency of the case, declaratory relief, and further relief as necessary to enforce the judgment.

## CLAIM 3: ULTRA VIRES PRESIDENTIAL ACTION TO "UNLEASH" FOSSIL FUEL POLLUTION AND DEBILITATE EPA
### (Against President Trump, the Office of the President, OMB, Director Vought, EPA, Administrator Zeldin, and Acting Administrator Clark)

272.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

273.   The Constitution vests in Congress the exclusive power to legislate. U.S. Const. art. I, § 1. Article I's Presentment Clause provides the President's role in

enacting statutes, which is to sign or return proposed bills. U.S. Const. art. 1, § 3. "Presidential action that either repeals or amends parts of duly enacted statutes" violates the Presentment Clause. *Clinton v. City of New York*, 524 U.S. 417, 439 (1998).

274.    The President has a constitutional duty to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3. The Take Care Clause is violated where executive action undermines statutes enacted by Congress and signed into law.

275.    *Ultra vires* review is available to challenge whether Presidential action is contrary to law. *See Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023). Even when invoking emergency authority, presidential authority is constrained by the Constitution, statutes, and the rule of law. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 500 (2023).

276.    The Constitution does not dedicate authority over fossil fuels or energy production to the Executive. There is no enumerated or inherent executive authority from the Constitution or any statute for the President to "unleash," prioritize, and fast-track the development and production of fossil fuels and the resulting climate pollution that knowingly causes harm to American youth.

277.    The EOs do not identify any constitutional or statutory source of authority to "unleash" fossil fuels or obstruct wind, solar, battery storage, efficiency, or EVs. The EOs are ultra vires because there is "no express constitutional or

statutory authorization" empowering the President to "unleash" fossil fuels in a manner that harms children's lives. *See Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942).

278.   The EOs directives to EPA and Administrator Zeldin are also ultra vires with respect to laws passed by Congress authorizing and mandating EPA to abate pollution and protect human health and the environment, including but not limited to the following.

279.   In the Reorganization Plan No. 3 of 1970, Congress consolidated authority over pollution into one federal agency—EPA—based on President Nixon's recommendation that "for pollution control purposes the environment must be perceived as a single, interrelated system" to coordinate an "attack on the pollutants which debase the air we breathe, the water we drink, and the land that grows our food." "Because environmental protection cuts across so many jurisdictions, and because arresting environmental deterioration is of great importance to the quality of life in our country and the world, I believe that in this case a strong, independent agency is needed." Congress authorized EPA to be responsible for controlling and preventing air pollution, among other environmental protection efforts.

280.   Pursuant to Article I, Congress enacted laws consolidating and delegating federal authority to EPA to manage the protection of the Nation's air and

prevent pollution that endangers human health and welfare, in coordination with the states.

281.   Congress has directed EPA and the Administrator "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population" and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." 42 U.S.C. § 7401(b)(1)-(2). The primary goals of the Clean Air Act are pollution prevention and the protection of human health and welfare. 42 U.S.C. § 7401(c). Effects on "welfare" include effects on "climate," "soils, water, crops, vegetation," "animals, wildlife," "weather, visibility," "damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being." 42 U.S.C. § 7602(h). Congress defines "air pollutants" to include GHGs, including "carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride." *See* 42 U.S.C. §§ 7434 (c)(2), 7432(d)(4), 7433(d)(2), 7435(c), 7436(i), 7437(d)(2), 7438(d).

282.   In 2009, EPA and its Administrator formally found in the Endangerment Finding that the current and projected concentrations of these same six key well-mixed greenhouse gases in the atmosphere "threaten the public health and welfare of current and future generations." They also found that new motor vehicles "cause

and contribute to the greenhouse gas pollution that threatens public health and welfare."

283.    The Clean Air Act specifies that no air pollutant can be emitted into the U.S. airspace in violation of any air quality standard. *See, e.g.*, 42 U.S.C. § 7411(e); 42 U.S.C. § 7412(f)(4); 42 U.S.C. § 7522.

284.    Congress has delegated EPA statutory authority to systematically control pollution through its regulatory programs over the following sources of pollution:

a. All stationary sources of pollution, including factories, chemical and fertilizer plants, petroleum refineries, power plants, cement plants, glass plants, and other industrial facilities;

b. All mobile sources of pollution, including all motor vehicles, engines, and equipment including small gasoline-powered engines like generators, mowers, chainsaws, and leaf-blowers;

c. Fuels;

d. Locomotives;

e. Ocean-going vessels and large ships with marine diesel engines, including ferry boats, and marine recreational equipment; and

f. Aircraft.

