Roger Sullivan
McGARVEY LAW
345 1st Avenue East
Kalispell, MT 59901
(406) 752-5566
rsullivan@mcgarveylaw.com

Philip L. Gregory*
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
(650) 278-2957
pgregory@gregorylawgroup.com

Julia A. Olson*
Andrea K. Rodgers*
Nathan Bellinger*
OUR CHILDREN'S TRUST
1216 Lincoln St.
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org

Daniel C. Snyder*
Haley Nicholson*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION**

| | |
|---|---|
| **EVA LIGHTHISER**; et al.<br><br>               Plaintiffs,<br><br>   v.<br><br>**DONALD J. TRUMP**, in his official capacity as President of the United States; et al.<br><br>               Defendants. | Case No: CV-25-54-BU-DLC<br><br>**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

I.      INTRODUCTION .................................................................... 1

II.     FACTUAL BACKGROUND ....................................................... 2

    A.  The False Premise of a "National Energy Emergency" ............................ 2

    B.  The Executive Orders: Unleashing Fossil Fuels ........................................ 5

        1.  EO-14154 ("Unleashing") .................................................... 5

        2.  EO-14156 ("Emergency") ..................................................... 6

        3.  EO-14261 ("Coal") ............................................................. 7

    C.  Implementation of the Executive Orders ................................................ 8

    D.  The EOs and Their Implementation Irreparably Harm Plaintiffs .............. 11

III.    THE COURT HAS ARTICLE III JURISDICTION ........................................ 19

IV.     STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION ........ 20

V.      ARGUMENT ........................................................................... 20

    A.  Plaintiffs Demonstrate Serious Questions Going to the Merits ................. 20

        1.  Ultra Vires Claims (Claims 3, 4, 5) ........................................ 20

            a.  Plaintiffs may invoke ultra vires review to challenge the Executive Orders ........................................................ 20

            b.  The President lacked authority to issue the Executive Orders ........ 21

                (1)  Claim 3: "Unleash" Fossil Fuel Pollution and Debilitate EPA ... 22

                (2)  Claim 4: "Unleash" Fossil Fuels by Terminating the NCA ........ 25

                (3)  Claim 5: "Unleash" Fossil Fuels by Dismantling, Suppressing, Scrubbing Science ........................................................ 25

        2.  Violation of Fundamental Due Process Rights ..................................... 28

            a.  Right to Life (Claim 1) ................................................ 28

            b.  Right to Liberty (Claim 2) ............................................ 31

                (1)  All Plaintiffs ........................................................ 31

                (2)  Montana and Hawai'i Plaintiffs ........................................ 32

            c.  The Executive Orders Cannot Survive Strict Scrutiny ................... 35

(1)   The President's interest in "Unleashing" fossil fuels does not serve a compelling government interest. ....................................36

(2)   The EOs are not necessary to achieve energy security and American prosperity. ...............................................................37

(3)   The Executive Orders are not narrowly tailored to achieve a compelling government interest. ................................................38

3.   State-Created Danger (Claim 6) ...........................................40

B.   Plaintiffs Are Likely to Suffer Irreparable Harm Absent an Injunction.....43

C.   Balance of Hardships Warrants Injunctive Relief. ....................................45

D.   Plaintiffs Should Not Be Required to Post a Bond. ..................................46

CONCLUSION .......................................................................................................47

CERTIFICATE OF COMPLIANCE .....................................................................49

## TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Kruger*,
 35 F. Supp. 3d 1259 (D. Mont. 2014) ............................................................20, 45

*Am. Elec. Power Co. v. Connecticut*,
 564 U.S. 410 (2011) ....................................................................................42

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
 No. 25-CV-03698-SI, 2025 WL 1358477 (N.D. Cal. May 9, 2025) ..................21

*Am. Sch. of Magnetic Healing v. McAnnulty*,
 187 U.S. 94 (1902) ......................................................................................21

*Am. Trucking Ass'n, Inc. v. City of L.A.*,
 559 F.3d 1046 (9th Cir. 2009) ......................................................................44

*Arc of California v. Douglas*,
 757 F.3d 975 (9th Cir. 2014) ........................................................................44

*Arizona Dream Act Coal. v. Brewer*,
 757 F.3d 1053 (9th Cir. 2014) ......................................................................43

*Armstrong v. Exceptional Child Ctr., Inc.*,
 575 U.S. 320 (2015) ....................................................................................21

*Biden v. Nebraska*,
 600 U.S. 477 (2023) ....................................................................................21

*Biden v. Sierra Club*,
 142 S. Ct. 46 (2021) ....................................................................................21

*Brophy v. New England Sinai Hosp.*,
 497 N.E.2d 626 (Mass. 1986) ......................................................................29

*Burson v. Freeman*,
 504 U.S. 191 (1992) ....................................................................................36

*Caetano v. Massachusetts*,
 577 U.S. 411 (2016) ....................................................................................31

*Castro v. Cnty. of L.A.*,
  833 F.3d 1060 (9th Cir. 2016) ..............................................................40

*City & Cnty. of S.F. v. Trump*,
  No. 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) ...........43

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ..............................................................................21

*Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*,
  No. 25-CV-02847-AMO, 2025 WL 1233674 (N.D. Cal. Apr. 29, 2025) ...........46

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
  489 U.S. 214 (1989) ..............................................................................37

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
  98 F.4th 1180 (9th Cir. 2024) ................................................................20

*Food & Drug Admin. v. All. For Hippocratic Med.*,
  602 U.S. 367 (2024) ..............................................................................19

*Gillette Co. v. '42' Prods. Ltd.*,
  435 F.2d 1114 (9th Cir. 1970) ...............................................................19

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*,
  512 F.3d 1112 (9th Cir. 2008) ...............................................................43

*Guertin v. State*,
  912 F.3d 907 (6th Cir. 2019) .................................................................29

*Held v. Montana*,
  560 P.3d 1235 (Mont. 2024) ..................................................................34

*Held v. Montana*,
  CDV-2020-307, 2023 WL 5229257 (Mont. 1st Jud. Dist. Ct. Aug. 14, 2023) ....34

*Helling v. McKinney*,
  509 U.S. 25 (1993) ................................................................................31

*Henry A. v. Willden*,
  678 F.3d 991 (9th Cir. 2012) .............................................................40, 42

*Hurtado v. California*,
110 U.S. 516 (1884) ..................................................................36

*Illinois Cent. R.R. Co. v. Illinois*,
146 U.S. 387 (1892) ..................................................................33

*Johnson v. Ryan*,
55 F.4th 1167 (9th Cir. 2022) ..................................................32

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) ..................................................41

*Martinez v. City of Clovis*,
943 F.3d 1260 (9th Cir. 2019) ..................................................40

*Matter of Maui Elec. Co., Ltd.*,
506 P.3d 192 (Haw. 2022) ........................................................35

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ....................................................44

*Meyer v. Nebraska*,
262 U.S. 390 (1923) ..................................................................32

*Mills v. Rogers*,
457 U.S. 291 (1982) ..................................................................32

*Navahine v. Dep't of Transp.*,
No. 1CCV-22-0000631, Joint Stipulation and Order re: Settlement
(Haw. 1st Cir. Ct. June 20, 2024) ............................................35

*Nunez by Nunez v. City of San Diego*,
114 F.3d 935 (9th Cir. 1997) ....................................................35

*Pacito v. Trump*,
768 F. Supp. 3d 1199 (W.D. Wash. Feb. 28, 2025) ................44

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
766 F.2d 1319 (9th Cir. 1985), *amended by* 775 F.2d 998 (9th Cir. 1985) ..........46

*Plyler v. Doe*,
457 U.S. 202 (1982) ..................................................................30, 43

*PPL Montana v. Montana,*
  565 U.S. 576 (2012)..................................................................................33

*Prince v. Massachusetts,*
  321 U.S. 158 (1944)..................................................................................30

*Reed v. Gardner,*
  986 F.2d 1122 (7th Cir. 1993) ..................................................................41

*Reno v. Flores,*
  507 U.S. 292 (1993)............................................................................36, 43

*Robinson v. Labrador,*
  747 F. Supp. 3d 1331 (D. Idaho 2024)......................................................46

*Rochin v. California,*
  342 U.S. 165 (1952)..................................................................................31

*Save Our Sonoran, Inc. v. Flowers,*
  408 F.3d 1113 (9th Cir. 2005) ..................................................................47

*Sierra Club v. Trump,*
  963 F.3d 874 (9th Cir. 2020) ....................................................................21

*Sinclair v. City of Seattle,*
  61 F.4th 674 (9th Cir. 2023)......................................................................41

*Sioux Tribe of Indians v. United States,*
  316 U.S. 317 (1942)..................................................................................23

*Tamas v. Dep't of Soc. & Health Servs.,*
  630 F.3d 833 (9th Cir. 2010)................................................................40, 42

*Taylor-Failor v. Cnty. of Hawaii,*
  90 F. Supp. 3d 1095 (D. Haw. 2015).........................................................47

*Tenakee Springs v. Clough,*
  915 F.2d 1308 (9th Cir. 1990) ..................................................................47

*United States v. Windsor,*
  570 U.S. 744 (2013)..................................................................................33

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ..................................................................................23, 24

*Wilkinson v. Torres*,
    610 F.3d 546 (9th Cir. 2010) ..................................................................40

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
    No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025)........6

*Youngberg v. Romeo*,
    457 U.S. 307 (1982) ..................................................................................31

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..................................................................................21

**Constitutional Provisions**

U.S. Const. amend. V ....................................................................................1