285.   Through its regulatory programs, EPA sets the national floor for air quality protection. States and Tribes may limit air pollution more stringently than EPA, but they may not allow more air pollution than does EPA. EPA oversees the conduct of states in controlling pollution emanating from within their borders and is authorized to take legal action should states not comply with federal law.

286.   In preventing pollution, Congress mandated that EPA and the Administrator "give special emphasis to research and development into new and improved methods, having industry-wide application, for the prevention and control of air pollution resulting from the combustion of fuels," including "control of combustion byproducts of fuels" and producing fuels that "result in decreased atmospheric emissions." 42 U.S.C. § 7404(a)(1)(A), (C).

287.   The President has acted ultra vires by directing EPA to unleash fossil fuels, including by invoking emergency procedures exempting fossil fuel industries from permits limiting their pollution.

288.   The Clean Air Act requires EPA to rely on science, not policy priorities untethered to the statute, for setting emission standards and air quality standards to prevent pollution. S*ee, e.g.*, 42 U.S.C. §§ 4364 (requiring the Administrator to maintain "a high level of scientific quality" with respect to the EPA's research efforts), 4365 (mandating establishment of an EPA Scientific Advisory Board to give scientific and technical advice to the agency), 7403 (mandating creation of "national

research and development program for the prevention and control of air pollution" administered by EPA's Office of Research and Development). In implementing the EOs, EPA has acted ultra vires in eliminating its scientific offices, staff, and GHG research capacity to prevent and control fossil fuel air pollution.

289.    EPA's Administrator is required to prescribe standards for motor vehicle emissions of any air pollutant, including GHGs, which "may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521. In implementing the EOs, the EPA acts ultra vires in dismantling these standards to benefit fossil fuel activities.

290.    EPA's Administrator is required to set performance standards for stationary sources, which states are empowered to implement and enforce per delegated authority from the Administrator. 42 U.S.C. § 7411. In implementing the EOs, EPA acts ultra vires in dismantling these standards to benefit fossil fuel activities.

291.    EPA's Administrator is required to set emission standards for hazardous air pollutants listed pursuant to the Clean Air Act, which "shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) . . . ." 42 U.S.C. § 7412(d)(1), (2). In implementing the EOs, EPA acts ultra vires in dismantling these standards to benefit fossil fuel activities.

292.   In the 2022 Inflation Reduction Act, Congress amended the Clean Air Act to further enable EPA to reduce GHG pollution by funding programs aimed at supporting zero emissions in different sectors, including but not limited to:

a. 42 U.S.C. § 7432: Appropriated $600M to support the transition to zero emission vehicles and another $400M for areas experiencing higher pollution (non-attainment areas). Eligible recipients include nonprofit school transportation associations, states, municipalities, and tribes.

b. 42 U.S.C. § 7433: Appropriated funds to reduce air pollution at ports, including $2.25B for zero emission port equipment, technology, and climate action plans and an additional $750M for non-attainment areas.

c. 42 U.S.C. § 7434: Appropriated $7B to provide grants to communities for zero emission technologies like solar on rooftops to reduce residential GHG emissions.

d. 42 U.S.C. § 7437: Appropriated $250M for planning and $4.75B in implementation of GHG air pollution plans.

e. 42 U.S.C. § 7438: Appropriated $2.8B for air pollution monitoring, prevention, remediation, and investment in zero emission technology to reduce GHG pollution and mitigate climate and health risks, among other harms from GHG pollution.

293.   Congress also appropriated funds for EPA to distribute for monitoring and reduction of GHG and other air pollution at schools, to reduce diesel emissions, and to reduce embodied GHG pollution in transportation construction materials, among other GHG pollution prevention measures. *E.g.*, IRA §§ 60104, 60105, 60106, 60112, 60116.

294.   In implementing the EOs, EPA acts ultra vires by freezing, delaying, recouping, and withholding funds that Congress has appropriated to reduce GHG pollution.

295.   The U.S. Supreme Court has ruled that any "federal common-law claim for curtailment of greenhouse gas emissions . . . . would be displaced by the federal legislation authorizing EPA to regulate carbon-dioxide emissions"; "Congress designated an expert agency, here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423, 428 (2011). Because other remedies at law have been curtailed, EPA's faithful execution of the law is vital. EPA must conduct its programs to protect the quality of the air and water for the benefit of human health and welfare, including for present and future generations, pursuant to the authorities under which EPA operates.