U.S. Const. art. I, §1 ......................................................................................1

Haw. Const. art. XI, § 1 ................................................................................35

Haw. Const. art. XI, § 9 ................................................................................34

Mont. Const. art. II, § 3 ................................................................................34

Mont. Const. art. IX, § 1 ..............................................................................34

**Statutes**

15 U.S.C. § 313(c) ........................................................................................28

15 U.S.C. § 1537 ..........................................................................................27

15 U.S.C. § 2933 ..........................................................................................25

15 U.S.C. § 2934 ..........................................................................................25

15 U.S.C. § 2936 ..........................................................................................25

15 U.S.C. §§ 2901-2908 ..............................................................................28

15 U.S.C. §§ 2921-2961 ..............................................................................28

33 U.S.C. § 893 ......................................................................................26, 27

33 U.S.C. § 893a ....................................................................................26, 27

33 U.S.C. §§ 3601-3611 ...............................................................................28

42 U.S.C. § 1862 ...........................................................................................27

42 U.S.C. § 285l ............................................................................................27

42 U.S.C. § 4364 ...........................................................................................22

42 U.S.C. § 4365 ...........................................................................................22

42 U.S.C. § 6601 ......................................................................................25, 26

42 U.S.C. § 6620 ...........................................................................................26

42 U.S.C. § 7401(a)(3) ..................................................................................33

42 U.S.C. § 7401(b)(1)-(2), (c) .....................................................................22

42 U.S.C. § 7403 ...........................................................................................22

42 U.S.C. § 7404(a)(1) ..................................................................................22

42 U.S.C. § 7416 ...........................................................................................33

42 U.S.C. § 7434(c)(2) ..................................................................................22

42 U.S.C. §§ 7432-38 ...................................................................................22

49 U.S.C. § 102(g) ........................................................................................28

51 U.S.C. § 60506 .........................................................................................27

**Rules**

Fed. R. Civ. P. 65 ...........................................................................................1

Fed. R. Civ. P. 7 .............................................................................................1

Local Rule 7.1 ................................................................................................1

## Other Authorities

1 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND ......................29

*Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 66496 (Dec. 15, 2009) ..........23

Exec. Order No.14154, Unleashing American Energy, §§1-3, 5, 7, 90 Fed. Reg. 8353 (Jan. 29, 2025).....................................................................................passim

Exec. Order. No. 14156, Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 29, 2025)................................................................................1, 6, 7, 31

Exec. Order. No. 14261, Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241, §§2-3, 5-7, 90 Fed. Reg. 15517 (Apr. 14, 2025) ......................................................................................1, 7, 8, 31

James Madison, *Address to the Agricultural Society of Albemarle* (May 12, 1818) ....................................................................................................................28

John Locke, SECOND TREATISE OF GOVERNMENT (1690)........................................29

Proclamation No. 10914, 90 Fed. Reg. 16777 (Apr. 21, 2025)................................9

*Prosperity*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/prosperity........................................................................39

Renee Salas et al., *The Case of Juliana v. U.S.—Children and the Health Burdens of Climate Change*, 380 New Eng. J. Med. 2085 (2019)....................................30

Reorganization Plan No. 3 of 1970 .......................................................................22

Samantha Adhoot et al., *Climate Change and Children's Health: Building a Healthy Future for Every Child*, 153 Pediatrics e2023065504 (2024)...............30

Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (1755) ...................28

Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363 (Jan. 29, 2025) ........................10

## I.     INTRODUCTION

The President issued and Defendants are implementing Executive Orders (collectively, the "EOs") to increase fossil fuel development, block renewable energy, and terminate congressionally mandated climate change science and research. They have done so under the false claim of an energy emergency, while the true emergency is that our fossil fuel-based energy system is polluting the air, water, lands, and climate on which Plaintiffs' lives, liberties, and personal security depend.

Pursuant to Federal Rules of Civil Procedure 7 and 65 and Local Rule 7.1, Plaintiffs respectfully move this Court for a preliminary injunction prohibiting Defendants from implementing EO-14154 ("Unleashing American Energy") §§1-3, 5, 7; EO-14156 ("Declaring a National Energy Emergency"), which directs federal agencies to invoke emergency powers to accelerate the use of fossil fuels; and EO-14261 ("Reinvigorating America's Beautiful Clean Coal Industry and Amending EO-14241") §§2-3, 5-7, which direct agencies to increase the utilization and export of coal.[1] The foregoing EOs (i) are ultra vires by exceeding executive authority in assuming powers reserved to Congress by U.S. Const. art. I, §1, and (ii) violate the Fifth Amendment by infringing on Plaintiffs' fundamental rights and unlawfully exposing Plaintiffs to state-created danger.

---

[1] *See* Compl. (Doc. 1) ¶¶62-81.

The EOs identify no constitutional or statutory authority allowing the President to "unleash" the accelerated development of fossil fuels and resulting GHG pollution that drives the climate crisis—because none exists. Without "express constitutional or statutory authorization" empowering the President to "unleash" fossil fuels, the EOs are ultra vires and should be enjoined. The EOs are also unconstitutional and ultra vires as applied.

Absent injunctive relief from this Court, the EOs will irreparably harm Plaintiffs by increasing the Nation's already-excessive development of fossil fuels and slowing the deployment of wind, solar, storage, efficiency, and electric vehicle ("EV") technology, thereby worsening the pollution and climate conditions that harm and endanger Plaintiffs. Simultaneously, Defendants' implementation of the EOs deliberately eliminates critical climate science and programs that warn Plaintiffs of impending dangers at the time they most need them, e.g., during the imminent wildfire, heat, and hurricane seasons. Where the President has defied Congress on questions of national significance, preliminary injunctive relief is warranted.

## II.     FACTUAL BACKGROUND

### A.     The False Premise of a "National Energy Emergency"

On day one of his current Administration, President Trump signed EOs mandating a dramatic expansion of the Nation's fossil fuel activities to address a

"national energy emergency" that does not exist. Heal ¶¶4-8,15-16; Stiglitz ¶¶12,45; Jacobson ¶9.[2] The U.S. is the world's largest producer of oil and gas, the largest exporter of gas, the fourth-largest exporter of oil, and has ample energy resources to meet its needs today and "the ability to meet its future energy needs entirely with clean, renewable energy." Heal ¶¶4-8; Jacobson ¶¶9-13,19-21. "In a true domestic energy emergency, the U.S. would not be exporting record-levels of fossil fuels." Heal ¶6; Jacobson ¶¶12-13. The truth is, "[t]he United States no longer needs fossil fuels for its energy purposes and has not for some time." Jacobson ¶17.

The national energy emergency fallacy is exemplified by the President's concurrent "shocking" directives to stymie the growth of wind, solar, and storage energy in the U.S., even though those are the cheapest and most abundant forms of energy today. Jacobson ¶¶14-19,39; Heal ¶¶9-10,14; Jenkins ¶¶14,17. "Such actions make zero economic sense" because "we are destroying economic value—making the economy worse off in total—every time we use coal, gas, or oil to generate electricity." Heal ¶¶13-14. Indeed, "93% of newly installed energy nameplate capacity in 2024 was solar, wind and battery storage" in the U.S. Jacobson ¶14. "Solar and wind energy will play an essential role in meeting energy demand in 2035 because of their lower costs, quicker scalability, and avoided GHG pollution."

---

[2] Last names are used for expert and fact witness declaration citations. First names or initials are used for Plaintiff declaration citations.

Jenkins ¶17; Jacobson ¶29 (a single windmill on each abandoned and orphaned oil and gas well could produce "far more than needed to power the U.S. for all energy purposes many times over.").

The clean renewable energy sources the EOs block are the very sources that provide reliable energy security *during* emergencies. Balbus ¶¶13-14. Thus, it "does not make sense for the Executive Orders to claim an energy emergency while blocking electric vehicles and efficiency measures for appliances." Heal ¶15; Jenkins ¶¶11,13-17,Ex.B; Olson ¶¶35-38. In total, "[t]he Executive Orders will raise US energy costs by more than $8 billion annually by 2035." Jenkins ¶10. In contrast, a transition to clean renewable energy by 2050 would result in "a cost saving of about $1.58 trillion per year" in American's annual energy costs, in large part because of substantial efficiencies gained through clean energy. Jacobson ¶25.

Based on this false "emergency" premise—and without any constitutional or statutory authority—Defendants have already begun implementing the EOs across the federal government, increasing greenhouse gas ("GHG") pollution, inhibiting the critical transition to renewable energy, blocking access to scientific information, and injuring Plaintiffs' fundamental rights.

### B.    The Executive Orders: Unleashing Fossil Fuels

#### 1.    EO-14154 ("Unleashing")

On January 20, 2025, President Trump issued EO-14154 to unleash fossil fuels. Section 1 states: "In recent years, burdensome and ideologically motivated regulations have impeded the development of these [fossil fuel] resources, limited the generation of reliable and affordable electricity, reduced job creation, and inflicted high energy costs upon our citizens." 90 Fed. Reg. 8353. This statement is false. Stiglitz ¶10; Jacobson ¶¶9-17,25; Heal ¶¶9-15; Jenkins ¶¶10-14,16-17,23.

Section 2 announces the directive "to encourage [fossil fuel] energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf"; "to eliminate the 'electric vehicle (EV) mandate.'"; and "that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law." 90 Fed. Reg. 8353. Section 3 directs heads of "all agencies" to "begin implementing action plans to suspend, revise, or rescind all agency actions" that place an "undue burden" on "identification, development, or use of domestic energy resources—with particular attention to oil, natural gas, [and] coal[.]" *Id.* at 8354. Climate science is one of the "undue burden[s]." MacCracken ¶¶24-26; Jonesi ¶¶10-11,14.