296.   EPA can only exercise its authority within the power granted to it by the Clean Air Act or other statutory authority. "Agencies have only those powers given to them by Congress," and Congress does not "typically use oblique or

elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). "The agency . . . must point to 'clear congressional authorization' for the power it claims." *Id.* Congress did not delegate to EPA authority or power to "unleash" fossil fuels or their pollution. The Clean Air Act and its amendments do not expressly, nor implicitly, authorize EPA to "unleash" fossil fuels and GHG pollution, which endanger children's and youth's health and welfare, including the health and welfare of Plaintiffs. Rather, the Clean Air Act articulates American prosperity based on human health, welfare, and the quality of the environment, which requires preventing and minimizing GHG pollution. The Inflation Reduction Act invests in solutions designed to understand and mitigate the effects of fossil fuel pollution and accelerate the transition to clean, renewable energy.

297.    Even if Congress wanted to bestow authority to EPA to "unleash" fossil fuel pollution and harm Plaintiffs, Congress has not delegated and cannot delegate to EPA the power to infringe any fundamental right to life or liberty. EPA must point to "clear congressional authorization" for the power it claims and none exists. The EOs cannot constitutionally grant EPA such authority.

298.    "Unleashing" more climate pollution is certainly a question with vast economic and political significance, which would have to be expressly stated in any legislation passed by Congress and then measured against the Constitution.

Congress' constitutional mandate is to enact laws that preserve the perpetuity of the Nation based on the sovereignty of the People, including present and future generations of children, accounted for in the Posterity Clause, who will one day exercise the political franchise and their own sovereign power and have equal rights under the Constitution.

299.   By directing EPA to "unleash" fossil fuels, increase coal extraction and production, and block wind, solar, efficiency, battery storage, and EVs, President Trump's EOs are ultra vires, obstruct Congress' express enactment of law, and work against the explicit purpose and mandate of EPA to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."

300.   President Trump through the EOs, and Administrator Zeldin, Acting Administrator Clark, and EPA through their implementation thereof, have illegally amended, repealed, rescinded, and circumvented the duly enacted federal statutes governing EPA, including but not limited to the 1970 law creating EPA, the Clean Air Act, and the Inflation Reduction Act.

301.   By acting contrary to Congress' mandates to EPA, Defendants are exceeding their authority under the Constitution, exceeding authority as delegated by Congress under Article I, and failing to faithfully execute the law under Article II. The EOs and these Defendants' implementation as described herein are therefore

ultra vires because they violate the separation of powers outlined in Articles 1 and 2, the Take Care Clause, the Presentment Clause, and implicate major questions.

302.   The ultra vires nature of the EOs has already harmed, and continues to harm, Plaintiffs.

303.   Plaintiffs have no adequate remedy at law because it is the totality of the Defendants' actions identified herein that are ultra vires and unconstitutional and, absent relief from this Court, Plaintiffs will suffer irreparable injury from the unlawful EOs.

### CLAIM 4: ULTRA VIRES PRESIDENTIAL ACTION TO "UNLEASH" FOSSIL FUELS BY TERMINATING THE NCA
### (Against President Trump, the Office of the President, NASA)

304.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

305.   By disbanding USGCRP and its staff and defunding and canceling the NCA, in implementing the EOs, Defendants have illegally amended, repealed, rescinded, and circumvented duly enacted federal statutes, including 15 U.S.C. §§ 2933, 2936, which direct the President to maintain USGCRP and for USGCRP to prepare and submit the NCA.

306.   No statute authorizes the termination of the NCA. By acting contrary to Congress' mandates, Defendants exceed their authority under the Constitution,

and their actions are ultra vires because they violate the separation of powers outlined in Articles 1 and 2, the Take Care Clause, and the Presentment Clause.

307.   Plaintiffs have no adequate remedy at law, and absent relief from this Court, will suffer irreparable injury from the elimination of the NCA.

## CLAIM 5: ULTRA VIRES PRESIDENTIAL ACTION TO "UNLEASH" FOSSIL FUELS BY DISMANTLING, SUPPRESSING, AND SCRUBBING SCIENCE
### (Against All Defendants)

308.   Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

309.   Congress has made clear that preservation of the natural environment and human health and welfare is a congressional priority. 42 U.S.C. § 4331. To accomplish that overarching goal which overlays implementation of all U.S. laws, Congress has found that scientific research and information sharing are vital. 42 U.S.C. § 4321; 44 U.S.C. § 3501 (describing Congressional intent to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government"); 42 U.S.C. § 6620 (mandating the Director of Office of Science and Technology Policy to "develop and issue an overarching set of principles to ensure the communication and open exchange of data and results to other agencies, policymakers, and the public of research conducted by a scientist employed by a

Federal civilian agency and to prevent the intentional or unintentional suppression or distortion of such research findings.").