Section 5 directs Defendants and "any other relevant agencies" to "undertake all available efforts to eliminate all delays within their respective permitting

processes" for fossil fuel energy projects. *Id.* at 8355. Section 7 instructs all agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program," as well as several programs designed to expand the use of EVs, wind, solar, and storage of renewable energy. *Id.* at 8357.[3]

### 2.    EO-14156 ("Emergency")

On January 20, 2025, President Trump issued EO-14156, which falsely states: "The energy and critical minerals ('energy') identification, leasing, development, production, transportation, refining, and generation capacity of the United States are all far too inadequate to meet our Nation's needs." 90 Fed. Reg. 8433; *supra* II.A. Section 2 directs agencies to invoke emergency powers "to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources, including, but not limited to, on Federal lands." 90 Fed. Reg. 8434. "Energy resources" is defined to include all forms of fossil fuels and

---

[3] The U.S. District Court for Rhode Island has preliminarily enjoined elements of the funding freeze in §7 of EO-14154. *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *26 (D.R.I. Apr. 15, 2025).

exclude all wind energy, all solar energy, battery storage, energy efficiency measures, and EVs. 90 Fed. Reg. 8436.

### 3.     EO-14261 ("Coal")

On April 8, 2025, President Trump issued EO-14261, which will "shackle Americans with one of the most expensive energy sources." Jacobson ¶18. Section 2 directs agencies to prioritize coal and "support the domestic coal industry by removing Federal regulatory barriers that undermine coal production, encouraging the utilization of coal to meet growing domestic energy demands, increasing American coal exports, and ensuring that Federal policy does not discriminate against coal production or coal-fired electricity generation." 90 Fed. Reg. 15517.

Section 3 "designate[s] coal as a 'mineral' as defined in section 2 of Executive Order 14241 of March 20, 2025," entitling coal to the emergency measures required by EO-14241. *Id.* Section 5 directs the Secretaries of the Interior and Agriculture to "prioritize coal leasing and related activities" on federal lands and "expedite coal leasing in these areas" through emergency powers. *Id.* Section 6 directs agencies to rescind "any guidance, regulations, programs, and policies within their respective executive department or agency that seek to transition the Nation away from coal production and electricity generation." *Id.* at 15518. Section 7 directs the Secretary of Commerce to "take all necessary and appropriate actions to promote and identify export opportunities for coal and coal technologies and facilitate international

7

offtake agreements for United States coal." *Id.* Climate science and all agency "guidance, regulations, programs, and policies" informed by climate science interfere with these coal revitalization directives. MacCracken ¶25; Olson ¶¶4,9.[4]

## C.   Implementation of the Executive Orders

Furthering the EOs, President Trump directed Defendant agencies to immediately repeal, without public notice and comment, allegedly "unlawful" regulations, including those that limit fossil fuels. Olson ¶7. EPA, DOT, and DOE are actively complying. Jonesi ¶¶10-12; Jenkins ¶8; Olson ¶¶15,17,19-20,35,38. EPA Administrator Zeldin subsequently announced "the greatest day of deregulation" admitting EPA was "driving a dagger straight into the heart of the climate change religion to . . . unleash American energy." Jonesi ¶¶7-8,10-11. At the "heart" of EPA's regulation of fossil fuel pollution is EPA's 2009 Endangerment Finding "that the current and projected concentrations of GHG emissions threaten the public health and welfare of current and future generations, which serves as the legal prerequisite for EPA to exercise its statutory authority to regulate GHG pollution." Jonesi ¶12. EPA is presently working to undo that Finding, which a 40-year EPA veteran describes as something not "a single scientist inside the federal government [ ] disagreed with." *Id.*

---

[4] Together, the three EOs, *in pari materia*, accomplish the "unleashing" of fossil fuels, referred to herein.

The President also granted stationary sources burning fossil fuels an exemption from the hazardous air pollutant rule, extending operations indefinitely and causing millions of additional metric tons of GHGs to be emitted annually. 90 Fed. Reg. 16777; Jenkins ¶¶9,18-21; Jonesi ¶¶18-19; Erickson ¶¶12-13. For example:

- "The Colstrip power plant is Montana's largest emitter of $CO_2$, emitting 11 million metric tons of $CO_2$ in 2023," and was headed to retirement but for the presidential exemption it received from EPA. Erickson ¶¶12-13.

- The J.H. Campbell coal plant in Michigan was ordered to continue operating past its closure date of May 31, 2025. *Id.* ¶18.

- DOI extended production for coal mines in Montana, such as Spring Creek Mine by 16 years and Bull Mountains Mine by 9 years. *Id.* ¶¶14-15.

- A half-century-old oil-and-gas-fired power plant in Pennsylvania, PJM Interconnection, was ordered to keep operating by Energy Secretary Wright a day before its closure. Jenkins ¶20.

DOE is also blocking and repealing efficiency standards for appliances, buildings, and batteries, and has authorized new liquified natural gas ("LNG") projects. Jenkins ¶20; Olson ¶33.

On the clean energy side, electric vehicles and charging infrastructure are being denied congressionally appropriated funds via the National Electric Vehicle Infrastructure program, while EPA is revoking "waivers" that allow states to mandate EVs by 2035, resulting in lost investment and corresponding manufacturing for EV-battery technology. Jacobson ¶38; Jenkins ¶¶12-16. Defendants froze other

funding from the Inflation Reduction Act, preventing the substitution of clean technologies for fossil fuel. J.M. ¶10; Jenkins ¶¶8,15; Olson ¶¶10-25. Consistent with his post-inaugural statement that "[w]e're not going to do the wind thing," President Trump directed the "withdraw[al] from disposition for wind energy leasing all areas within the Offshore Continental Shelf (OCS) as defined in section 2 of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331" and canceled approved wind projects. 90 Fed. Reg. 8363; Jonesi ¶18; Jenkins ¶¶12-13; Olson ¶8.

At the President's direction and because climate science interferes with unleashing fossil fuels, Defendants are collectively dismantling and disabling institutions that provide information central to the fields of climate science and clean energy. MacCracken ¶¶14-23; Balmes ¶¶33-36; Byron ¶¶37-42; Whitlock ¶¶20-27; Jonesi ¶¶9,13-15; McLean ¶¶13-15,17-20,31-35; DiLiberto ¶¶13-20; Running ¶¶60-63; Balbus ¶¶8,19; Olson ¶¶10,12-13,16,20,23,35-36,40-52. Of paramount importance, the President ordered the U.S. Global Change Research Program ("USGCRP") to dismiss all researchers working on the National Climate Assessment ("NCA"), "one of the most vital tools in our country for understanding risks and consequences from continued reliance on fossil fuels and for preparing for climate change impacts," in effect canceling the NCA. MacCracken ¶25; Olson ¶¶46-47; McLean ¶20; Byron ¶38; Whitlock ¶20 (the NCA was vital to the Montana Climate Assessment); Running ¶¶60-61. "'Unwinding' climate science and the NCA

is a critical component of 'unleashing' fossil fuels because the scientific evidence does not and never will support the President's Executive Orders or their implementation and shows how dangerous they are for the Plaintiffs and American public." MacCracken ¶25. Defendants are methodically implementing the EOs in dozens of ways across Defendant agencies. Olson ¶¶3-52.

### D.    The EOs and Their Implementation Irreparably Harm Plaintiffs

There is overwhelming scientific consensus that Earth is warming as a direct result of GHG emissions, primarily $CO_2$, from the burning of fossil fuels. Running ¶¶15-16. The production and burning of coal, oil, and gas release $CO_2$ into the atmosphere, where it steadily accumulates, affecting Plaintiffs throughout their lives. Running ¶¶8-19. Scientists measure how much extra energy, or heat, is being retained in Earth's systems (e.g., oceans, ice, air, land surface) compared to how much heat escapes from our atmosphere into space; this is called Earth's "energy imbalance." Running ¶¶20-28. This is the most critical metric for measuring global heating and attendant impacts on the climate system. Running ¶26. Earth's energy imbalance is in a danger zone due to fossil fuel pollution and an overload of $CO_2$. Running ¶¶23-26. Every ton of $CO_2$ emitted contributes to global heating, impacts the climate, and thus increases Plaintiffs' exposure to harms now and in the future. Running ¶¶12-19,28; Whitlock ¶13; Byron ¶¶17,21.

Implementation of the EOs is already increasing and will continue to increase GHG pollution, threatening Plaintiffs' lives, health, and safety. Erickson ¶¶10-15,17-21; Running ¶¶17-18; Whitlock ¶¶11-19; Byron ¶21; Van Susteren ¶¶22,35; Jenkins ¶¶9,13-14,17-21. "By 2035 the Executive Orders will cause an increase in GHG emissions of 510 million metric tons of $CO_2$-equivalent," as a low estimate, not including additional emissions from increased coal production and other near-term actions. Jenkins ¶¶9,19-22. "The amount of emissions that is likely to result if Defendants' Executive orders to 'unleash' fossil fuels continue to be implemented are substantial and significant in Montana and across the nation." Erickson ¶21. For instance, the approved modifications of Montana's Spring Creek Mine and Bull Mountains coal mine will result in an additional 68 and 98 million metric tons of $CO_2$ emissions respectively. Erickson ¶¶14-15. "Montana has the largest recoverable coal reserves among all US states" with potential $CO_2$ emissions of 842 million metric tons if "unleashed." Erickson ¶11.