310.   Congress has recognized "the profound impact of science and technology on society" and declared that "the general welfare, the security, the economic health and stability of the Nation, the conservation and efficient utilization of its natural and human resources, and the effective functioning of government and society require vigorous, perceptive support and employment of science and technology in achieving national objections." 42 U.S.C. § 6601(a)(1).

311.   Congress has also declared that science and technology should contribute to the priority goals of "making discoveries of basic science widely available at home and abroad," "preserving, fostering, and restoring a healthful and esthetic natural environment," "providing for the protection of the oceans and coastal zones, and the polar regions," "promoting the conservation and efficient utilization of the Nation's natural and human resources," and "eliminating air and water pollution," among other goals. 42 U.S.C. § 6601.

312.   Defendants' wholesale suppression of climate science research and data across the federal government to implement the EOs, as alleged herein, contravenes these Congressional findings and directives to pursue and make available scientific research that has guided the United States for more than half a century.

313.   All Defendants have acted ultra vires in suppressing climate science and data on their websites and interfering with its dissemination.

314.   Defendants' actual and threatened cuts to NSF-funded climate science research and education are ultra vires and contradict statutes requiring NSF to "promote United States leadership in ocean and atmospheric science and competitiveness in the applied uses of such knowledge," to "enhance public awareness and understanding of . . . atmospheric science," and to strengthen and meet the "needs of the various sciences." 33 U.S.C. §§ 893(a), 893a(a); 42 U.S.C. § 1862.

315.   Defendants' actual and threatened cuts to NIH-funded research related to fossil fuel pollution, climate change, and health are ultra vires and contradict the congressionally mandated purpose of the National Institute of Environmental Health Sciences to "conduct and support" "research, training, health information dissemination, and other programs with respect to factors in the environment that affect human health, directly or indirectly." 42 U.S.C. § 385l.

316.   Defendants NASA's and Pietro's deletions of climate data from NASA's website are ultra vires and contradict Congress' command that NASA's "Administrator shall" "enhance and facilitate the[] availability and widest possible use" of NASA's "climate related data" "to ensure public access to accurate and current data on global warming." 51 U.S.C. § 60506.

317.    Defendants' cuts to NOAA's programs, funding, staffing, and research alleged herein are ultra vires and contravene Congress' mandate requiring NOAA to develop a world-class Oceanic and Atmospheric Research program, to disseminate oceanic and atmospheric data to the general public, and to collaborate with universities to conduct scientific research that enhances scientists', the public's, and decisionmakers' understanding of the changing atmosphere and its effect on oceans. *See, e.g.*, 15 U.S.C. § 1537 (NOAA's environmental and information systems need to "integrate and interpret data from different sources to produce information that can be used by decisionmakers in developing policies that effectively respond to national and global environmental concerns."); 33 U.S.C. § 893a ("to enhance public awareness and understanding of ocean, coastal, Great Lakes, and atmospheric science and stewardship by the general public"); 33 U.S.C. § 893 ("in consultation with the Director of [NSF] and the Administrator of [NASA], shall establish a coordinated program of ocean . . . and atmospheric research and development . . . that will promote United States leadership in ocean and atmospheric science . . . ."); *see also* 15 U.S.C. §§ 313(c), 2901-2908, 2921-2961; 33 U.S.C. §§ 3601-3611.

318.    Defendant DOT's dismantling of the Office of Climate Change and Environment is ultra vires and violates the clear congressional mandate to maintain such an office. 49 U.S.C. § 102(g).

319. No statute authorizes Defendants' wholesale ultra vires actions to scrub, suppress, and dismantle climate science. Nor could one exist because other duly enacted statutes say the opposite. By acting contrary to multiple Congressional mandates, Defendants exceed their authority under the Constitution by violating the separation of powers outlined in Articles 1 and 2, the Take Care Clause, and the Presentment Clause, and are therefore ultra vires.

320. The ultra vires nature of the EOs implementation has already harmed, and continues to harm, the Plaintiffs.

321. Plaintiffs have no adequate remedy at law, and absent relief from this Court, will suffer irreparable injury from the unlawful EOs.