Rising atmospheric $CO_2$ concentrations are causing temperatures to rise in Montana, California, Oregon, Hawai'i, and Florida, with harmful consequences. Running ¶¶20-22,29-34. Montana, Oregon, and California are heating faster than the global average because higher latitudes are heating more quickly. Running ¶29. 2024 was the warmest year on record while the ten warmest years on record have all occurred since 2015, during Plaintiffs' childhoods. Running ¶20. Plaintiff Joseph

"suffer[s] [from] life-threatening heat illness" and has "previously been hospitalized for heat sickness," which led to intubation, days in the hospital, and "almost cost [him his] life." Joseph ¶¶6-9. Dr. Byron, a pediatrician, confirms that unleashing fossil fuels will worsen heat-related illness for Joseph, "including an elevated risk of mortality." Byron ¶¶19,22-24. "In children with asthma, including Plaintiffs Olivia, Isaac, and Joseph, exposure to higher temperatures is associated with lower lung function, which is linked to development of chronic respiratory disease later in adulthood." Byron ¶22.

Increased temperatures and drought conditions increase the frequency and severity of climate change-induced wildfires and smoke, which harm all Plaintiffs physically and psychologically. Running ¶¶35,39-53; Byron ¶25. Plaintiff Avery's "childhood memories are full of fires" with "air [ ] chock full of unhealthy and hazardous smoke," as she worked in unsafe conditions to protect animals, threatening her safety. Avery ¶¶3-4. Plaintiff J.M. works with animals outdoors and worsening fires in Montana have "forced [her] to be outside in the summer and fall even when the air is filled with wildfire smoke," making her sick and forcing her to prepare for evacuation. J.M. ¶¶4-5. Upon returning to LA for college in January 2025, Plaintiff Kalālapa "had to wear an N-95 mask for three weeks on campus because of the smoke and school warnings about breathing in heavy metals and other hazardous particulate matter" and still suffered impaired vocal chords. Kalālapa ¶7;

13

Byron ¶26. "Wildfire smoke has been associated with widespread negative health impacts on children and can trigger or worsen respiratory diseases, including asthma." Byron ¶25. Plaintiffs J.K. and N.K. suffer from respiratory illness made worse by smoke, impairing their lives and forcing a decision to leave Montana. Anderson ¶¶3-9. "Twelve of the youth Plaintiffs in this case live in counties that received an 'F' grade for 24-hour high particle pollution days between 2021-2023 in the American Lung Association, State of the Air, 2025 Report[.]." Byron ¶25; Plaintiff Olivia ¶4 (asthmatic Missoula resident: "there is nowhere to escape;" "wildfire smoke is particularly dangerous to my health and wellbeing, and even my very life"). The science validates what Olivia knows: "I know that if the Trump administration is allowed to 'unleash' more planet warming fossil fuels, the wildfires in Montana, and the smoke in Missoula will get worse and I will breathe in even more of it." Olivia ¶4; Running ¶¶50,53; Byron ¶¶25-28; Balmes ¶¶30-32.

Plaintiffs also face direct physical injuries from exposure to more (and avoidable) fossil fuel pollution, including pulmonary harms from exposure to particulate pollution and coal dust. Byron ¶¶16-21; Balmes ¶¶17-25. "Pollution from coal-fired power plants is associated with thousands of excess deaths every year in the United States, and each additional ton of pollution increases the risk of death." Byron ¶17; Jacobson ¶¶30-35 (limiting fossil fuel pollution avoids deaths and protects human life); Balmes ¶17. "The trains transporting the coal also generate

14

significant air pollution, with an associated increase in the risk of asthma and other chronic lung diseases for children of nearby communities" including Plaintiffs Eva, Ripley, J.M., Olivia, Lander, Grace, J.H., and I.H. Balmes ¶24 ("exposure to coal dust impacts respiratory health"); J.M. ¶9. "In addition to death, pollution from fossil fuels cause preterm birth, impaired fetal growth, childhood asthma, decreased mental health, respiratory and cardiovascular disease, and cancer." Jacobson ¶31. The EOs also impact Plaintiffs in other tangible ways, such as blocking funding for electric school buses that Plaintiff J.M. worked to secure for her school. Now, J.M. will be exposed to more pollution from the old, diesel buses slated for replacement. J.M. ¶10. A leading pulmonologist confirms "[s]chool buses powered by fossil fuels are also harmful for children and pollute the air they breathe" and "can lead to significant health risks." Balmes ¶¶19,27.

More heat brings more pollen and worsening allergies for Plaintiffs Lander, Olivia, Georgi, Ula, Ripley, J.M., and Avery. Byron ¶29. Unleashing fossil fuels will result in more immediate harms to Plaintiffs' physical health, which include shortness of breath, headaches, sore throats, eye and nose irritation, disrupted sleep, exacerbated allergies, dizziness, nausea, congestion, and the potential for life threatening illness. Byron ¶¶22-30; Eva ¶18; Joseph ¶10.

Unleashing more fossil fuel pollution today locks in traumatic climate harms that cause Plaintiffs life-long cognitive and mental health injuries. Byron ¶¶31-36;

Van Susteren ¶¶30-35; Olivia ¶¶7-8; Eva ¶19; Avery ¶¶17-19; Joseph ¶¶9,13; Delaney ¶12; J.M. ¶¶8-9,11; Kalālapa ¶11. The federal government knows that climate change causes "serious mental health consequences" among children and is a chronic stressor that will have adverse effects on children's lives. Van Susteren ¶¶13-15. Many Plaintiffs describe injuries to their mental health and wellbeing they have experienced because of their direct exposure to climate change impacts, such as wildfires, hurricanes, flooding, and fossil fuel pollution. Van Susteren ¶¶15-17. The compounding psychological harms caused by more climate change is a recognized adverse childhood experience ("ACE") that contributes to a lifetime of hardships for youth. Byron ¶¶31-36; Van Susteren ¶33. The institutional betrayal embedded in the EOs exacerbates this pre-existing psychological harm for Plaintiffs. Van Susteren ¶20; Avery ¶¶19-20; Olivia ¶7.

"Unleashed" fossil fuel pollution will injure Plaintiffs' cultural practices, subsistence, familial traditions, and opportunity for family formation. Plaintiff Kalālapa, a Native Hawaiian, will lose more coral reef and fish populations vital to Indigenous subsistence to ocean warming, risking "erasure" of her life and culture. Kalālapa ¶¶5-6,11 ("As an Indigenous Pacific Islander, we are our lands and oceans; and our lands and oceans are us."). Plaintiff Delaney, a fourth generation Floridian, will lose her family's traditions on the reefs from increases in ocean warming and acidification. Delaney ¶¶2,6-7,12. Reefs serve the additional purpose of providing

16

Kalālapa and Delaney's personal security from storm surge and coastal flooding and erosion. Kalālapa ¶6; Delaney ¶12. In the West, the increased loss of snow in the winter and access to important rituals in nature deprive Plaintiffs of familial traditions. J.M. ¶¶4-5,8 (horseback riding; snow at Christmas); Anderson ¶7 (hiking, camping, fishing, hunting in Montana). Unleashed fossil fuel pollution leads to greater insecurity for Plaintiffs who wish to have children of their own, and greater risk of birthing babies with physical ailments, depriving them of the healthful opportunity to form families. Olivia ¶10; Avery ¶2; Byron ¶34 ("a child born in 2020 is expected to be exposed to up to a seven-fold increase in extreme heat waves compared to someone born in 1960"); Balmes ¶18 (fossil fuel pollution health "risk begins prenatally"); Van Susteren ¶41.

All Plaintiffs will lose more access and the use and enjoyment of their state public trust resources as lakes dry up, forest land is lost to fire, tidelands flood, and fisheries and wildlife diminish or alter migration patterns. *See generally* Eva, J.M., Olivia, Grace, Anderson, Kalālapa, Delaney, Joseph, Avery, Running, Whitlock.

The concurrent deprivations of critical climate change science and research, datasets on climate and fossil fuel pollution, warning systems, survival resources, and removal of climate change communications across federal agencies also threaten Plaintiffs with irreparable harm. Whitlock ¶¶20-27 (cuts to climate science programs and funding "are catastrophic"); MacCracken ¶¶12,16; McLean ¶¶15,17-20,25,27;

17

DiLiberto ¶22; Balbus ¶8-9,12,17-19; Jonesi ¶¶9-14. "Reports and data prepared by federal agencies are critical for public health researchers, medical providers, and others to be able to educate themselves about the dangers posed by climate change and fossil fuels." Byron ¶¶37-38,40 (cuts to programs supporting youth mental health); Balbus ¶9. Warning systems for poor air quality in Montana, hurricanes in Florida, flood events, and heat waves have all been cut. Byron ¶¶41-42; McLean ¶¶26-29; MacCracken ¶16. Plaintiff Avery has already suffered harmed through three hurricane evacuations in two years of living in Florida, where her school was severely damaged. Avery relies on, and will be at risk without, the government's hurricane tracking and warning systems needed to escape danger. Avery ¶¶7-14,18,21. Plaintiffs Delaney, Joseph, and Avery also use climate science the government produces—science that has been cancelled pursuant to the EOs. Delaney ¶¶6,16; Joseph ¶¶21-23; Avery ¶21; Olson ¶¶40-47; *supra* II.C; *infra* V.A.1.b.(3). Likewise, the suspension and cancellation of federal funding for climate change research and renewable energy harms Plaintiffs' professional and academic opportunities they are pursuing to defend their lives and the nature they seek to protect. Delaney ¶¶16-17; Joseph ¶¶14-19; Avery ¶21; Eva ¶20; Grace ¶¶3-12.