## CLAIM 6: SUBSTANTIVE DUE PROCESS STATE-CREATED DANGER
### (Against All Defendants)

322. Plaintiffs hereby incorporate the above paragraphs by reference as though fully set forth herein.

323. First, the EOs and their implementation are unconstitutional under the state-created danger doctrine because (a) they constitute affirmative government conduct that expose Plaintiffs to an actual, particularized danger that Plaintiffs would not otherwise have faced; (b) the injuries Plaintiff suffer or will suffer are foreseeable; and (c) Defendants have acted with deliberate indifference to that known or obvious danger.

324.    The EOs by design will "unleash" more fossil fuels, and their pollution, exposing Plaintiffs as children and youth to actual, particularized dangers. Every additional ton of GHG pollution the EOs cause increases dangers to Plaintiffs.

325.    Before President Trump issued the EOs, Defendants knew increasing fossil fuel pollution would endanger Plaintiffs' lives, causing them injuries, including to their physical health and wellbeing.

326.    With deliberate indifference, Defendants are taking actions that will irreversibly harm Plaintiffs by, among other things, blocking solar, wind, battery storage, efficiency efforts, and EV infrastructure and vehicles that reduce fossil fuel pollution; de-regulating and permitting fossil fuel activities with directives to ignore climate science; dismantling climate science research and study; canceling, suppressing, and scrubbing vital government climate data sets and models; scrubbing climate-related speech from government websites and academic and scientific research institutions around the country; dismantling extreme weather event warning systems; and undermining the efforts of scientific, medical, and clean renewable energy communities, climate advocates, and these Plaintiffs, who are trying to protect their terrestrial existence, their health and safety, and their future from fossil fuel pollution.

327.    Second, in addition to creating dangers to which Plaintiffs would not otherwise have been exposed, Defendants have restrained Plaintiffs' liberty by

asserting sovereign control over the airshed to which Plaintiffs are confined and cannot escape, which creates a corresponding constitutional duty to assume responsibility for their safety and general well-being. Through the EOs, Defendants have also assumed control over the "unleashing" of American energy to which Plaintiffs are confined, and from which they cannot escape. Given the custodial responsibilities Defendants have assumed over the Nation's airshed and American energy, and the special relationship to Plaintiffs it creates, Defendants have a constitutional duty to act affirmatively to make Plaintiffs safe from the enhanced danger they cause.

328.   Defendants assert control over the airshed by allowing and setting the amount of pollution that can be emitted to the air. Defendants assert control over energy by the EO's directives for fossil fuel "unleashing," and "American energy dominance," at the expense of clean renewable energy. Defendants' EOs and implementation thereof have imposed severe limitations on Plaintiffs' freedom to act on their own behalf to avoid each additional ton of GHG pollution and the foreseeable and particularized injuries it causes them. Defendants, therefore, have a special relationship with Plaintiffs, and have a concomitant duty of care to ensure their reasonable safety from the fossil fuel pollution Defendants are "unleashing."

329.   The issuance and implementation of the EOs constitute state-created dangers, violate Defendants' constitutional duty to Plaintiffs, and deprive Plaintiffs'

of their liberty rights to personal security. As a result, Plaintiffs are entitled to injunctive relief to protect the status quo during the pendency of the case, declaratory relief, and further relief as necessary to enforce the judgment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and each of them, pray for relief as set forth below:

1. A declaration pursuant to 28 U.S.C. § 2201 that Executive Orders 14154 §§ 1–3, 5, 7; 14156; and 14261 §§ 2–3, 5–7 and any implementing executive actions pursuant thereto are unlawful, unconstitutional, ultra vires, and invalid.

2. A permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing Executive Orders 14154 §§ 1–3, 5, 7; 14156; and 14261 §§ 2–3, 5–7.

3. A permanent injunction mandating that Defendants rescind all agency-wide directives applying, implementing, and effectuating Executive Orders 14154 §§ 1–3, 5, 7; 14156; and 14261 §§ 2–3, 5–7 prior to this injunction.

4. Award Plaintiffs their costs in this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, or otherwise appropriate; and

5.    Grant such other relief as the Court deems just and proper.

Respectfully submitted this 29th day of May, 2025.

*/s/ Roger Sullivan*
Roger Sullivan
McGARVEY LAW
345 1st Avenue East
Kalispell, MT 59901
(406) 752-5566
rsullivan@mcgarveylaw.com

Julia A. Olson*
Andrea K. Rodgers*
Nathan Bellinger*
OUR CHILDREN'S TRUST
1216 Lincoln St.
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org

Philip L. Gregory*
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
(650) 278-2957
pgregory@gregorylawgroup.com

Daniel C. Snyder*
Haley Nicholson*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Counsel to seek admission pro hac vice*

120