It is critical to remember that the above-described injuries are to children and youth, who are physiologically and cognitively developing through age 25. Children breathe in more air per unit of time than adults and consume more food and water

proportional to their body weight, making them more susceptible to polluted or contaminated air, water, or food. Byron ¶20; Balmes ¶18. They spend more time recreating outdoors and have more difficulty self-regulating body temperature, making them more susceptible to excess heat, poor air quality, and other climate change impacts. Balmes ¶18. EPA knows children are at a critical development stage as their physiological and psychological maturity develops more rapidly than at any other time in life, making them particularly susceptible and most vulnerable to climate change and fossil fuel pollution. Byron ¶¶6,31,Ex.B.

## III.    THE COURT HAS ARTICLE III JURISDICTION

This Court has Article III jurisdiction because Plaintiffs (1) have "suffered or likely will suffer an injury in fact," *supra* II.D; (2) "the injury likely was caused or will be caused by the defendant[s']" EOs, *supra* II.C; and (3) is likely to be at least partially redressed by "the requested judicial relief" of enjoining the EOs, *supra* II.C.,D. *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024). In addition, "there is a substantial [Article III] controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" regarding the constitutionality of the EOs. *Gillette Co. v. '42' Prods. Ltd.*, 435 F.2d 1114, 1118-19 (9th Cir. 1970); Doc. 1.

## IV.    STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

A party is entitled to a preliminary injunction if it demonstrates (i) "serious questions going to the merits," (ii) "a likelihood of irreparable injury," (iii) "a balance of hardships that tips sharply towards the plaintiff," and (iv) "the injunction is in the public interest." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024). The serious questions standard is "a lesser showing than likelihood of success on the merits." *Id.* With respect to the third and fourth factors, "consideration of the public interest is generally subsumed by the balance of the equities analysis when the Federal government is a party." *All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1267 (D. Mont. 2014).

## V.    ARGUMENT

### A.    Plaintiffs Demonstrate Serious Questions Going to the Merits

The President had no authority to issue the unconstitutional EOs and even if Article II or statutes permitted them, his EOs will not survive this Court's strict scrutiny. These are serious questions justifying a preliminary injunction.

#### 1.    Ultra Vires Claims (Claims 3, 4, 5)

##### a.    Plaintiffs may invoke ultra vires review to challenge the Executive Orders

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v.*

*Exceptional Child Ctr., Inc*., 575 U.S. 320, 327 (2015). "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-CV-03698-SI, 2025 WL 1358477, at *15 (N.D. Cal. May 9, 2025). "Where the President exceeds his authority, the district court may declare the action unlawful and an injunction may issue." *Id.*; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588-89 (1952); *see also Sierra Club v. Trump*, 963 F.3d 874, 892 (9th Cir. 2020), *vacated on other grounds by Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (finding an equitable ultra vires cause of action to challenge Department of Defense's transfer of funds).

### b. The President lacked authority to issue the Executive Orders

Under Article II section 3, the President and his officers must faithfully execute the law and all acts "must be justified by some law, and in case an official violates the law to the injury of an individual, the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). "Presidential action that either repeals or amends parts of duly enacted statutes" violates the Presentment Clause. *Clinton v. City of New York*, 524 U.S. 417, 439 (1998). Even when invoking emergency authority, presidential authority is constrained by the Constitution, statutes, and the rule of law. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 500 (2023) (forgiving student loans violates separation of powers).

21

### (1)    Claim 3: "Unleash" Fossil Fuel Pollution and Debilitate EPA

By directing all agencies to unleash fossil fuels, fast-track climate pollution, and suppress climate science, the EOs, *in pari materia*, illegally amend, repeal, rescind, and circumvent duly enacted federal statutes, including the Clean Air Act and Inflation Reduction Act, which identify carbon dioxide as an air pollutant and direct Defendant EPA to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution," and achieve "pollution prevention." 42 U.S.C. § 7434(c)(2); 42 U.S.C. § 7401(b)(1)-(2), (c); *see also* Reorganization Plan No. 3 of 1970 (establishing EPA); *See, e.g.*, 42 U.S.C. § 7434(c)(2) (GHGs are air pollutants). Congress expressly stated the need "for the prevention and control of air pollution resulting from the combustion of fuels" and a "result in decreased atmospheric emissions." 42 U.S.C. § 7404(a)(1). Congress directed EPA to invest in solutions to understand and mitigate the effects of fossil fuel pollution and accelerate the transition to clean, renewable energy, *e.g.* 42 U.S.C. §§ 7432-38, and to invest in scientific integrity, including through the mandated Office of Research and Development. 42 U.S.C. §§ 4364, 4365, 7403.

"Agencies have only those powers given to them by Congress," and Congress does not "typically use oblique or elliptical language to empower an agency to make

a 'radical or fundamental change' to a statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Congress did not delegate to EPA authority or power to "unleash" fossil fuels. EO-14154. The Clean Air Act and its amendments do not expressly, nor implicitly, authorize EPA to "unleash" GHG pollution, which "endanger[s] the public health and welfare of current and future generations." *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 66496, 66523 (Dec. 15, 2009). The EOs do not, and cannot, identify any constitutional or statutory source of authority to ignore federal environmental law and "unleash" fossil fuels, their pollution, or obstruct wind, solar, battery storage, efficiency, or EVs. EPA itself said that "courts 'expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.'" *West Virginia*, 597 U.S. at 716. "Unleashing" more climate pollution is certainly a question with vast economic significance. *See generally* Stiglitz, Heal, Jacobson, Jenkins. The EOs are also ultra vires because there is "no express constitutional or statutory authorization" empowering the President to "unleash" fossil fuels, including coal, on an emergency basis in a manner that harms children's lives. *See Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942).

By directing EPA to "unleash" fossil fuels, increase coal extraction[5] and production, and block wind, solar, efficiency, battery storage, and EVs, and dismantle climate science, including by cutting funding, grants, and staff, *see supra* II.C., President Trump's EOs are ultra vires for obstructing Congress' express enactment of law, working against the explicit purpose and mandate of EPA to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." This violates separation of powers outlined in Articles I and II, the Take Care Clause, the Presentment Clause, and implicates major questions about fossil fuel pollution, climate change, public health, EVs, and a preference for clean, non-polluting energy, which Congress has already resolved against the EOs. Plaintiffs raise serious questions that Defendants are exceeding their authority, "asserting highly consequential power beyond what Congress could reasonably be understood to have granted" under the Constitution exceeding authority as delegated by Congress under Article I, and failing to faithfully execute the law under Article II. *West Virginia*, 597 U.S. at 724.

---

[5] The Supreme Court has said: "We also find it 'highly unlikely that Congress would leave' to 'agency discretion' the decision of how much coal-based generation there should be over the coming decades." *West Virginia*, 597 U.S. at 729.

### (2) Claim 4: "Unleash" Fossil Fuels by Terminating the NCA

By disbanding USGCRP and defunding and canceling the NCA pursuant to the EOs, Defendants have illegally amended, repealed, rescinded, and circumvented duly enacted federal statutes, including 15 U.S.C. §§ 2933, 2934, 2936, which direct the President to maintain USGCRP and for USGCRP to prepare and submit the NCA. MacCracken ¶17; Olson ¶¶46-47. Congress enacted this 1990 law on a question of national significance and the President and his agents violate the separation of powers, outlined in Articles I and II, the Take Care Clause, and the Presentment Clause, in not carrying out the law as written: "The President *shall* establish an interagency United States Global Change Research Program to improve understanding of global change. The Program *shall* be implemented by the Plan developed under section 2934 of this title." 15 U.S.C. §§ 2933, 2934, 2936 (emphasis added). Plaintiffs raise serious questions that the EOs are ultra vires in dismantling the USGCRP and NCA.

### (3) Claim 5: "Unleash" Fossil Fuels by Dismantling, Suppressing, Scrubbing Science

At 42 U.S.C. § 6601[6], Congress prioritized "making discoveries of basic science widely available at home and abroad," "preserving, fostering, and restoring a healthful and esthetic natural environment," "providing for the protection of the

---

[6] National Science, Engineering, and Technology Policy and Priorities Act.

oceans and coastal zones, and the polar regions," "promoting the conservation and efficient utilization of the Nation's natural and human resources," and "eliminating air and water pollution," among other goals. *See also* 42 U.S.C. § 6601(a)(1). At 42 U.S.C. § 6620, Congress directed that by a date certain in 2007, the Director of Office of Science and Technology Policy:

> shall develop and issue an overarching set of principles to ensure the communication and open exchange of data and results to other agencies, policymakers, and the public of research conducted by a scientist employed by a Federal civilian agency and to prevent the intentional or unintentional suppression or distortion of such research findings. The principles shall encourage the open exchange of data and results of research undertaken by a scientist employed by such an agency and shall be consistent with existing Federal laws.

All Defendants are engaged in the wholesale elimination of climate science research and data in contravention of these congressional policies that have guided the United States for more than half a century. MacCracken ¶¶14-23; Balmes ¶¶33-36; Byron ¶¶37-42; Whitlock ¶¶20-27; Jonesi ¶¶9,13-15; McLean ¶¶13-15,17-20,31-35; DiLiberto ¶¶13-20; Running ¶¶60-63; Balbus ¶¶8,19; Olson ¶¶10,12-13,16,20,23,35-36,40-52; *supra* II.C.

Defendants' cuts to NSF-funded climate science contradict statutes requiring NSF to "promote United States leadership in ocean and atmospheric science and competitiveness in the applied uses of such knowledge," to "enhance public awareness and understanding of . . . atmospheric science," and to strengthen and meet the "needs of the various sciences." 33 U.S.C. §§ 893(a), 893a(a); 42 U.S.C. §

1862. Defendants' cuts to NIH-funded research related to fossil fuel pollution, climate change, and health contradict the congressionally mandated purpose of the National Institute of Environmental Health Sciences to "conduct and support" "research, training, health information dissemination, and other programs with respect to factors in the environment that affect human health, directly or indirectly." 42 U.S.C. § 285l.

Defendants NASA's and Administrator Pietro's deletions of climate data from NASA's website contradict Congress' command that NASA's "Administrator shall" "enhance and facilitate the[] availability and widest possible use" of NASA's "climate related data" "to ensure public access to accurate and current data on global warming." 51 U.S.C. § 60506. Defendants' cuts to NOAA's programs, funding, staffing, and research are ultra vires and contravene Congress' mandate requiring NOAA to develop a world-class Oceanic and Atmospheric Research program, to disseminate oceanic and atmospheric data to the general public, and to collaborate with universities to conduct scientific research that enhances the understanding of the changing atmosphere and its effect on oceans. *See, e.g.*, 15 U.S.C. § 1537 (NOAA must "integrate and interpret data" to produce information to develop policies that respond to national environmental concerns); 33 U.S.C. § 893a ("to enhance public awareness and understanding of ocean, coastal, Great Lakes, and atmospheric science and stewardship by the general public"); 33 U.S.C. § 893 ("in

27

consultation with the Director of [NSF] and the Administrator of [NASA], shall establish a coordinated program of ocean . . . and atmospheric research and development . . . that will promote United States leadership in ocean and atmospheric science . . . ."); *see also* 15 U.S.C. §§ 313(c), 2901-2908, 2921-2961; 33 U.S.C. §§ 3601-3611. Cuts to extreme weather warning systems are particularly dangerous, in addition to being ultra vires. Byron ¶¶41-42; McLean ¶¶26-29; MacCracken ¶16.

Defendant DOT's dismantling of the Office of Climate Change and Environment violates the clear congressional mandate to maintain such an office. 49 U.S.C. § 102(g); Olson ¶36. Plaintiffs raise serious questions that the EOs are ultra vires in dismantling, suppressing, and scrubbing climate science across the federal government.

### 2.    Violation of Fundamental Due Process Rights

#### a.    Right to Life (Claim 1)

The Due Process Clause of the Fifth Amendment provides that no person may be "deprived of life . . . without due process of law." The Framers understood the fundamental right to life as the right of current and future generations of living persons to enjoy their "terrestrial existence" in health and the pursuit of happiness. *See, e.g.*, Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (1755) (defining "life" as "[e]njoyment, or possession of terrestrial existence"); James Madison, *Address to the Agricultural Society of Albemarle* (May 12, 1818)

("Animals, including man, and plants may be regarded as the most important part of the terrestrial creation. . . . To all of them, the atmosphere is the breath of life. Deprived of it, they all equally perish."); 1 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 123, 125 ("absolute rights" include "a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health"); John Locke, SECOND TREATISE OF GOVERNMENT 2.6 (1690) (inalienable natural rights include health). While the "right to life" has received less judicial attention than the fundamental rights to liberty and property, the right is nonetheless explicit and has no lower stature or protection than its Fifth Amendment cohorts.

The right to life protects Plaintiffs from government acts that threaten essential aspects of their terrestrial existence, interfering with their health, safety, or natural lifespan, including a livable future. Courts have interpreted "life" to "encompass[] a broader interest than mere corporeal existence" that includes "the individual's right to preserve his humanity." *See Brophy v. New England Sinai Hosp.*, 497 N.E.2d 626, 635 (Mass. 1986). With respect to children, a deprivation of the right to life occurs when the government affirmatively disrupts—in a medically significant way—the healthy physiological and psychological growth and functioning of a child into adulthood, causing them a lifetime of hardship or exposing them to heightened risk of illness or death. *See, e.g.*, *Guertin v. State*, 912 F.3d 907, 921 (6th Cir. 2019) (intentionally exposing children to a life-threatening

substance, through a life-sustaining source like water, violates due process.); *Plyler v. Doe*, 457 U.S. 202, 222-24 (1982) (rejecting government conduct that "imposes a lifetime hardship" on children); *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944) ("A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens."); *see generally* Byron, Van Susteren.[7]

The EOs cause such injuries by, among other things, requiring Defendants to "suspend, revise, or rescind all agency actions" that place an "undue burden" on fossil fuel development; "eliminate" the so-called "electric vehicle mandate"; implement policies to "encourage", "facilitate", and "utilize" fossil fuel exploration, development, and production "on Federal lands and waters"; remove "Federal regulatory barriers that undermine coal production, encouraging the utilization of coal" and "increasing American coal exports"; and "immediately pause the disbursement of funds appropriated" through legislative programs designed to expand the use of wind, solar, and storage of renewable energy. *See* EO-14154; EO-

---

[7] Samantha Adhoot et al., *Climate Change and Children's Health: Building a Healthy Future for Every Child*, 153 Pediatrics e2023065504 (2024) ("The warming of our planet matters to the health, well-being, and future of every child"; describing "life-altering and traumatic events that exact mental health and learning harms"); Renee Salas et al., *The Case of Juliana v. U.S.—Children and the Health Burdens of Climate Change*, 380 New Eng. J. Med. 2085 (2019) ("[C]limate change is the greatest public health emergency of our time and is particularly harmful to fetuses, infants, children, and adolescents.").

14156; EO-14261; *see also supra* II.C. In so doing, the EOs facially and as applied threaten immediate harm to essential aspects of Plaintiffs' lives, including their health, safety, bodily integrity, full natural lifespans, and livable future. *Supra* V.A.2.a.

Even if the right to life was limited to "mere corporeal existence," Plaintiffs have raised serious questions that an unleashing of fossil fuels will unleash GHG pollution, which will cause more heat and extreme temperature events and, for example, expose Plaintiff Joseph to more life-threatening heat illness, which almost took his life once already. Joseph ¶¶6-9; Byron ¶¶19,22-24; Running ¶¶12-22,29,31-34.

### b.    Right to Liberty (Claim 2)

### (1)    All Plaintiffs

Plaintiffs enjoy a fundamental liberty interest in being free from governmental endangerment of their health and safety. *See, e.g.*, *Rochin v. California*, 342 U.S. 165, 172 (1952) (forced "stomach-pumping" violates due process); *Youngberg v. Romeo*, 457 U.S. 307, 321, 324 (1982); *Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993) (risk to prisoners' future health from exposure to tobacco smoke); *see also Caetano v. Massachusetts*, 577 U.S. 411, 421 (2016) (Alito & Thomas, JJ., concurring) ("A State's most basic responsibility is to keep its people safe.").

The EOs infringe on privileges "long recognized at common law as essential to the orderly pursuit of happiness by free [people]" that "may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect." *Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923). Plaintiffs' infringed liberties include personal security, bodily integrity, dignity, opportunity to pursue happiness, the right to engage in established cultural practices; the right to form families; and the right to pursue knowledge and professions. *Supra* II.D. Plaintiffs raise serious questions that the EOs infringe upon these liberty interests by increasing GHG emissions that cause Plaintiffs' injuries, resulting in rising temperatures, rising seas, extreme storms, and wildfires. These increased emissions threaten and injure Plaintiffs' health, homes, cultural practices, livelihoods, ability to form families, and pursue their happiness, all while depriving them of scientific knowledge and opportunity to defend their lives. *Supra* II.D.

### (2)    Montana and Hawai'i Plaintiffs

The Montana and Hawai'i Plaintiffs have adjudicated fundamental rights under their state constitutions that are protectable liberty interests under the Federal Constitution. A liberty interest "may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies." *Johnson v. Ryan*, 55 F.4th 1167, 1180 (9th Cir. 2022); *Mills v. Rogers*, 457 U.S. 291, 300 (1982)

("full scope of a [party's] due process rights may depend in part on the substantive liberty interests created by state as well as federal law"). For example, in *United States v. Windsor*, the Supreme Court held the Defense of Marriage Act (DOMA)— federal law defining marriage as between a man and woman—violated the Due Process Clause of the Fifth Amendment. 570 U.S. 744, 766 (2013). The Supreme Court reasoned that because the couple's marriage was legally recognized by New York, and because marriage was "within the authority and realm of the separate States" the federal law "injure[ed] the very class" New York "sought to give further protection and dignity." *Id.* at 764, 769.

Like marriage, protecting citizen beneficiary rights to access, use, and enjoy state public trust resources is traditionally within the power and authority of states. *See, e.g.*, *Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 453 (1892) (states have duty to protect public trust resources from substantial impairment and alienation); *PPL Montana v. Montana*, 565 U.S. 576, 603-04 (2012) ("[T]he public trust doctrine remains a matter of state law" and "[u]nder accepted principles of federalism, the States retain residual power to determine the scope of the public trust [] within their borders."). Likewise, Congress preserved the rights of states to grant their citizens greater protection from pollution. *See, e.g.*, 42 U.S.C. § 7416; 42 U.S.C. § 7401(a)(3) ("air pollution prevention. . . and air pollution control at its source is the primary responsibility of States and local governments").

The Montana Plaintiffs have an explicit constitutional right to "a clean and healthful environment," which includes a right to a stable climate system. Mont. Const. art. II, § 3, art. IX, § 1; *Held v. Montana*, 560 P.3d 1235, 1249 (Mont. 2024). At trial, the *Held* plaintiffs established that "every ton of fossil fuel emissions contributes to global warming and impacts to the climate and thus increases the exposure of Youth Plaintiffs to harms now and additional harms in the future," infringing the Youth Plaintiffs' state constitutional right to a clean and healthful environment and access to Public Trust Resources, and corresponding rights to liberty, dignity, health and safety. *Held v. Montana*, CDV-2020-307, 2023 WL 5229257, at *11, *42 (Mont. 1st Jud. Dist. Ct. Aug. 14, 2023). Such fundamental rights, reserved to Montana citizens under federal law, are protected liberty interests under the Fifth Amendment. By immediately increasing GHG pollution the EOs infringe all Montana Plaintiffs' liberty interests in a healthful environment and a stable climate system with use, enjoyment of, and access to Montana's public trust resources. Erickson ¶¶12-15,21; Running ¶¶5-6,29,31,36-46,48,50; Byron ¶¶25-28,41-42; Whitlock ¶¶20-27; *see, e.g.*, Olivia ¶3; J.M. ¶¶4-5,8; Eva ¶2; Anderson ¶¶11-12; Grace ¶2.

Likewise, under Hawaiʻi's Constitution article XI, section 9, the Hawaiʻi Plaintiffs enjoy a "right to a clean and healthful environment" that "subsumes a right to a life-sustaining climate system." Kalālapa, Ex.1: *Navahine v. Dep't of Transp.*,

No. 1CCV-22-0000631, Joint Stipulation and Order re: Settlement (Haw. 1st Cir. Ct. June 20, 2024); *Matter of Maui Elec. Co., Ltd.*, 506 P.3d 192, 202 (Haw. 2022). The Hawaiʻi Plaintiffs also hold state constitutional rights (article XI, section 1) as beneficiaries of the public trust where Hawaiʻi has "affirmative public trust obligations . . . to conserve and protect 'Hawaiʻi's natural beauty and all natural resources . . . '[f]or the benefit of present and future generations.'" Kalālapa, Ex.1. Hawaiʻi has recognized the "climate emergency" "poses immediate and long-term threats to Hawaiʻi's" public health, natural resources, and environment, "endangering the health, safety, and welfare of the people" where "children are uniquely vulnerable", requiring an "emergency mobilization effort to restore a safe climate." Kalālapa, Ex. 1. By mandating unleashing fossil fuels and causing increased GHG pollution, the EOs violate these liberty interests of Plaintiffs Kalālapa and C.M. to a life-sustaining climate system and public trust resources in Hawaiʻi. Kalālapa ¶¶3-6,8-11; Running ¶¶30,34,45-46,49,52,54-59.

      **c.    The Executive Orders Cannot Survive Strict Scrutiny**

Government acts that infringe a fundamental right are subject to strict scrutiny. *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997). Under strict scrutiny, the Fifth Amendment "forbids the government to infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v.*

*Flores*, 507 U.S. 292, 301-02 (1993). The government "must demonstrate that its law is necessary to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992). Defendants fail to meet this heavy burden here.

The due process clause "was designed to protect the citizen against all mere acts of power, whether flowing from the legislative or executive branches of the government." *Hurtado v. California*, 110 U.S. 516, 527 (1884). The EOs epitomize "mere acts of power" in their arbitrary defiance of Congress, scientific consensus, and promotion of a destructive, fossil fuel-dependent energy system at the expense of Plaintiffs' life and liberty. Unlike in *Reno*, there are enumerated and recognized unenumerated fundamental rights, which invoke strict scrutiny, and the governmental interest here is decisively *not* in "preserving and promoting the welfare of the child." 507 U.S. at 303 (citations omitted).

> **(1)** **The President's interest in "Unleashing" fossil fuels does not serve a compelling government interest.**

While the EOs purport to promote "affordable energy" and "job creation," EO-14154 §1, the true government interest—articulated repeatedly by the President—is to maximize fossil fuel development (i.e., "drill baby, drill") and suppress climate science. *Supra* II.A,C. The President's desire to advance dangerous fossil fuels over renewable alternatives is not a compelling government interest. In *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 227

(1989), California defended a ban on primary election endorsements by asserting an interest in "stable government." But the Supreme Court rejected the State's characterization, reframing the interest as "preserving party unity during a primary," which the Court found non-compelling. *Id.* at 228. *Eu*'s reasoning applies with greater force here, where the government's true asserted interest—propping up fossil fuels at the expense of renewables—falls well short of compelling.

### (2)    The EOs are not necessary to achieve energy security and American prosperity.

Unleashing fossil fuels at the expense of renewable energy works against what the EOs purport to promote. They will increase the price of energy with no long-term benefits for job creation; lose manufacturing opportunities; and threaten American Prosperity with enormous economic damages and increased risk to life, health, and prosperity. *See generally* Stiglitz, Heal, Jenkins, Jacobson. The U.S. can power a secure, prosperous national economy with non-fossil fuel energy at lower energy costs, and greater reliability than a fossil fuel-based energy system. Jacobson ¶¶14-23. Defendant DOE admits "[t]he rise of renewable power, which comes from unlimited energy resources, like wind, sunlight, water, and the Earth's natural heat, has the potential to vastly improve the reliability of the American energy system." Olson ¶53. "There is scope for massive increases in the production of renewable energy in the U.S. at lower costs than fossil energy." Heal ¶¶7-8; Jacobson ¶¶14-16.

37

The EOs make energy more expensive. Wind and solar energy, which the EOs effectively block, are presently the least expensive sources of energy even *without* accounting for the health, climate, and environmental costs of fossil fuels. Heal ¶¶9-10; Jacobson ¶¶25-27; Stiglitz ¶39. "Onshore wind energy production has been cheaper than all fossil fuel energy sources since 2011 while solar photovoltaic energy has been cheaper than all fossil fuel energy sources since 2016." Jacobson ¶18. The EOs "will raise US energy costs by more than $8 billion annually by 2035" rather than lower them. Jenkins ¶10.

The EOs impose enormous costs on society. Factoring in the other costs of fossil fuels, renewable sources of energy that replace fossil fuels will save trillions of dollars in avoided health care, climate disasters, loss of natural resources, and lost coastal infrastructure costs. Jacobson ¶¶25-27; Stiglitz ¶¶10-16,18,22,25,28; Heal ¶¶10-16; Jenkins ¶21. The EOs destroy jobs, reduce sales, and block investments in new technologies and manufacturing opportunities. Stiglitz ¶47; Jenkins ¶¶12-16,21. Between 2025-2035 capital investments in electric storage, wind power, solar, electric transmission, and other renewables will fall by a cumulative $260 billion. Jenkins ¶12.

### (3)    The Executive Orders are not narrowly tailored to achieve a compelling government interest.

Even if Defendants were acting on compelling government interests in promoting energy security and American prosperity (they are not), the EOs are not

rationally related to those interests, let alone narrowly tailored to minimize injury to Plaintiffs' fundamental rights. Energy security can be achieved most readily by utilizing wind and solar resources, which are the cheapest form of energy today and are quicker to build out. Jacobson ¶¶14,19-21. The EOs intentionally disregard and block the vast, well-established potential for renewable energy to fulfill the Nation's needs. *See* Heal, Jenkins, Jacobson. "[I]t is technologically and economically feasible to transition all 50 states, statewide, for all energy purposes, to 100% clean, renewable energy by 2050, meeting all energy needs across all sectors while keeping the electricity grid stable 100% of the time." Jacobson ¶¶5-8,20-23, Ex.1.

Prosperity means "the condition of being successful or thriving," Merriam-Webster Dictionary, which requires a stable climate, healthy environment, and most of all, healthy children unsaddled by escalating pollution. Dr. Joseph Stiglitz, a Nobel Laureate economist states: "Defendants' actions directing the 'unleashing' of more fossil fuels into our energy systems serves to undermine the objective of economic prosperity that they purport to advance." Stiglitz ¶¶10-12,40. "Scientific information has long been a commodity that is a backbone of American prosperity . . . American prosperity is harmed by the government's dismantling of climate science." *Id.* ¶38. The EOs are not narrowly tailored to meet compelling state interests while minimizing harm to fundamental rights.

### 3.    State-Created Danger (Claim 6)

The EOs and their implementation are unconstitutional under the state-created danger doctrine because they (i) create or expose Plaintiffs to "an actual, particularized danger that [they] would not otherwise have faced"; (ii) "the injury [they] suffer[] was foreseeable"; and (iii) the government actor was "deliberately indifferent to the known danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019); *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010) (foster children exposed to sexual abuse), overruled in part by *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1076-78 (9th Cir. 2016) (deliberate indifference is objective standard); *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012) (foster children exposed to neglect and injuries).[8]

The EOs expose Plaintiffs to actual, particularized dangers they would not otherwise have faced. *See supra* II.D. According to 19-year-old Plaintiff Avery:

> No matter where I live, I cannot escape extreme climate events resulting from fossil fuel pollution. Multiple catastrophic wildfires, weeks of hazardous air quality from smoke, an unprecedented summer heat dome in the Pacific Northwest, unprecedented ice storms, three hurricanes, and marine heatwaves warming the ocean—*the ocean*—to hot tub temperatures. That does not even include the drought conditions, algal blooms, low snowpack, and other harms I have experienced.

---

[8] The dispositive factor in determining whether deliberate indifference suffices to "shock the conscience" is whether the government was practically capable of engaging in "actual deliberation." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Here, Defendants were plainly capable of deliberating—and in fact did so through Project 2025 before the President, and OMB Administrator Vought, took office and issued the EOs. MacCracken ¶25.

Avery ¶18.

Defendants' decision to "unleash" fossil fuels during a climate and health emergency is functionally equivalent to police "unleashing a drunk driver on the road." *Sinclair v. City of Seattle*, 61 F.4th 674, 684 n.4 (9th Cir. 2023) (citing *Reed v. Gardner*, 986 F.2d 1122, 1123-25, 1127 (7th Cir. 1993)). Just as other motorists in the area were "worse off with a drunk driver heading toward them than a sober one," *id.* at 683, Plaintiffs are worse off with fossil fuel unleashing and climate science suppression amidst a climate and health emergency.

The dangers Plaintiffs face were foreseeable and avoidable when the EOs were issued. Defendants have long known that increasing fossil fuel pollution injures the public and Plaintiffs' lives, including to their physical health and wellbeing, and knew there were alternatives. MacCracken ¶10; Avery ¶20; Jacobson ¶23; *Juliana v. United States*, 947 F.3d 1159, 1164, 1166, 1168 (9th Cir. 2020). Specifically, for the last six decades, federally-supported scientific research on climate change, "has made clear that there is no other plausible explanation for the increasingly rapid *global* warming that is occurring . . . [from] combustion of fossil fuels for energy, . . . and that replacing fossil fuel energy with non-greenhouse gas polluting forms of energy is what is urgently required to stop the continuing increase of human-induced warming." MacCracken ¶10.

41

The EOs and implementing actions are deliberately indifferent to the harm caused by fossil fuel, which endangers essential aspects of Plaintiffs' lives. Deliberate indifference "requires (1) a showing of an objectively substantial risk of harm; and (2) a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and . . . a reasonable official would have been compelled to draw that inference." *Henry A.*, 678 F.3d at 1000–01 (cleaned up). Crucially, "the subjective component may be inferred from the fact that the risk of harm is obvious." *Id.* at 1001. The dangers Plaintiffs face are substantial and obvious, *id.*, and Defendants knew as much before the EOs. *Supra* II.D; MacCracken ¶¶3-10. To make matters worse, Defendants adamantly oppose efforts that lessen the danger; e.g., renewable energy and climate science research.

Defendants have also restrained Plaintiffs' liberty by asserting sovereign control over the airshed and now the "unleashing" of GHGs, from which Plaintiffs cannot escape. "Congress designated an expert agency, here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions," and the Supreme Court has foreclosed other remedies at law. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423, 428 (2011). Given this custodial responsibility, and the special relationship to Plaintiffs it creates, Defendants have a corresponding constitutional duty to assume responsibility for their safety and general well-being. *Tamas*, 630 F.3d at 843 (duty

to protect "helpless and vulnerable population" is the "quintessential responsibility" of government social workers); *Reno*, 507 U.S. at 302 ("juveniles, unlike adults, are always in some form of custody"); *Plyler*, 457 U.S. at 226 (mandating closer scrutiny of laws that impose a lifetime of hardship on young people for matters beyond their control).

### B. Plaintiffs Are Likely to Suffer Irreparable Harm Absent an Injunction.

One of the purposes of preliminary injunctive relief is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1116 (9th Cir. 2008) (quotation omitted). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); Stiglitz ¶49 (no way to compensate Plaintiffs for irreversible harms).

Here, Plaintiffs face a range of irreparable physical and psychological injuries from the EOs, which threaten to accelerate the climate emergency, slow the necessary transition to renewable energy, and dismantle critical climate science, programs, and warning systems. *Supra* II.D; *see, e.g.*, *City & Cnty. of S.F. v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) (enjoining executive orders withholding federal funds from cities and counties; irreparable injuries included "deprivation of constitutional rights"); *Pacito v. Trump*, 768 F.

43

Supp. 3d 1199, 1236 (W.D. Wash. Feb. 28, 2025) (enjoining executive order suspending refugee admission and funding to resettlement agencies; irreparable injuries included financial harm, family separation, and "existential threat to [plaintiffs'] survival"); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (deprivation of constitutional rights is irreparable harm).

The GHG pollution being unleashed directly hurts Plaintiffs' health and will stay in the atmosphere for hundreds to thousands of years, accelerating climate change. Balmes ¶¶17,31-32; Byron ¶¶31-35; Running ¶¶11,17-18. Every incremental increase in fossil fuel pollution and heat not avoided adds to Plaintiffs' physical and psychological injuries. Byron ¶¶15,18-21; Balmes ¶28; Van Susteren ¶35. There is overwhelming evidence that irreparable harm to Plaintiffs is "*likely* in the absence of an injunction." *Arc of California v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014). Plaintiffs have carried their burden to demonstrate irreparable harm by demonstrating infringement of their rights under the Due Process Clause and ultra vires doctrine. *Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1059 (9th Cir. 2009). Further, without injunctive relief now, Plaintiffs will lose the ability to achieve their required remedy to stop the constitutionally defective unleashing of fossil fuels, the dismantling of climate science, and the delayed deployment of clean renewable energy and EVs since January 20, 2025, which would lock in irreparable harm to Plaintiffs, including to their physical and psychological health. Stiglitz ¶¶41-

52; Van Susteren ¶¶20-21,31-36,41-44 (institutional betrayal and trauma from climate change alter hormone levels, brain development, cognitive functioning, reproductive success, and even children's DNA).

### C.    Balance of Hardships Warrants Injunctive Relief.

It is neither equitable nor in the public's interest[9] to allow Defendants to violate the U.S. Constitution. While the inquiry should end there, weighing the harm that granting or denying a preliminary injunction would cause the parties also supports an injunction in this case.

Put simply, the injuries to Plaintiffs from allowing continued implementation of the EOs vastly outweigh any potential "harm" to Defendants. In truth, given the false rationales underlying the EOs, Defendants do not face the prospect of any harm whatsoever. Nor does the public, whose interests are aligned with Plaintiffs. Indeed, it is in all Americans' interest to substitute the development and combustion of fossil fuel with renewable energy. Grace ¶¶9-12. Solar, wind, and other renewable alternatives are less expensive for consumers, exponentially less harmful, and—unlike fossil fuel—conducive to sustaining human life on Earth. Jacobson ¶¶24-35; Byron ¶¶35-36. Abatement of the pollution saves lives. *Id.*

---

[9] *All. for the Wild Rockies*, 35 F. Supp. 3d at 1267 ("[C]onsideration of the public interest is generally subsumed by the balance of the equities analysis when the Federal government is a party.").

Moreover, the thousands of federal employees whose jobs have been terminated; scientists and researchers whose grants have been suspended and terminated; educators, professionals, farmers, ranchers, fisheries, homeowners, businesses, and schools that rely on climate-related data being scrubbed or hidden from public view; and other members of the public being harmed by implementation of the EOs all stand to gain from the injunction sought here. Balbus ¶¶9,12; McLean ¶¶19-20,24-29; Byron ¶¶37-42; MacCracken ¶¶13,15-16,19-22; DiLiberto ¶¶12-22; Jonesi ¶¶13-14,20; Whitlock ¶¶22-27. Under such circumstances, "[t]he public interest is not served by maintaining agency actions that conflict with federal law and federal agencies' own regulations." *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, No. 25-CV-02847-AMO, 2025 WL 1233674, at *12 (N.D. Cal. Apr. 29, 2025) (enjoining termination of funding for counsel representing unaccompanied children in immigration court). The balance of hardships tips sharply in Plaintiffs' favor.

### D.    Plaintiffs Should Not Be Required to Post a Bond.

When a party demonstrates serious constitutional questions going to the merits and a bond "would effectively deny access to judicial review", no bond is required. *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended by* 775 F.2d 998 (9th Cir. 1985); *Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1350 (D. Idaho 2024). Plaintiffs are

children and youth, represented pro bono, who lack resources to protect their constitutional rights. Olson ¶2. Because Plaintiffs pursue this litigation in the public interest to protect their constitutional rights, this Court should use its discretion to forego the security requirement where giving security would effectively deny access to judicial review. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *Tenakee Springs v. Clough*, 915 F.2d 1308, 1314 n.4 (9th Cir. 1990); *Taylor-Failor v. Cnty. of Hawaii*, 90 F. Supp. 3d 1095, 1102-03 (D. Haw. 2015).

## CONCLUSION

"Protecting and defending life is the issue at the heart of this case and making the choice to be prepared in a way that minimizes damages and loss of life is the only rational choice." MacCracken ¶26. Plaintiffs respectfully request a preliminary injunction enjoining implementation of the EOs.

DATED this 13th day of June, 2025, at Eugene, OR.

Respectfully submitted,

*/s/ Julia A. Olson*
Julia A. Olson
Andrea K. Rodgers
Nathan Bellinger
OUR CHILDREN'S TRUST
1216 Lincoln St.
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org

47

Roger Sullivan
McGARVEY LAW
345 1st Avenue East
Kalispell, MT 59901
(406) 752-5566
rsullivan@mcgarveylaw.com

Philip L. Gregory
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
(650) 278-2957
pgregory@gregorylawgroup.com

Daniel C. Snyder
Haley Nicholson
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(d)(2)(E), I certify that the foregoing brief has a word count of 10,677 words, excluding the portions exempted by L.R. 7.1(d)(2)(E). The parties filed a Joint Motion for Overlength Brief/Ext of Time, Doc. 23, requesting an enlargement of the word limit up to 11,000 words.

*s/ Julia A. Olson*
Julia A. Olson