**ATTENTION CLERK OF THE COURT:**

**AMICUS CURIAE, JERRY CASTELLE WILL FILE HIS AFFIDAVIT OF SERVICE IN**

**THIS MATTER UPON RECEIPT OF CERTICATES OF MAILING FROM THE**

**UNITED STATES POSTAL WORKER**

**THANK YOU**

RECEIVED

SEP 16 2025

Clerk, U.S. Courts
District of Montana
Missoula Division

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MONTANA - MISSOULA DIVISION
----------------------------------------------------------------------X

EVA LIGHTHISER; RIKKI HELD;
LANDER BUSSE; OLIVIA
VESOVICH; KATHRYN GRACE
GIBSON-SNYDER; GEORGIANNA
FISCHER; TALEAH HERNÁNDEZ;
**B.B.,** a minor, by and through his
guardian S.B.; **J.K.,** a minor, by and
through his guardian L.A.; **N.K.,** a
minor, by and through his guardian L.A.;
ULA JONES; RIPLEY CUNNINGHAM; **J.M.,**
a minor, by and through her guardian C.M.; **J.H.,** a
minor, by and through his guardian
M.H.; **IH.,** a minor, by and through his
guardian M.H.; **KALÁLAPA WINTER; C.M.,** a
minor, by and through her guardian E.M.;
DELANEY REYNOLDS; AVERY McRAE;
MIKO VERGUN; ISAAC VERGUN;
and JOSEPH LEE,

|  |  |
|---|---|
| CASE NO. CV-25-54-BU-DLC | |

**NOTICE OF MOTION FOR
DISMISSAL PREDICATED UPON
POINTS ONE - POINTS ELEVEN
INCLUSIVE HEREIN**

                              Plaintiffs

                    v.

**DONALD J. TRUMP,** in his official
capacity as President of the United States;
**EXECUTIVE OFFICE OF THE
PRESIDENT; OFFICE OF
MANAGEMENT AND BUDGET;
RUSSELL VOUGHT,** in his official
capacity as Director of the Office of
Management and Budget; **JEFFREY
BOSSERT CLARK,** in his official
capacity as Acting Administrator of the
Office of Information and Regulatory
Affairs; **UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN,** in his official
capacity as Administrator of the United
States Environmental Protection Agency;
**UNITED STATES DEPARTMENT OF
THE INTERIOR; DOUG BURGUM,** in
his official capacity as Secretary of the
Interior; **UNITED STATES**

                    Hon. Dana Christensen

**DEPARTMENT OF ENERGY; CHRIS
WRIGHT,** in his official capacity
as Secretary of Energy; **UNITED STATES
DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY,** in his official capacity as
**STATES ARMY CORPS OF
ENGINEERS; LIEUTENANT
GENERAL WILLIAM H.
GRAHAM, JR.,** in his official capacity as
Chief of Engineers and Commanding
General of the United States Army Corps of
Engineers; **NATIONAL AERONAUTICS
AND SPACE ADMINISTRATION;
JANET PETRO,** in her official capacity as
acting NASA Administrator; **UNITED
STATES DEPARTMENT OF
COMMERCE; HOWARD LUTNICK,**
in his official capacity as Secretary of
Commerce; **NATIONAL OCEANIC
AND ATMOSPHERIC
ADMINISTRATION; LAURA GRIMM,**
in her official capacity as acting NOAA
Administrator; **NATIONAL SCIENCE FOUNDATION;
BRIAN STONE,** in his official capacity as
Acting Director of NSF; **UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F.
KENNEDY, JR.,** in his official capacity as
Secretary of HHS; **NATIONAL INSTITUTES OF
HEALTH; JAYANTA
BHATTACHARYA,** in his official
capacity as Director of NIH; and the
**UNITED STATES OF AMERICA,**

Defendants.

------------------------------------------------------------------X

**PLEASE TAKE NOTICE :**

           That upon the annexed papers numbered 1-56 inclusive and also
predicated upon the dispositive Points I through Points XI contained therein, **JERRY
CASTELLE,** acting as **Amicus Curiae,** Pro Se will move this Honorable Court on September
17, 2025 at the U.S. District Court – District of Montana – Missoula more specifically at the
Russell Smith Federal Courthouse located at -201 E. Broadway, Suite 310, Missoula, MT 59802

2

at 9:00 A.M. pacific time or as soon thereafter as counsel can be heard for an order of dismissal of the above captioned cause of action, or for whatever relief this Court deems just and proper.

Dated: September 9, 2025

Old Bethpage, New York 11804

Respectfully submitted

JERRY CASTELLE, Pro-Se
P.O. Box 391
Old Bethpage, New York 11804
(516) 639-3478
Jcastelle3@gmail.com

To: Plaintiff's attorney Julia Olson
    Defendant Donald Trump
    Defendant Russell Vought
    Defendant Jeffrey Bossert Clark
    Defendant Lee Zeldin
    Defendant Doug Burgum
    Defendant Chris Wright
    Defendant Sean Duffy
    Defendant William H. Graham, Jr
    Defendant Janet Petro
    Defendant Howard Lutnick
    Defendant Laura Grimm
    Defendant Brian Stone
    Defendant Robert F. Kennedy Jr.
    Defendant Jayanta Bhattacharya

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MONTANA - MISSOULA DIVISION
-----------------------------------------------------------------------X

EVA LIGHTHISER; RIKKI HELD;
LANDER BUSSE; OLIVIA
VESOVICH; KATHRYN GRACE
GIBSON-SNYDER; GEORGIANNA
FISCHER; TALEAH HERNÁNDEZ;
B.B., a minor, by and through his
guardian S.B.; J.K., a minor, by and
through his guardian L.A.; N.K., a
minor, by and through his guardian L.A.;
ULA JONES; RIPLEY CUNNINGHAM; J.M.,
a minor, by and through her guardian C.M.; J.H., a
minor, by and through his guardian
M.H.; IH., a minor, by and through his
guardian M.H.; KALÄLAPA WINTER; C.M., a
minor, by and through her guardian E.M.;
DELANEY REYNOLDS; AVERY McRAE;
MIKO VERGUN; ISAAC VERGUN;
and JOSEPH LEE,

               Plaintiffs

     v.

DONALD J. TRUMP, in his official
capacity as President of the United States;
EXECUTIVE OFFICE OF THE
PRESIDENT; OFFICE OF
MANAGEMENT AND BUDGET;
RUSSELL VOUGHT, in his official
capacity as Director of the Office of
Management and Budget; JEFFREY
BOSSERT CLARK, in his official
capacity as Acting Administrator of the
Office of Information and Regulatory
Affairs; UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his official
capacity as Administrator of the United
States Environmental Protection Agency;
UNITED STATES DEPARTMENT OF
THE INTERIOR; DOUG BURGUM, in
his official capacity as Secretary of the
Interior; UNITED STATES

CASE NO. CV-25-54-BU-DLC


AMICUS CURIAE BRIEF FOR
DISMISSAL PREDICATED UPON
POINTS ONE - POINTS ELEVEN
INCLUSIVE HEREIN


Hon. Dana Christensen

**DEPARTMENT OF ENERGY; CHRIS
WRIGHT,** in his official capacity as
Secretary of Energy; **UNITED STATES
DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY,** in his official capacity as
**STATES ARMY CORPS OF
ENGINEERS; LIEUTENANT
GENERAL WILLIAM H.
GRAHAM, JR.,** in his official capacity as
Chief of Engineers and Commanding
General of the United States Army Corps of
Engineers; **NATIONAL AERONAUTICS
AND SPACE ADMINISTRATION;
JANET PETRO,** in her official capacity as
acting NASA Administrator; **UNITED
STATES DEPARTMENT OF
COMMERCE; HOWARD LUTNICK,**
in his official capacity as Secretary of
Commerce; **NATIONAL OCEANIC
AND ATMOSPHERIC
ADMINISTRATION; LAURA GRIMM,**
in her official capacity as acting NOAA
Administrator; **NATIONAL SCIENCE FOUNDATION;
BRIAN STONE,** in his official capacity as
Acting Director of NSF; **UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F.
KENNEDY, JR.,** in his official capacity as
Secretary of HHS; **NATIONAL INSTITUTES OF
HEALTH; JAYANTA
BHATTACHARYA,** in his official
capacity as Director of NIH; and the
**UNITED STATES OF AMERICA,**

Defendants.

-------------------------------------------------------------------X

STATE OF NEW YORK    )
　　　　　　　　　　　):
COUNTY OF NASSAU    )

<u>**PREAMBLE**</u>

**Amicus Curiae,** legally named **JERRY CASTELLE,** acting in this instant capacity as a litigant Pro Se and being duly sworn, deposes and states the following under

2

penalties of perjury. That he is not a party to this action; and respectfully begs this Court's indulgence by referring to himself in the third person, hereinafter simply as "**Amicus**". That attributable to **Amicus** unique skill set, as being sufficiently experienced in the law for the last thirty-five years, as both a plaintiff pro se and a defendant pro se, in both federal and state forums; as well as appellate advocacy in both forums;......hereby submits this *"friend of the court"* brief representing sound legal arguments and recommendations, in order to introduce vital concerns and data that this Court might not be aware of.

Further, **Amicus,** as a knowledgeable *"friend of the court"* aids in this Court's jurisdiction by introducing wider implications for justice within its own justiciable deliberation. Additionally, **Amicus** especially desires to offer legally relevant information, expertise, arguments and perspectives; both within the oil and gas industry, as well as advanced science pertaining to clinical medicine and organic chemistry, which will enable to help this Court decide upon a favorable ruling for Defendants herein.

Moreover, this Honorable Court may find comfort in finding **Amicus** extremely knowledgeable environmentally, as a self-proclaimed climate change expert inventor, in that he is the beneficial owner of three recently granted U.S. patents involving novel solutions toward helping combat global warming and carbon dioxide emissions. **Amicus** prosecuted all of his patents without benefit of a patent attorney as evidenced by the fact that the USPTO has given **Amicus** his own <u>customer number</u> # **138712**. These patents are as follows: **PATENT NUMBER: 9,771,714** – a novel solution as a vacuum insulation panel which obviates the need to heat and A/C buildings. **PATENT NUMBER: 11,808,462** – microwave / induction coil technology for providing heating comfort to buildings during the winter months, thus obviating the need for fossil fuels. **PATENT NUMBER: 11,210,754-** residential development of 10,000 vacant and abandoned landfill sites for capping escaping methane gas. Additionally, **PATENT NUMBER: 9,771,714** has world-wide patent rights via the Patent Cooperation Treaty, which **Amicus** prosecuted himself without benefit of a patent attorney.

Accordingly, the following ensuing eleven dispositive Points enumerated below will now aid in this Court's jurisdiction to dismiss this instant cause of action as being entirely frivolous and vexatious.

## **POINT I**

### *Nixon V. Fitzgerald* 457 U. S. 731 ( 1982 )

The U. S. Supreme Court in 1982 held that the President of the United States has absolute immunity from lawsuits that extends to all acts within the ***outer perimeter***" of his duties of office which essentially protects these three executive orders from any legal attack whatsoever. Hence, in a nutshell, that textual opinion therein reads as follows: .

> [ ***the president's absolute immunity is a functionally mandated incident of his*** <u>***unique office,***</u> ***rooted in the constitutional tradition of the separation of powers and supported by the Nation's history. Because of the singular*** <u>***importance of the***</u> <u>***President's duties,***</u> ***diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government.***] ***While the separation of powers doctrine does not bar every exercise of jurisdiction over the president, a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch. The exercise of jurisdiction is not warranted in the case of merely private suits for*** <u>***"damages"***</u> ***based on a President's official acts.***

Accordingly, this last sentence therefore becomes the vital linchpin for any dismissal of this case at bar, whereupon the word ''***damages***'' becomes the operative key to unlock sound judicial reasoning herein. At first blush then, it would appear that this operative word ''***damages***" narrows the legal interpretation of just how and to what extent a president's absolute immunity can be adjudicated.

Suffice it to say, that Plaintiffs attorney, Julia Olson has herein framed her prayer for redress under the umbrella of equitable relief where customary legal remedies like monetary **damages** are deemed wholly insufficient to provide justice to these twenty-two youths. Instead, in the broader sense, the word "***damages***", as articulated within the holding of <u>***Nixon v. Fitzgerald***</u> customarily connotes monetary loss and liability. It would thus appear then that incorporating this word "***damages***" as articulated within SCOTUS's holding therein, acts to foreclose this otherwise dispositive case law citation from consideration of dismissal of the case at bar.

Nothing can be further from this unjust interpretation, which shackles justice. Let's consider instead a rather broader definition of the word "***damages***". By and large, justice dictates that it should be defined as any discernible harm caused by something, in such a way as to (1) impair its value, or (2) usefulness, or (3) normal function. Hence, any

perceived harm which impairs either the usefulness or normal function of the president's *unique office,* and or the *importance of the president's duties,* thus constitutes *"damages"* in the legal sense. The latter consideration is best illustrated wherein the verbal job description between the brackets supra, underscores the importance of preventing *"diversion of POTUS duties ''* to have to defend this instant rather frivolous and vexatious lawsuit, by having to devote needless wasted time preparing for trial.


## POINT II

## CLAIM PRECLUSION

*"Res Judicata"* more commonly referred to as "Claim Preclusion" customarily sounds the death knell on a second attempt at re-litigation, and thus prevents the same party from prosecuting the same claims emanating from two different separate actions; where it becomes quite obvious that in this case at bar, Plaintiff 's attorney is splitting up a single cause of action in a state court from previous litigation; viz. *Held v. Montana* No. **CDV-2020-307** into a second law suit herein and thereby re-litigating that same previous controversy anew;......here in federal court; especially wherein that first cause of action in state court culminated in a "final judgment". This latter element of a final judgment (1) comprises the first element within the doctrine of *'"claim preclusion"*. The second element necessary for claim preclusion is (2) either the same or similar parties within both lawsuits; or at the very least, both parties being in *"privity"* with one another. The third element required for claim preclusion is where the (3) claims in both lawsuits are either identical or similar.

### THE SAME PARTIES

Let's first examine element (2), the same parties. Accordingly, Plaintiffs attorney now admits before this Court on page 18- ¶ 23 the following. " Plaintiffs Eva, Rikki, Lander, Olivia, Grace, Georgi, Taleah, B.B., J.K., and N.K.; ( viz. ten previous plaintiffs in that state court matter out of the twenty-two currently at bar); were in fact the

5

same plaintiffs in **Held v. State of Montana** ( " *the Held plaintiffs* " ). The state district court therein found the evidence of their fossil fuel pollution and climate injuries, including their trial testimony and that of their experts, to be credible and undisputed by the State of Montana. The state district court also found and concluded each of them has been, and continues to be, injured by climate change and air pollution from fossil fuels. **Held v. Montana CDV-2020-307,** FINDINGS OF FACT, CONCLUSIONS OF LAW and ORDER pages 195-96,199,200-01,204,206 Montana Judicial District Court August 14, 2023. Moreover, these findings were not challenged by the State of Montana and were subsequently affirmed on appeal to the Montana Supreme Court. Hence, all of those plaintiffs in the Montana state lawsuit are in fact the very same plaintiffs within this federal case at bar.

      As for the defendants in both lawsuits, this Court must now examine that while the defendants in the state lawsuit, i.e. **Held v. Montana** were in fact the legal constituents of that state, they must be considered to have been *"united in interest"* with these instant federal Defendants via the doctrine of "**privity.**" Therefore, in its legal sense, "**privity**" generally connotes a close, direct or successive relationship or some legal connection between the parties, often involving a shared mutual interest or right. This Court must now also recognize that Defendant Trump received all four Montana electoral presidential votes or 352,079 popular votes comprising 58.39 % of the Montana voting constituents. Moreover, under the widely held *"relation back doctrine"* it allows this Court to view this new federal claim herein to be considered as if it were filed when the original Montana lawsuit was filed, but only if Defendant Trump is *"united in interest* with the state of Montana. Hence, since there is a shared jural relationship between both defendants therein, a judgment against Defendant Trump would significantly affect or impair the Montana state court judgment.

## THE SAME CLAIMS

## CLAIM 1

Plaintiff s Claim 1 begs the requirement within the *""standing to sue"*

doctrine, which essentially ensures, that only those plaintiffs who have suffered a concrete and particularized injury, caused by the defendant's conduct; which can be effectively remedied by a court decision, thus possess a controversy ripe for adjudication herein. Further, that same well settled doctrine also explores the possibility where a plaintiff can instead, as well, be in imminent danger of suffering perhaps a direct personal injury. Hence, within this context then, the word *"concrete"*, herein pertains to the reality of an actual palpable harm rather than some mere abstractions and therefore a particular discernible bona fide injury, as opposed to highly speculative spontaneous informed generalizations. Therefore, Plaintiffs Claim 1 thus asserts that the Defendant's three Executive Order's *"'future"* implementations, will infringe on these twenty-two breathing youth's substantive due process violations of a **"right to life"** as a direct result of their human-like necessity to breathe atmospheric air. In short, they will not be able to breathe!

Perhaps the gravamen of Claim 1 lies within the text on Page 96 paragraph 257 therein. Concisely, that general language asserts as follows:....................................

''President Trump's EO's and Defendants implementing actions that *"unleash"* fossil fuel production into the air, deprive Plaintiffs of their earthly existence and threaten and interfere with their natural lifespans and livable future."

In sum and substance. Plaintiff's attorney asserts therein that their young natural lives are in grave mortal danger from death, by not being able to breathe. But when??? Notwithstanding this rather bold outrageous argument, the only missing ingredient from Claim 1 is the absence of the quintessential crystal ball which would enable this Honorable Court, with its impossible task of having to "divine" the future, and prognosticate into the foreseeable unknown;.... thus, stemming from the sheer inability to anticipate or reasonably predict the potential consequences of Defendant Trump's three Executive Orders. Hence, Claim 1 lacks a "concrete" harm or injury fairly traceable to Defendant Trump. Witness that foreseeability is often used to establish "proximate cause" in personal injury cases.

It thus appears then, that Plaintiffs attorney, Julia Olson, lacks a sufficient

understanding of just how human beings breathe. It is therefore axiomatic that atmospheric air contains 78 % nitrogen, 21 % oxygen and only a trace amount of carbon dioxide, which is **0.04 %.** Therefore, when a human being inhales, his or her rib cage anatomy expands and therein creates internal <u>negative</u> air pressure in the lungs which automatically sucks in oxygen. This latter element is ultimately utilized by every individual cell within the body; wherein internal carbon dioxide within the body becomes a toxic waste product, which must be eliminated and exhaled as such. It is a scientific fact that this exhaled carbon dioxide within the lungs is instead **0.4%,** which is understandably at a greater or higher concentration than the ambient atmospheric partial pressure of **.04%** or **10** times greater than atmospheric air.

Therefore, in sum and substance, despite an *"unleashing'* of fossil fuel pollution attributable to Defendant Trump's three EOs; these twenty-two young plaintiffs will automatically be able to breathe for the rest of their natural lives. Accordingly, for the purposes of *"claim preclusion"* similarity; Plaintiffs herein now assert the same future inability to breathe similar to the previous lawsuit ***Held v. Montana*** state lawsuit.

### <u>CLAIM 2</u>

Next, in assessing both separate Claim's similarity between Claim 2 of this federal case at bar, and the four State Claims in ***Held*** v. ***Montana,*** supra: Plaintiffs attorney has unwittingly reaffirmed before this Court that all twenty-two youths are not arguing for any curtailment of *"liberty "* to travel to any other *"public trust resources "* except of the specific public trust areas of travel which may possibly occur within the State of Montana. Therefore, on page 99, ¶ 267, Julia Olson also maintains before this Court;.........."***that the right to access, enjoy, and utilize state public trust resources is a liberty".***. ( which is, arguably herein being violated according to her Claim). Moreover, she further maintains; *"the U.S. Supreme Court recognizes that the **'public trust doctrine'** is a matter of state law;"* which proves *'a fortiori '* that Claim 2 at bar is the exact equivalent as the claim in ***Held*** v. ***Montana.*** Hence, while this Court may ultimately decide to possibly invoke "supplemental" jurisdiction, it is respectfully submitted that the correct procedural guideline for Claim 2 is to have Plaintiffs herein amend their Claim 2

8

within the Montana state court;.. post judgment; and thereafter raise this SAME Claim 2 anew, within **_Held_ v. _Montana;_** and therefore adjudicate this infringed *"liberty "* violation there instead.

### CLAIM 3

Moreover, there can be little dispute that within the context of Plaintiff s state law claims, as compared in similarity with instead Claim 3 of this case at bar, under Page 2, Issue One, within **_Held V. Montana_** , the Appellate Court estated;........*"whether the Montana Constitution's guarantee of a "clean and healthful environment" includes a stable climate system that sustains human lives and liberties. "* Therein lies the crux of Claim 3's complaint. Hence, upon a careful perusal of Claim 3 it becomes quite apparent that it connotes a tripartite grievance encompassing three separate complaint viewpoints. First is the "ULTRA VIRES" factor, which thus limits the ability of the judiciary to hear and decide cases that are deemed to be inherently political in nature and better suited for resolution by the legislative or executive branches of government. This "ULTRA VIRES" factor thus questions whether Defendant Trump unconstitutionally is acting beyond his presidential legal power by legislating law via these three EO's. Moreover, few can disagree that the two other main viewpoints inherent within Claim 3 are a presidential mandate to *"unleash"*, *"prioritize "*, and *"fast track"* the development and production of fossil fuels. While the second other objective is to debilitate the enforcement powers of the federal EPA, from being responsible for controlling and preventing air pollution. In short, to dismantle science

These separate viewpoints must be considered as coalescing into three different distinct aspects, where each one should be considered *non sequitur* to the other two. Simply put, *non sequitur* means that the premise of "ULTRA VIRES" does not logically flow from the subsequent two other conclusions that fossil fuel production is being *"unleashed"* at the same time that the EPA is being unsatisfactorily debilitated. Let us now assume arguendo that this Honorable Court finds the "ULTRA VIRES" viewpoint as a textually demonstrable constitutional commitment to another branch of government

under the "separation of powers" Clause of the U.S. Constitution. In deference to this consideration lies the holding in ***Baker* v. *Carr*** 369 US 186 ( 1962) which ruled that; .................... *"federal courts should not hear cases which deal directly with issues that the Constitution makes the sole responsibility of either the executive and /or the legislative branch. "* Hence, does this case law citation sound the death knell for this entire controversy?

However, should this Court instead disregard the potential for lack of justiciability therein, and desire to instead adjudicate Claim 3; then under this latter scenario, this Court must re-visit on page 105, ¶ 285, where Plaintiffs attorney states the following;.... *"States and Tribes may limit air pollution more stringently than EPA. "* Perhaps unwittingly then, Julia Olson has chosen to invoke the federal statute pursuant to **Title 42 Chapter 85 Code Section § 1740 (a) (3)**.................... **"through any <u>measures</u> air pollution control at its source is the prime responsibility of the <u>States</u>."** Therefore, "***by operation of law* "** the fundamental rights of all twenty-two Plaintiffs herein, without any specific action or agreement from all Defendants herein mandates that Claim 3 must be automatically removed back to the state of Montana for post-judgment reconsideration and amendment of this instant Claim 3 pursuant to the final judgment in ***Held v. Montana*-** which ostensibly means that Claim 3 herein is in fact the same claim within that same controversy.

<u>CLAIM 4</u>

Once again, when now comparing Claim 4 in this case at bar to the four State of Montana Claims in ***Held v. Montana'*,** i.e. relative to a legal comparison of their similarity; this Court is once again confronted with the same initial viewpoint of the "ULTRA VIRES" factor. Therefore, **"Amicus"** herein, previously argued before this Honorable Court that this latter factor severely limits the ability of the judiciary to hear and decide cases that are deemed to be inherently <u>political</u> in nature and better suited for resolution by the other two remaining branches of government. Thus, notwithstanding any potential procedural disposition herein; it is now respectfully submitted that the textual allegations raised by Plaintiffs within Claim 4 herein are simply not supported by

any of their important associated real-world facts. In short, Plaintiffs factual Complaint within Claim 4 simply lacks any supporting truthful evidence; therefore, there is no sound justifiable legal basis for this Claim 4.

It is now incumbent on "**Amicus**" herein to elucidate and analyze for this Court which facts, if any;.... unquestionably are true, and thus supported by those sworn allegations of fact submitted by Plaintiffs attorney on page 111-112, ¶ 304-307 in this case at bar. Let us now fully explore the true facts for the record. First, we must begin by stating Plaintiffs grievances as sworn to by Attorney Julia Olson. She thus maintains therein, that by implementing his three Executive Orders, Defendant Trump is presently acting beyond his granted Constitutional powers under the Office of the President by;...*illegally amending, repealing, rescinding, and circumventing duly enacted federal statutes, including 15 USC § 2933 and § 2936. "* However, nothing can be further from the TRUTH !!!!!!!!!!!

Accordingly then, upon information and belief with the source being the Internet;... and also pursuant to 15 USC § 2933 and § 2936, Defendant Trump is mandated by said law to establish a research agency called the "United States Global Change Research Program" ( USGCRP ) which must produce the quintessential and vital National Climate Assessment Report (NCA ) every **FOUR** years. Therefore, under the previous Biden Administration, the last NCA 5 Report published was in November 2023. Hence, the next scheduled Report is due no later than November 2027, which is by law, just four years later. Further, "**Amicus**" makes the following sworn allegations of fact. From a fair reading of the four corners of all three Executive Orders very carefully; viz. **EO # 14154**, that directive promulgates into law the ""*unleashing of American energy"*; and **EO # 14156**; which unquestionably declares a national emergency by invoking emergency powers to accelerate the leasing, production and transportation of domestic crude oil, gas and coal. While finally, there is also **EO # 14261**, which reinvigorates America's beautiful, clean coal industry.

Hence, upon very careful scrutiny of every word contained within all three Executive Order documents; there seems to be the complete absence of any indication which even remotely suggests that Defendant Trump is guilty or liable for illegally ""*unleashing fossil fuels"* attributable to this erroneously assumed termination of

the <u>National Climate Assessment (NCA) Report</u> ! Moreover, Attorney Julia Olson had the necessary legal skill set to peruse these same three Executive Orders. Further, she also had the ability to learn that on November 2023, NCA # 5 was published by the Biden Administration. Unquestionably, as a duly admitted and experienced member of the bar, she also had to have known; since this controversy at bar was initially filed on May 29, 2025, that Defendant Trump would only be in violation of federal statutes Title 15 USC § 2933 and § 2936 come November 2027; which would be clearly three years away. Why, then does this unethical breach of legal duty exist so glaringly apparent ?

Was this failure to state true facts within Claim 4 yet an unsavory attempt to defeat " <u>sameness of claims."</u> pursuant to the dispositive doctrine of 'Claim Preclusion ?" We may never know with certainty. Accordingly, then, the only just and proper remedial measure for this Court to explore is to quash Claim 4 as a complete nullity. This legal justification is warranted by the well settled rule under **FRCP 12 (b) (6)** which provides for dismissal as such for failure to state a claim upon which relief can be granted; due to the foregoing assertion where the facts as presented within Claim 4 do not establish a valid cause of action.

## CLAIM 5

Although Claim 5 does not possess all of the legal earmarks of *"'sameness"* to invoke the well settled dispositive doctrine of *"claim preclusion"* ; nevertheless, Plaintiffs herein once again  fail to have established a valid legal claim for which relief can be granted pursuant to **FRCP 12 ( b) (6).**  In other words. Plaintiffs Claim 5 does not allege sufficient facts that, even if proven true, would entitle them to the legal remedy they are seeking. In essence, this judicial analysis here is not whether Plaintiffs can prove their allegations, but instead, whether the allegations, even if true, establish any legal wrongdoing on the part of Defendants herein. Therefore, in order for this Honorable Court to effectively establish any legal wrongdoing on the part of Defendants herein, it is strongly suggested that it first revisit Page 113, ¶ 312; which thus clarifies Plaintiffs tripartite complaint grievance from the perspective of three separate viewpoints.

Viewpoint # 1 is *"<u>Defendant's wholesale dismantling, suppression and scrubbing of climate science research and data.</u>* Suffice it to say then, we can safely infer that

Plaintiffs are, for the most part, thus ostensibly suing Defendants herein, inter alia; "*by not making available scientific research* "; i.e. (dismantling, suppressing and scrubbing science.) However, notwithstanding this claimed grievance; there is not one scintilla of evidence which even suggests that any Executive Order has been signed by Defendant herein which "*does not make available scientific research.*" Quite understandably, then, scientific research involves the slow time consuming ( years ) and systematic process of investigating phenomena through scientific observation, experimentation and analysis to both generate knowledge and to test hypothetical theories. Therefore, how far into the future must this Honorable Court probe?

Hence, for the purposes of our legal inquiry herein, this Honorable Court is now being asked to scientifically treat this latter Viewpoint # 1 as the dependent variable; (i.e. the effect; or perhaps the omission of scientific data ) which should be measured or observed over time (years ) just to see how it responds to changes being made within the independent variable. Accordingly, then, this slow systematic implementation of Defendant's three Executive Orders, over a certain protracted period of time (years) must constitute the independent variable; i.e. Viewpoint # 2 ( unleashing ); which normally would be intentionally changed or manipulated (i.e. the cause) by the Defendants herein. However, this does not occur here, simply because Viewpoint # 2 remains the same over time and therefore is not changed nor manipulated in any manner whatsoever. In sum and substance. Viewpoint # 2 is not even expedited at all, but merely proceeds on a slow ( 7 years) business as usual trajectory. Put another way. On April 8, 2025, **Executive Order # 14261**; (the third cause ) dealing with re-invigorating the coal industry was signed into law; while just 21 days later, Plaintiff's attorney filed this instant lawsuit on April 29,2025; complaining about some vague harm which possibly could take place in just a meager 21 days! . Therefore, Julia Olson is now instead asking this Court to divine, and prognosticate some vague and highly speculative harm, which may or may not unfold in the foreseeable future, nor possibly occur at all for that matter. Simply put, what measurable harm could possibly have taken place within those few meager twenty-one days which elapsed ????

The same holds true for **Executive Order # 14154**: the *"unleashing of American energy"* , and **Executive Order # 14156**: " *the Declaration of a National Emergency; "* both signed into law on January 20, 2025. While a short three months later, Julia Olson filed this instant lawsuit. Finally, within said ¶ 312, Plaintiffs attorney complains from the perspective

13

of Viewpoint # 3, that these recently signed and yet to be completely implemented Executive Orders contravene the following Congressional findings and directives. By and large, these infra. Congressional directives below; which comprise Viewpoint # 3, exert no significant impact on this controversy, and are merely permissive in nature, thus obviating any statutory demand of not making available scientific research. Simply put, they merely only direct and dictate what Congress would like the Executive Branch to execute. Let's now explore these enumerated Congressional directives, one by one as follows.

      **42 use §4331**: in cooperation with state governments to use all practical means and measures to maintain conditions where man and nature can exist in productive harmony. To also achieve the beneficial uses of the environment without degradation.

      **44 use §3501**: minimize paperwork burden from the collection of government information. Coordinate information resources management and disseminate public information.

      **42 use § 4321**: the goal of the National Environmental Policy Act (NEPA) which promotes harmony between humans and the environment to prevent environmental damage.

      **42 use § 6620**: release of scientific research results.

      Accordingly, it thus becomes patently apparent herein, that from the standpoint of a judicial inquiry of any possible wrongdoing; where Congress, in passing these foregoing four statutes supra, merely ascribed an air of implied statutory permissiveness (*witness the underlined supra.*) as the legislative lawmaking branch;.... simply for the executive branch of the President to enforce. Perhaps then, the most glaring grievance within Claim 5 is that of the latter statute **42 USC § 6620**; which seems to portend either the scrubbing, suppressing or dismantling of scientific research results; which then subsequently devolves into a highly vague, speculative and not quantifiable, nor measurable grievance! In other words, does the unleashing of fossil fuels necessarily result in the dismantling of science; or does this latter scenario instead cause the unleashing of fossil fuels? Plaintiffs herein are patently vague on this argument.   Accordingly, these are the four main questions which beg for inquiry. (1) What duty of care does Defendant Trump owe to these Plaintiffs within Claim 5 ?  (2) Has Defendant

14

Trump breached that duty to care ? (3) From the analysis of Claim 5 then; how have Plaintiffs suffered any harm ?  Finally, if there is any concrete harm articulated; then is it the result of defendant's putative breach of duty?

Arguing from perhaps another standpoint, i.e. Viewpoint # 2 ( *the unleashing* ) which as previously stated must be considered the engagement of <u>active conduct</u> by Defendant's deliberate wanton *"unleashing"* of fossil fuels;… which logically then permits another heretofore, unprovoked and fully autonomous third non-party; viz.  a big well- known multinational oil company, by granting the latter permission to;... IF THEY SHOULD SO DESIRE to facilitate in the transformation of these fossil fuels via their eventual surveying, exploration, permitting, drilling, extraction, production, refining, development and transportation of either crude oil, natural gas, or coal resources. Whereas, Viewpoint # 1, must be considered as instead the <u>passive conduct </u>via stifled scientific research, which allows or perhaps prevents lawmakers to eventually and POSSIBLY make informed decisions about the degradation of the environment due to this aforementioned fossil fuel *"unleashing"*.

This next ensuing exposition aims to enlighten this Court that both Viewpoint # 1 and Viewpoint # 2 are completely counterintuitive under any notion that the latter is the causative factor. Which means the former is the observed effect; hence, only being viewed through the rather arduous, insanely expensive, risky and protracted lengthy period of time involving perhaps seven years. The record thus demonstrates that Defendant Trump signed two Executive Orders on Monday, January 20, 2025. Next let's assume arguendo that on Tuesday, January 21, 2025, (the first available next day for fossil fuel *"unleashing "* ) Exxon Mobil, a multinational big oil company decided to begin off-shore oil exploration due to both of these Executive Orders.

Let's now explore, not only the length of time spent by Big Oil, but also the sequence of the myriad of mandatory steps necessary before one gallon of crude oil can be sold and combusted by an automobile driver; who subsequently emits the undesirable fossil fuel carbon dioxide emissions from his automobile. First, survey teams and scores of seismic geologists map the ocean floor bed into a grid pattern and ascribe the latter with GPS coordinates linked to global satellite surveillance;....in a location where Big Oil suspects crude oil is buried. Next, they begin shooting sonar in the form of shock waves into the ocean's sea bed floor.

15

Accordingly, it is axiomatic that sound travels at different time rates through sand versus a liquid such as crude oil. Geologists then next analyze and interpret this differential travel sound data in order to accurately pinpoint and determine exactly just where crude oil is located. Once suspected, they next obtain the necessary government lease for drilling rights and the vital environmental permitting red tape constraints, in order to begin exploratory drilling.

The next phase begins with the dispatching of a mobile drilling unit to perform the task of drilling four exploratory wells. This process takes approximately 90 days to procure the required four probative cylinders subsequently embedded therein for analysis and investigation of each differential layer of sea bed strata. If crude oil is thus seen at any particular layer level, then the next step involves construction of a huge off shore oil drilling platform costing hundreds of millions of dollars and consuming two to five years in time to construct. Subsequently a series of repetitive drilling arbors measuring thirty feet in length are advanced serially one after the other to begin drilling downward hundreds of feet. Next, a series of cylindrical hollow casings; again each 30 feet long, thus replace the drilling arbor. It is through this hollow casing that crude oil is extracted and pumped up to the top of the oil rig for transportation to an oil refinery.

This projected time line from the beginning initial survey to the ultimate refinement of crude oil into gasoline sold at the service station takes from six to seven years, This rather lengthy projected time line of the claimed *"unleashing"* of fossil fuels demonstrates just how quixotic Claim 5 is where there is no logical legal connection between the alleged cause ( projected time- line of fossil fuel production ) and the effect of  dismantling  of science. In essence seven years from January 21, 2025 when Big Oil ( putative Exxon Mobil ) first began its exploratory survey brings us to January 21, 2032; the very first day that science would become impacted from that incipient ULTRA VIRES *"unleashing"* of fossil fuels. Hence, Defendant Trump's four- year presidency would have past and expired before seeing any impact from the beginning of any dismantling of science. More to the point, this foregoing analysis results in only one inescapable conclusion;.....that while Claim 5 is not the same claim as in ***Held* v. *Montana*** ;.......Plaintiffs have not sufficiently established  that within Claim 5 any wrongdoing has taken place; therefore there is the complete absence of any grounds for seeking any remedy, hence pursuant to **FRCP 12 (b) (6)** Claim 5 must be dismissed for failure to state a claim upon  which relief can be granted.

16

## CLAIM 6

Upon a fair reading of Plaintiff's Claim 6 we uncover a rather tortured grievance or complaint couched under the umbrella of a *"substantive due process"* violation. In sum and substance, *"substantive due process"* is rooted in the 5th and 14th Amendments which protect individuals from government intrusion of fundamental rights; one of which is a *"due process"* guarantee. It basically, in a nutshell, asks the question of whether the government, in this case at bar;............does Defendant Trump have a good enough reason or a substantial justification for infringing on these twenty-two Plaintiff's protected rights or interests under the Due Process Clause of the U.S. Constitution ? This latter inquiry now thus centers upon Plaintiffs Page 116, ¶ 323, which begins its major litany of grievances attributable to Defendant Trump's three Executive Orders; whereby it is alleged therein that their systematic implementation has resulted in a **"state created danger"**;...... mainly attributable to (**a**) an affirmative government conduct leading to an actual <u>particularized</u> and avoidable <u>danger,</u> plus (**b**) these suffered injuries therefore were <u>foreseeable</u> and (**c**) Defendants are also acting with <u>deliberate indifference.</u>

In short, Plaintiffs thus claim, that the EO's *"unleashing"* of fossil fuels causes actual **"danger"** from GHG pollution! Further, that Defendants are aware of this impending **"danger"** resulting in physical injury, while concomitantly thwarting known solutions to curb this harm. Moreover, Plaintiffs further complain that Defendants exert a *"sovereign control"* over the air Plaintiffs breathe via this wanton *"unleashing"* of GHGs. Accordingly, then. Plaintiffs also maintain that this alleged custodial *"sovereign control"* over Plaintiffs airshed subsequently devolves into a *"special relationship"* which henceforth thus lays the groundwork for invoking a plethora of case law citations centered around nineteen " **state created danger**" judicial decisions cited *infra.* As such, the law of Claim 6 now revolves around the U.S. Supreme Court Decision under ***De Shanev v.Winnebaeo County Department of Social Services-* 489 U.S. 189 (1989)** which held that the government has absolutely <u>no</u> affirmative duty to protect people from privately inflicted harms. Wherein Chief Justice Rehnquist explained that the Constitution typically provides "negative liberties" ( i.e. make a choice without restrictions ) via the 1st Amendment; 5th Amendment, 4th Amendment and 14th Amendment; but essentially does not impose any affirmative duties on the government whatsoever.

17

Within this context then, an affirmative duty by the government is a distinct legal obligation for the government to take specific actions to protect individuals or insure certain outcomes in order to prevent harm or "**danger**". Let us now be perfectly clear about the fact that Defendant Trump via his three Executive Orders is not inflicting any harm per se;...... instead it is the "*unfettered*" private non-party multinational Big Oil Companies. Therefore, that U. S. Supreme Court decision *supra,* further elaborated; *"nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors"* By and large, it is noteworthy to point out that the mere recitation by attorney Julia Olson *of "dicta"* within certain Appellate Court decisions *infra,* should not in and of itself connote any judicial affirmance of Plaintiff s allegations herein. For example. Plaintiffs are quick to point out that *"Defendants are acting with <u>deliberate indifference</u>" ; w*hile at the same time stating that there also lies a *"special relationship"* between Plaintiffs and Defendants. Quite interestingly, these are the very same *"dicta "* opined within ***<u>Beltran</u> v. <u>City of El Paso</u> 367 F.3d 299 (5*** Cir 2004 )** which therein elaborated that plaintiff would have to show that the defendant acted with *"deliberate indifference"* meaning that the state actor (Trump) both knew of and disregarded an excessive risk to the victim's health and safety.

It thus appears that attorney Julia Olson has read the very scholarly legal compendium written by Professor Erwin Chemerinsky at Duke University Law School who authored the rather enlightening 26 page article entitled;...**"The State-Created Danger Doctrine"**; wherein this unique phraseology *"special   relationship"* and *"deliberate indifference"* abound. More to the point, what *"special relationship"* do these twenty-two youths have in common with Defendant Trump ???  NONE !!!!  This Honorable Court must now be enlightened to the fact that Professor Chemerinsky points out that *"special relationship"* as used within the doctrine of "<u>**state-created danger**</u>" usually connotes a custodial relationship where the harmed individual was perhaps either in prison or under arrest; or perhaps in a state mental institution. See ***<u>Beltran v. City of El Paso</u> 367 F.3d 299 ( 5th Cir 2004 ).** By and large, this 26- page scholarly legal case law compendium has exactly <u>nineteen</u> case law citations, all of which involve very tragic consequences involving either death, coma, rape or other serious grave injuries. Therefore, none of these cases therein remotely sympathize with the alleged vague GHG emissions complained of herein.

However, in this case at bar, Plaintiffs "**state-created danger**" is simply reduced to rather highly speculative prognostication of some vague yet to be proven danger. It is a fact that there exists no explicit right to a healthy climate both in International law (United Nations) or U.S. law. Hence, the U.S. Supreme Court in a 7-2 decision reversed **_Gonzales 125 S. CT 2810_** wherein Justice Scalia explained that no law creates an "*entitlement*" and without an "*entitlement*" there can be no property right; and without a property interest there can be no due process violation. Therefore, since the Clean Air Act does not provide an "*entitlement*" then there is no "*substantive due process*" violation. Moreover, the latter is not written in mandatory terms, therefore, there also can be no procedural due process violation.

In short, there is no universally recognized explicit "*right to breathe clean air*" as a stand-alone fundamental right recognized by the courts as a substantive due process affirmative right. See **De Shaney** supra. While in **Pinder v. Johnson** 54 F. 3d 1169 ( 4th Cir 1995 ) that Appellate Court reasoned; "*it cannot be stated that the state commits an affirmative act or creates a danger every time it does anything that makes injury at the hands of a third party* ( Big Oil ) *more likely.* Furthermore, the Sixth Circuit articulated a three- prong test in order to assess a "**state-created danger**". They reasoned there must exist (**1**) an affirmative conduct, which created the risk by a third party; (**2**) distinguishing special danger to the plaintiff alone versus danger to the public at large and (**3**) finally the defendant knew of the danger to the plaintiff.

It is also axiomatic then that fossil fuel ""*unleashing*" has gone on for the last **155** years since the incipience of Standard Oil by John D. Rockefeller who subsequently sold that company to BP in 1987. This Honorable Court also has to look no further for dispositive guidance than the case law citation of **_Pena v. DePrisco - 432 F3d 98 ( 2d Cir 2005 )_** where the Second Circuit granted ""*qualified immunity*" to the officers by articulating that said doctrine shields government officials from liability in civil lawsuits unless their conduct or actions were clearly illegal and that there was no clearly established law that the officers violated.

Quite clearly then it can be seen from the sound decisions within the body of these nineteen case law citations that the "**state-created danger**" alleged within Plaintiffs Claim 6 is purely a figment of attorney Julia Olson's legal imagination. Therefore, while Claim 6 lacks "sameness" necessary for claim preclusion it instead fails to state a claim upon which relief can be

granted pursuant to **FRCP 12 (b) (6).**

**FINAL STATE COURT JUDGMENT**

Now let's consider element (1) of ***Res Judicata"***. In essence, all of that foregoing legal battle within ***Held v. Montana*** thus culminated in a ..... [ <u>final state court judgment</u> emanating from the Montana First Judicial District Court within ***Held v. Montana*** Case # ***CDV-2020-307,*** which effectively ruled in favor of said previous ten young plaintiffs supra, thus, finding that the State of Montana violated their constitutional right to a clean and healthful environment. More to the point, the State court also concluded that a key provision in Montana's energy policy i.e. the state statute, known as the Montana Environmental Policy Act ( MEPA) thus prohibited consideration of greenhouse gas emissions ( GHG) and their ultimate impact on climate when conducting environmental reviews which was therefore patently unconstitutional. Hence, a permanent injunction was subsequently issued by the State of Montana, whereby the holding therein held that more specifically that "MEPA Limitation" enactment surrounding "Issues Two" and "Issues Three", which thereby restricted GHG emissions '""*beyond"* Montana's state borders was unconstitutional because it arbitrarily excluded GHG emissions from *"global"* environmental reviews, hence violating the ten plaintiffs constitutional rights.]

By and large, the following constitutes the highlights of said MEPA. First, the Montana MEPA required the various state agencies to evaluate the environmental effects of proposed action; similar to the federal EPA. Its express purpose was to ensure a balance between state infrastructure projects (i.e. oil and gas exploration and coal mining ) and environmental protection under the umbrella of this statewide policy. However, in 2011 Montana enacted a very limiting unsavory state statute known as the "MEPA Limitation"; which effectively constrained and limited consideration of all GHG emissions from climate change impacts ;.......even beyond Montana's state borders, which was tantamount to an unconstitutional global climate limitation. Instead, Montana's MEPA was modelled after the federal nationwide NEPA to ensure that all

20

environmental considerations are integrated into state agency decision making process.

## POINT III

## RES JUDICATA

Res Judicata is a preclusive legal barrier especially used in federal courts, which acts as a bar against "*subject matter jurisdiction*" within that forum. It essentially prevents a party, in this case at bar, Plaintiffs, from re-litigating a claim that has already been decided within the state of Montana; viz. ***Held v. Montana,*** supra. Hence, despite said final state court judgment within that litigation on the merits, and based upon the same legal theory, Plaintiffs are now seeking to enlarge "*de nuovo*" in federal court a new further supplemental review of the three presidentially mandated Executive Orders by attempting to declare same as being unconstitutionally void and thus considered "*ultra vires*".

Accordingly, in order to establish "*res judicata*", three essential key elements must be met. First, as stated above, there must exist a previous final state court judgment on the merits of that controversy. Which fact clearly exists.! Second, there must be either the same parties, or perhaps the parties at a minimum must be in privity with one another. That also clearly exists ! Finally, the same cause of action must emanate from both controversies. Therefore, within ***Held v. Montana,*** that prior case in state court reached a conclusion that was essentially a decision on the substance of the claims via a trial verdict reached on the merits. It is further acknowledged that essentially the Plaintiffs also were the same in both cases, since ten of them are identical to the *Montana* case. Additionally, privity does exist in a special relationship where both separate defendants interests, are so connected and intertwined within each lawsuit, that said federal defendants are now bound by the state court judgment as if, they were a party therein. In short, the USA can't pollute Montana's clean air.

The last element requires that the federal lawsuit must be based on the same claim or legal right that was litigated in the state of *Montana* lawsuit. Therefore, it is an

undisputed fact that <u>Issue One</u> on appeal in the Montana Appellate Court involved that state's constitutional guarantee of a *"clean and healthful environment."* Therefore, few can argue that all six federal claims of Plaintiff's herein, center around that same cause of action involving those twenty-two Plaintiffs' fundamental right to breathe clean air, free from the polluting GHG emissions from the alleged anticipated wanton *"unleashing"* of fossil fuels. In essence then, *"res judicata"* respects the policy consideration of **"comity"** which ensures that once a state court has definitely ruled on a matter, the parties involved cannot bring the same claim again in federal court, which thus promotes efficiency and finality within the legal system. Accordingly, this latter consideration acts like a barrier thus preventing a winning plaintiff to re-sue a losing defendant in privity on the same cause of action.

Few can dispute then, that the state court matter was adjudicated *"on the merits"*; meaning that the judgment, decision and ruling, the state court made, was based on the law, after hearing all the relevant facts and evidence presented in court. Therefore, within this case at bar in federal court, *"comity"* thus acts as a judicial barrier, wherein the practice in federal courts bestows deference and respect to the laws and judicial decisions of a state court. It becomes a matter of courtesy and mutual respect aimed at promoting harmonious relations and the efficient administration of justice. It is therefore a respect for state sovereignty in recognition of the distinct and independent role of the state court which has previously exercised its own jurisdiction regarding the very same jurisdictional matter.

By and large then, this dispositive *"res judicata"* Point III thus evolves into a procedural matter. Simply put, state court judges have the authority to rule on federal law, because state courts have *"concurrent jurisdiction"* with federal courts over many federal claims; meaning that they are permitted to hear and decide cases involving federal law. In sum and substance, it matters little that a sitting president is being sued; nor that his three signed Executive Orders are the federal mandates sought to be challenged as being wholly unconstitutional. It is therefore a fact, that the U.S. Supreme Court has ruled that state courts

22

have "***concurrent jurisdiction***" over most federal claims, meaning they have the legal authority to hear and decide this case at bar as well. Hence, there is no exclusive jurisdiction within this controversy which prevents a state court in Montana from exercising its own jurisdiction.

In essence, state courts play a significant role in the application and interpretation of the federal laws involved within this controversy. Therefore, it is respectfully submitted that the proper procedure for this case at bar, is either outright dismissal for lack of subject matter jurisdiction pursuant to "*res judicata*" or perhaps in the alternative, removal to the state forum. Clearly, the latter course would suggest that Plaintiffs make an application for post judgment amendment of the ***Held v. Montana*** claims in order to adjudicate the alleged unconstitutionality of these three underlying Executive Orders.

## POINT IV

## STANDING TO SUE DOCTRINE

### A. INJURY IN FACT

The federal courts incorporate a very important dispositive legal principle which ostensibly determines whether these 22 youths have a valid right to entertain this instant lawsuit in federal court. However, this federal court must now first ascertain and ensure that it will be able to resolve the disputes between these parties, thus making certain that these 22 Plaintiffs have a legitimate and genuine stake in the outcome, as opposed to merely addressing some rather obscure abstract legal questions or hypothetical and nebulous vague grievances. Therefore, it was established by the case law citation within **Lujan v. Defenders of Wildlife** **504 U.S. 555 ( 1992 )** which was a landmark U.S. Supreme Court decision therein that sharpened standing requirements under Article III of the Constitution. The latter has now become the beacon of light for environmental standing jurisprudence, especially since this Honorable Court will find it enlightening, as not only being case on point; but to also shed light on this judicially perplexing problem of a putative third non-party who now becomes an obstacle toward addressing **"redressability"** herein. There are three very basic core elements required herein; the first of which is **INJURY IN FACT.** Simply put, this is the very first basic initial requirement, whereby the Plaintiffs herein must demonstrate to have suffered a **"concrete"** and **"particularized personal"**

23

injury which interpolates as real harm that affects each one of them both personally and individually.

The late Justice Scalia articulated therein this first illuminating requirement; whereupon he opined: ....**respondents ( Plaintiffs herein) bear the burden of showing standing by establishing, inter alia, that they have suffered an injury in fact, i.e., a concrete and particularized, actual or imminent-invasion of a legally protected interest. To survive summary judgment motion, they must set forth by affidavit or other evidence specific facts to support their claim . "This Court has consistently held that a plaintiff claiming only a generally available grievance about government, unconnected with a threatened concrete interest of his own, does not state an Article III case or controversy."** Moreover it was stated therein: ...."**At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. " However, the plaintiff can no longer rest on such 'mere allegations', but must 'set forth' by affidavit or other evidence 'specific facts'. "In order to establish standing depends considerably upon whether the plaintiff is himself an object of the action at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. "**

This next ensuing High Court admonition becomes the entire linchpin,... case on point within this controversy at bar;  "**When, however, as in this case, a plaintiff's asserted injury arises  from the government's allegedly unlawful regulation (the three E.O.s ) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated third party (herein Big Oil) to the government action or inaction and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts: ( herein Big Oil) and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.**

Hence, upon a very careful perusal of the sworn allegations of fact submitted by these 22 young Plaintiffs on pages 5-30 therein, there seems to be a rather vague generalized and insubstantial cluster of rambling narrative discourse therein ;....whereby each Plaintiff has experienced somewhat rather controversial and unclear symptomatology. Thus, ranging in ages from 7 through 25, there appears to be only seven ( perhaps, a third of them ) which characterizes their generalized experienced harm as some form of difficulty in breathing. Several others however, seem to complain of not being able to use the greater outdoors as often as they would like to. Notwithstanding the foregoing, this argument by and large is not very helpful to this Honorable Court, especially where **INJURY IN FACT** requires a particularized **concrete** harm experienced.

Accordingly, **Amicus** has to now embark upon some form of medical differential diagnosis to "cull out" all of the several potential and possible causes of breathing difficulties as

24

being for the most part highly improbable of occurring. Difficulty breathing can be attributable to a host of varying medical maladies; therefore. **Amicus** must rule each one of them out with certainty as being highly unlikely to occur within all 22 young individuals at once. Among the array of suspect medical disease culprits are <u>mitral valve</u> and <u>tricuspid valve</u> regurgitation caused by calcification of the cardiac leaflets;.... which customarily occurs in fifty to seventy year older victims. Since the oldest Plaintiff is twenty-five years old, let's rule this condition out, as highly improbable.

      Similarly, <u>coronary artery blockage</u> can also be a culprit, however the latter customarily afflicts only an older age group. Therefore, let's rule this out as well. Next, we have <u>cystic fibrosis </u>which affects the lungs by causing certain proteins to thicken and clog the breathing alveoli lung sacs; however, this condition is caused by a congenital gene defect and therefore highly unlikely in all 22 youths. <u>Pulmonary emphysema </u>as a lung malady is usually seen in heavy cigarette smokers who smoke three packs per day causing a grave inability to exhale properly without becoming severely exhausted physically. Since this malady usually occurs mid- life, and in particular smokers, we are justified in ruling this condition out as well; especially since this understandably does not seem to be prevalent in all 22 youths as a whole. While only one Plaintiff complained of <u>asthma;</u> twenty-one other Plaintiffs having the same malady is also highly unlikely. <u>Foramen ovale: (</u> small hole in the heart septum) is a very rare congenital birth defect seen only in infants and toddlers, whereby it is as well highly unlikely. <u>Sickle cell anemia </u>is caused by inheriting two mutated hemoglobin genes, one from each parent, thus leading to the production of abnormally shaped red blood cells. Highly unlikely in all 22 youths.

      Finally, we have arrived at the one single causative factor which seems to be substantiated by the sworn allegations of fact of fact reported by 18 out of 22 Plaintiffs on pages 5-30; or 81 % of the entire group of Plaintiffs. Therefore, upon information and belief, the source being the internet; 16 million people in the U.S. are afflicted with <u>Chronic Obstructive Pulmonary Disease ( COPD ).</u> The record now before this Court clearly demonstrates that all 18 youths herein were exposed to **<u>wildfires;...</u>** whereupon it is an undisputed fact that the latter produce large amounts of soot and smoke, dark enough to be seen with the naked eye. However, it is the very small tiny particles within wildfires, which causes the associated lung damage;.... particles so small in fact, that they can only be detected using an electron microscope. This Court

25

is now encouraged to learn more about how wildfire smoke affected 81 % of these Plaintiffs by visiting the following website indicated as: **:<https://www.airnow.gov/air-quality-and-health/fires- and-your-health / >.**

      This Court will now soon learn that the most common cause of **wildfires** in the U.S. is human caused ignitions attributable to carelessness in starting and using campfires. By and large then, this Court needs to now be educated as to the two etiological agents contained within **wildfires** which cause COPD; emanating from Plaintiffs exposure to these 18 **wildfires.** The two etiological agents therein are **'"particulate matter"** in two varying very tiny sizes. Additionally, this Court is also encouraged to visit the EPA website concerning the latter which is denominated as: **"particulate matter ( PM) pollution , https: //epa.gov/pm-pollution."** Therein this Court will learn that the larger size particulate matter is PM 10, which is 10 um (microns ) in diameter. To offer this Court a realistic size comparison; one lone particle of fine beach sand is nine times larger than PM 10; yet this latter pollution particle is definitely inhalable when an individual is exposed to any **wildfire;** subsequently getting deep inside the lungs, thus causing **inflammatory** COPD. Accordingly, this Court must also note that the smaller size particulate matter is PM 2.5 which is a very tiny inhalable particle, instead 2.5 micrometers in diameter; so tiny in fact that a single hair from a human skull usually measures about 70 micrometers in diameter, thus making it 30 times larger than this PM 2.5 fine particulate particle. Both of these two particulate matter entities; i.e. PM 10 and PM 2.5 are emitted directly from the **wildfire** source. Hence, both can get deep inside your lungs and blood stream. Which then elicits a chronic **inflammatory** response within the main airway bronchial tube, thus narrowing this vital passageway with phlegm and mucus causing eventual breathing difficulty.

      Perhaps another substantiating sworn allegation of fact submitted by Attorney Julia Olson is the fact that 9 out of 22 Plaintiffs ( 40% ) live in predominantly **rural** areas. This fact alone becomes extremely probative for the following reasons, which supports and lends credence to **Amicus** contention that these 18 different **wildfire** locations are perhaps the proximate cause of said Plaintiffs complained of harm from breathing difficulty. In legal parlance then, '"probative facts " constitute real demonstrable evidence which tends to either prove or disprove a fact in question; making it more or less likely to be true. Hence, the following probative facts are crucial for establishing the validity that Plaintiffs difficulty in breathing is the direct result of

these 18 different **wildfires,** and not from any unsubstantiated fossil fuel "unleashing" Let us now explore these facts with more credible probative reasoning.

Since 40 % of these 22 youths live in predominantly rural areas, they unquestionably do not reside close to any interstate federal highway system or any state highway roads; therefore, these 9 Plaintiffs reside and live far away from any $CO_2$ automobile and diesel fuel truck $CO_2$ toxic gas exhaust emissions. Moreover, only urban areas have hundreds of single-family homes, multiple scores of commercial buildings plus many industrial warehouses and factories; all containing chimneys, with each one emitting $CO_2$ noxious harmful fumes. Additionally, rural areas lack the electricity generating stationary utility smoke stack emitting chimneys. This latter scenario comprising a multiplicity of causation factors is not the case for a rural area which is predominantly devoid of these noxious GHG fume emitting sources. How then does Julia Olson explain this probative fact to this Court when many Plaintiffs have experienced difficulty in breathing?

In the final analysis, this Honorable Court would have to agree with **Amicus** herein that the so-called **"concrete"** harm which Plaintiffs allege is purely a figment of their Attorney's own legal imagination. Moreover, what these probative facts suggest is that for these identified 40 % rural living Plaintiff youths; ....Defendant Trump's first Executive Order gallon of gasoline sold seven years later in 2032; or perhaps the first Executive Order gallon of building heating oil sold seven years later in 2032 will never, ever cause GHG emission harm to impact that 40% rural group of youngsters. No! never, ever! Hence, <u>**INJURY IN FACT**</u> is nowhere to be found herein and is now reduced to a guessing game, whereupon it appears very easy for Plaintiffs attorney, after evincing a state court final judgment in **Held v. Montana** to articulate 18 separate grievances of breathing difficulty in these latter youths; then thereafter, very simply, yet quite carelessly, ascribe its **past** causation to the **future** ( seven years later in 2032 ) ''unleashing'' of fossil fuels via these three **"ultra vires"** Executive Orders signed in early 2025.

## POINT V

## STANDING TO SUE DOCTRINE

## B. CAUSATION

From the foregoing argument supra, regarding "<u>injury in fact,</u>" this Court must be assured and confident that Plaintiffs attorney somehow fails to have articulated any recognizable "<u>concrete</u>" or "<u>particularized</u>" injury. This requirement becomes a dire necessity toward

27

establishing "<u>causation</u>" within Point V herein. Accordingly, then, absent any articulated "<u>concrete</u>" injury it thus becomes almost impossible to establish "<u>causation</u>" herein. Hence, in **<u>Lujan V. Defenders of Wildlife</u>** supra.: late Justice Scalia counseled any future environmental plaintiffs that; **"there must be a causal connection between the injury and the conduct complained of.** The injury has to be; **'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party** ( Big Oil) **not before the court.** See **<u>Simon V. Eastern Kentucky Welfare Rights Organization</u> 426 U.S. 26 ( 1976).**

Moreover, within that latter decision the High Court reasoned that the connection between the IRS's action and the alleged harm to the plaintiffs was too speculative. <u>Speculative harm</u> therefore, within the legal context of that latter case law citation from the High Court refers to potential future harm that is extremely uncertain, highly improbable, or based purely on conjecture rather than demonstrable risk. In marked contrast however, "<u>foreseeable harm</u>" instead is harm which is reasonably expected to occur under the circumstances of being highly probable. Therefore, in a federal court of law, if a plaintiff fails to articulate any showing of any "<u>concrete</u>" and "<u>particularized</u>" injury, then a fortiori they lack standing to sue and have entertained only the possibility of "<u>speculative</u>" harm; and not in fact "<u>concrete</u>" harm. In short, the legal connection (traceability ) between the defendant's conduct and the alleged harm is too highly speculative.

In other words, <u>speculative</u> harm is purely based upon sheer guesswork and or possibilities; whereas "foreseeable harm" is a reasonable pure expectation based upon <u>facts</u> and <u>evidence.</u> Let's now explore these alleged facts and evidence herein to demonstrate that Plaintiffs lack 'ʌstanding to sue" based upon their failure to establish **"causation."** Hence, in order to logically analyze this problem, we must begin first by concluding that Plaintiffs herein essentially have failed to articulate any discernible "<u>concrete</u>" and "<u>particularized</u>" injury. Therefore, there is a complete absence of any harm to adequately trace to Defendant Trump. In essence, there is no logical connection between Defendant Trump's three Executive Orders and Plaintiffs vaguely hinted harm.

**Amicus**, thus now insists that this Court must instead pursue another approach by combining those "sworn to '' alleged facts emanating from these 22 Plaintiffs, in conjunction

with any possible evidence, in order to determine the "foreseeability" of what could reasonably be expected in the way of any possible harm. If these facts instead fail to lead to any traceable path to Defendant Trump, then "causation" as a necessary requirement herein has not been established. Let's begin our analysis by using pure mathematics. We can easily identify from the record on pages 5 through 30, before us, who in fact are the only nine Plaintiffs ( 40% of 22 ) living in strictly **rural** areas of Montana. We previously indicated on page 26 ¶ 2 herein that these nine rural living Plaintiffs are not being harmed by any noxious GHG emissions attributable to climate change as Plaintiffs attorney suggests we believe.

Next on a separate sheet of paper we arbitrarily write down numbers 1 through numbers 9 which represent these 40 % **rural** Plaintiffs **"unharmed"** by any GHG emissions whatsoever! Thus, they are completely eliminated and discarded from our analysis. Moreover, we must also make certain that all of these aforementioned nine **rural** Plaintiffs were also the victims of **"wildfires".** This is an important analysis because we now have an entire group of nine **rural** living Plaintiffs whose alleged "harm" can't logically and "fairly" be traced to Defendant Trump because these nine **"wildfire"** victims were all harmed in the past by wildfires (i.e. prior to the three Executive Orders.)

We now have 13 Plaintiffs remaining out of the total 22. Now let's gather another nine Plaintiffs of these remaining 13 who were also victims of different **"wildfires"** Please remember we previously identified a total of 18 **"wildfire"** victims from Plaintiffs record submitted. This unique second group is now comprised of the remaining nine **"wildfire"** victims; but also, possibly an additional nine GHG emission victims as well. Accordingly, it is absolutely axiomatic that particulate matter identified as **PM 10** and **PM 2.5** both occur with systematic regularity in both **"wildfire"** smoke and greenhouse gas emissions as well. Let's also recall that there were numerous Plaintiffs who complained of breathing difficulties. Logically speaking then, how does this Court fairly and absolutely trace the suspect COPD lung harm to Defendant Trump's three Executive Orders completely and with any degree of certainty; since this second group has possibly two separate and distinctly different harms; i.e. **"wildfire"** and GHG emissions. More to the point, since these 18 **"wildfires"** all happened ( 2017-2024) prior to Defendant's three E.O.'s; then Plaintiffs fail to demonstrate **"causation"** and therefore, "standing to sue" is definitely lacking. Also, at the end of this analysis we are left with four unharmed

29

Plaintiffs.

## POINT VI

## STANDING TO SUE DOCTRINE

### C. ABSENCE OF REDRESSABILITY

Previously on Page 15 ¶ 3 we discussed all the necessary steps which must be undertaken by a big fossil fuel oil or gas company from the very beginning stages of dispatching survey teams to scores of seismic geologists mapping out the sought- after site on the ocean floor, in an endeavor to explore for the unknow location of crude oil or gas. It was also discussed that this process customarily took 6-7 years before one gallon of gasoline or one cubic foot of natural gas was sold to any consumer. **Amicus** now argues that Point VI supra. - _"absence of redressability"_ is the most critical dispositive argument being made thus far herein. Hence, it becomes patently clear from a fair reading of Plaintiff s "PRAYER FOR RELIEF" on page 119 that (1) they are seeking the creation of a remedy pursuant to **FRCP 28 USC §2201** to declare said three Executive Orders as unlawful, unconstitutional, ultra vires, and invalid. Further, (**2**) they seek a permanent injunction against enforcing said three Executive Orders and (**3**) in addition a permanent injunction mandating that Defendants rescind all agency-wide directives emanating from said three Executive Orders; and finally (**4**) award costs to Plaintiffs.

Hence, the sheer _"absence of redressability"_ herein thus becomes all the more clear in fact when viewed through the lens of late Justice Scalia's writing for the majority in _**Lujan v. Defenders of Wildlife**_ supra, on page 24 ; wherein he reasoned;.......................

_" when a plaintiffs asserted injury arises from the government's allegedly unlawful regulation (the three E.O.'s ) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated third party ( herein Big Oil) to the government action or inaction. " "Standing depends on the unfettered choices made by independent actors not before the courts. "_ **Emphasis added.**

This latter reasoning by SCOTUS was not only case on point, but rather brilliant clairvoyance;.... thus, aiding this Court in its adjudication at bar. Further, this in fact also

becomes a legal truism emanating from this following ensuing argument. **Amicus** maintains that there can only be two possible outcomes from the resolution of this controversy. Either Defendant's three Executive Orders supra, will remain intact and completely undisturbed; meaning they will exist in full force and effect; or perhaps instead, in the alternative. Plaintiffs four prayers for relief will be granted. Accordingly, **Amicus** now desires to demonstrate that in either scenario *"redressability "* is woefully illusory and absolutely impossible to achieve, or to even come to fruition at all. Therefore, in essence, the late Justice Scalia forewarned all environmental attorneys that " *when a plaintiff's asserted injury arises from the government's allegedly unlawful regulation* **(the three E.O.'s )** *of someone else",* ( meaning Big Oil) then this condition understandably frustrates the doctrine of *"redressability".*

Perhaps the most important passage articulated by the late Justice Scalia therein, which was undoubtedly extremely prescient was;..... *"redressability ordinarily hinges on the response of the regulated third party* ( Big Oil ) *to the government action or inaction "* These three underlined words supra. thus form the basic underpinnings, which helps convey the legal caveat used by the High Court to express dispositive doom and gloom for all would be environmental lawsuits as it pertains to this doctrine of *"redressability"* within Point VI's "standing to sue" requirement. Hence, in order to elucidate this argument further, it appears that SCOTUS was extremely prophetic in dealing with the customary environmental lawsuit. By and large, they were keenly aware that many plaintiffs would customarily initiate an environmental lawsuit by suing initially only a government entity; simply because the latter enacted pertinent environmental legislation.

Additionally, more often than not, these same plaintiffs would also choose not to join a culpable third party to that same lawsuit. However, this same non-joined third party was usually,   the only real culpable proximate cause of the alleged harm. Now let's revisit Plaintiffs "PRAYER FOR RELIEF", articulated supra. There are only two possible outcomes. First, either the three Executive Orders will remain intact and completely undisturbed;.....or in the alternative, Plaintiff's said relief will be granted by this Court. Therefore, pursuant to the second scenario *"redressability "* may be possible; whereas under the first scenario, *"redressability "* becomes

practically impossible to achieve. The true realistic scenario is that pursuant to either dual scenario, *"redressability* " does not realistically occur in either case.

Let us now explore how these several underlined words such as *"redressability:"* *"response;"* *"regulated;"* in addition to *"unfettered"*;.... which all coalesce together to convey the sheer utter futility of Plaintiff's ever achieving any measure of *"redressability."* Let's now begin this argument first by conveying to this Court a rather concise probative flow chart as a credible narrative by stating that it is an undisputed fact that said three Executive Orders were only meant to be written commands intended for an unnamed putative third non-party ( viz. Big Oil). By and large. then, these three written commands would normally suggest blind obedience in the form of an expected *""response* ( i.e. the unleashing of fossil fuels ). However, because these third non- parties are not at all *""regulated"* and are also *"unfettered"* then they are in fact fully autonomous. As such there can't be any obedience whatsoever;.... ergo, if no obedience, therefore there can be no expected *"response"* which results in only mere speculation per se, herein !

Accordingly, there evolves a cogent explanation for this complete lack of *"response"* from these not *""regulated"* and *"unfettered"* third non-parties. This explanation lies in the corporate structure and governance of a typical multi-national big oil company such as British Petroleum. The latter purchased the first original fossil fuel company named Standard Oil, founded in 1870 by John D. Rockefeller which later completed this acquisition in 1987; thus, becoming the third largest oil company in the world, with a sum total of 155 years of expertise in exploring for crude oil; with annual revenue of 194 billion dollars in 2024 and a net profit of only a meager 11.47 billion dollars and with over 100,500 employees.

Albert Manifold, is the new Chairman of the Board receives 1.65 million euros in total compensation. The latter oversees the Board of Directors who report directly to the total group of shareholders at an annual meeting each year. Murray Auchincloss is the Chief Executive Officer, who runs, and oversees the entire company's operations. While each individual shareholder is primarily interested in just dividend payouts on their common stock shares, plus capital gains appreciation on the underlying stock price; the CEO instead focuses on

pure economic factors of <u>supply</u> and <u>demand</u> of crude oil and natural gas. It is in fact these unique latter economic factors which foretells of whether to explore for new oil and natural gas. Hence, before beginning any exploration activities, any major oil drilling company will first undertake a series of crucial decisions to identify potential drilling sites to access their viability. This latter process involves huge capital expenditures, extensive research and evaluation by using very sophisticated methods and technologies.

      The express reason behind this careful analysis is to critically monitor the company's business **margins;** which is the difference between gasoline or natural gas's selling price at the pump or meter, versus the associated company's costs of getting it there. This is the crucial measure of profitability and efficiency for the aforementioned individual shareholders;.....which in turn indicates how effectively this oil company turns its revenue into profits;....... which then in turn becomes a measure of the business's financial health. Thus, as measured and disclosed from BP's revenue stream supra. versus their net profits, this BP **margin** thus becomes six per cent; which is extremely slim. But oil is like food, clothing, shelter and medicine;......you must have it ! Therefore, from the foregoing it thus appears that the economic **supply** and **demand** consideration of these crude oil or natural gas products must be accurately monitored; because any appreciable production of an over-supply from **"unleashing"** thus interpolates into a lower price for crude oil;......meaning less profit to Big Oil. Instead, production of any fossil fuel products accordingly must keep **supply** tightly in close tandem with **demand,** so that warehousing dangerous petroleum never occurs; along with inadvertently lowering its price in the marketplace!

      Henceforth, the key factor in closely monitoring this **demand,** which in turn governs how much fossil fuel **supply** to produce, or perhaps **"unleash"** becomes apparent in the difference between the gross revenue stated for BP in 2024;..... which was 189 billion dollars, minus it's net profit, which was 11.47 billion dollars. Understandably then, this leaves 177.53 billion dollars spent by BP just to earn that 11.47 billion dollars. Let's also now subtract BP's employee salaries. 100,000 employees earning $100,000 per year yields one billion dollars. This leaves 176.53 billion for BP's costs to produce either oil or gas. Additionally, upon information and belief, the source being the internet, Big Oil companies usually have present on the horizon around 30-40 offshore oil and gas rigs at any given point in time. It is thus rather important for this Court to grasp the full potential of this **supply / demand** impact! Accordingly, if we divide just 35 oil rigs into BP's 176 billion dollar costs, we can then extrapolate that each rig cost on

average 5.02 billion dollars;…. after factoring in all exploration, production, transportation and refining costs per rig. For example, in 2024 there were 753 oil rigs; while as of 2025 there are 578 worldwide.

Additionally, there are five big U.S. Western Oil Majors with their market share shown in bold brackets;…. viz. Exxon Mobil [ **28 %** ];  Chevron [**16 %** ]; Shell [ **28.7 %** ]; BP [ **15.7 %** ];  and Total Earnings [**16.2 %** ]. Further, there are five large listed Independent Oil Companies also with their market share in bold such as Conoco Phillips [ **25 %** ], EOG Resources [ **10.3 %** ], Devon Energy [ **.07 %** ], Marathon Oil [ **61.3 %**], and Diamond Back Energy [ **.04 %** ]. These ten latter oil and gas companies account for 13.3 million barrels of fossil fuel production per day in the U.S.A. alone. Whereas Saudi Arabia alone accounts for 13.3 million barrels per day; while the other four OPEC nations contribute another 13.3 for a combined 26.6 million barrels per day for the combined OPEC cartel. Hence, there are only ten top countries worldwide responsible for 75% of the world's combined fossil fuel production. This becomes an important factor in the **supply / demand** analysis.

Accordingly, herein lie three rather major important facts for this Court to consider which tend to cast a pall over the "*redressability*" requirement. **(1)** BP recently sold its U.S. on-shore renewable energy 1.7 gigawatts wind business, i.e. BP Wind Energy North America to LS Power for a considerable undisclosed sum of money. This transaction was part of BP's 20 billion dollar divestment program to consolidate and simplify its main stream business of oil and gas ( fossil fuel ) production. Additionally, BP also recently discovered a major offshore oil and gas exploration site off the coast of Brazil with implications for increasing its market share via the recent Trump / European Union export trade negotiation. ( See **(3)** infra. )  Also, fueling this non "*redressability*" fire further, quite recently, **(2)** Chevron Oil won a $53 billion dollar arbitration lawsuit challenge against its biggest rival, Exxon Mobil to acquire a competitor, the Hess Corporation with its 30% stake in Stabroek;…. an off-shore oil drilling reserve in Guyana which holds more than 11 billion barrels of oil and gas reserves discovery in decades. Besides Chevron, likewise, Exxon Mobil Oil was also vying to increase its own "**market share**" within the total U.S. marketplace of 22 million barrels of oil production per day. Additionally **(3)** quite recently Defendant Trump heralded on July 27,2025 an overwhelming international negotiation coup with the European Union in a massive tariff trade deal to enable the U. S. to export crude oil and gas

abroad, whereby the European Union will now purchase $ 250 billion dollars of fossil fuel products per year for the next three years. This latter fact alone means that the U.S. will effectively cut into Saudi Arabia's "market share" by 33%; thus; reducing the latter's sales production output by 4.78 billion dollars annually for the next three years.

"Market share" thus, becomes a critical economic factor within this aforementioned **supply / demand** analysis. "Market share" additionally represents the percentage of the oil/ gas market controlled by these ten aforementioned five majors and five big independents supra.; which significantly impacts competition among them. Understandably then, a larger "market share" therefore often translates into increased power in the very competitive oil / gas market; with marked influence and significant marketplace advantages. Conversely, a smaller market share can interpolate into a weaker marketplace competitive position. Hence, companies with a larger market share often benefit from economies of scale, leading to lower production costs and higher profit margins.

This Court now needs some guidance into the strong inter-relationship between *"redressability"* as it pertains to these aforementioned three recent world-wide developments mentioned supra. which includes **(1)** the BP 20 billion- dollar divestment ploy coupled with its major oil/gas exploration find off the coast of Brazil; **(2)** the Chevron / Hess /Guyana 11 billion barrels of oil acquisition; vis-à-vis **(3)** the 250 billion dollar per year European Union Trump tariff trade export deal with it's marked implications within the vital **supply / demand** dynamic subtly intertwined with "market share" considerations. To be sure there are huge sums of investment capital playing a significant role in influencing the collective expectations of all of these ten aforementioned market participants within this vast arena regarding future **supply** and **demand** for oil and gas.

Hence, according to the U.S. Energy Information Administration ( EIA ) it is the quintessential *"**futures market**"* which acts as a unique platform within a rather brilliant process that establishes a reliable benchmark for the true accurate market price of crude oil and gas. While each of these aforementioned five big U.S. Western Oil Majors supra. are fully independent and autonomous    ( i.e. *unfettered according to Justice Scalia* ) their ultimate unregulated *"response"* is at the complete mercy of this brilliant oil futures trading platform such as NYMEX or CME;.....where they will not therefore logically speaking *"**unleash**"* fossil fuels

simply because of any written presidential Executive Order. They are instead being guided by a subtle array or combination of mechanisms; the first of which is "*price discovery*" aptly called the **benchmark** price.  Next, there is the "*hedging*" position, where all the oil/gas producers, and other allied associated and related businesses with vulnerable exposure to the extremes of price volatility use the CME "*futures*" contracts to so to speak "*lock in*" a desired price for future business transactions. The prime reason for this "hedging" and speculation is to shield themselves from potentially drastic unsavory price fluctuations, thus ensuring a stable revenue stream at predictable costs.

This subtle "*futures*" marketplace thus expresses the participant player's individual beliefs about the direction of future oil / gas prices. Initially this process begins with the collective opinion of these five aforementioned big U.S. Western Oil Majors as exploration participants shaping these futures prices. This, in turn, impacts how the other market participants; including the other producers, refiners and even gasoline station owners will price the actual physical commodity. Next, as developing news around the world affects expectations about future **supply** and **demand,** these news events help shape futures contracts. Thus influencing the current "spot price influence" ( i.e. the price for immediate delivery of the commodity ).

Next, it's the professional traders and savvy commodity investors who then speculate on possible futures price movements, thus buying or selling futures contracts with the sole aim of profiting from price increases ( the long position ) or decreases ( the short position ). This manifest volatile activity thus adds important liquidity to the marketplace, which can in turn logically contribute to price swings up or down. Hence, rising futures prices upward can signal to these oil / gas producers that future demand is expected to be strong; which will reflexively in turn, therefore further encourage future production of oil or gas. This latter scenario is exactly where Plaintiff's grievance or the expectation of the unsavory "*unleashing*" of fossil fuels may come into play. However, the very opposite observation can also likely occur, where instead falling futures prices can and does suggest weaker future demand, which will inevitably lead to cuts in the production of oil or gas. Therefore, in essence, these futures contracts act as a central hub or clearing house, where the collective expectations, risk management, and of course speculation converge and coalesce into contributing to the determination and movement of both oil and gas prices at the pump or meter.

36

Amicus now offers this Court a helpful analogy of the **"demand"** factor being likened to a stage and the entire assemblage of musicians on that stage can be anecdotally compared to the **"supply"** factor. Quite understandably then, a stage of limited size ( i.e. **demand** ) can only support and hold a predictable number of limited musicians; before some begin to fall off stage;.......this is the analogy of an **"oversupply"** within the theater of the oil/gas industry. Therefore, in reality, it's the oil / gas futures contracts which determines the price of the underlying commodity, such that there can never be any true *"unleashing"* of fossil fuels as Julia Olson suggests. Hence, this Honorable Court must now appreciate that we live in a world of fixed known and predictable **"demand"** i.e.;......no increase in population, therefore no new cars, trucks, ships, planes, houses, or buildings or factories to heat, with even a fixed requirement for the electrical demand on that known population. Thus, few can disagree that this predictable fixed **"demand"** is accommodated then by a correspondingly predictable **"supply"** of energy, simply because an **"over-supply"** would mean a lower selling price of oil or gas and thus lower profits for "Big Oil." Therefore, *"unleashing"* under the foregoing dynamic analysis of **supply** and **demand** is realistically totally impossible

In sum and substance, although this Court can declare these three Executive Orders as unconstitutional or *"ultra vires"* it will have no substantial impact on *"redressability"* because the *"**unfettered**"* response of all collective third non-party entities ( Big Oil ) will always be "business as usual" due to the aforementioned **supply / demand** and **market share** dynamics alluded to supra.

## POINT VII

### ABSENCE OF RIPENESS

#### EXECUTIVE ORDER # 14154 *"UNLEASHING AMERICAN ENERGY"*

Quite recently under Defendant Trump's present administration, a new development has unfolded which now dramatically alters the adjudication landscape quite unfavorably for Plaintiffs herein, which not only questions whether or not a realistic threat of harm does exist at all; but more importantly, whether this entire case at bar is even ripe for a judicial decision. The judicial incentive here is the prevention of a premature unnecessary and wasteful adjudication. Moreover, if the dispute herein is insufficiently developed factually, or

37

perhaps mired in absolute guesswork or factual conjecture, then any remote potential for injury or harm becomes too highly speculative to warrant any judicial action whatsoever.

Now let's review this recent new legal factual development! Defendant Trump recently announced a new tariff trade deal with the European Union on June 27, 2025 which included inter alia. a binding provision for the European Union to purchase 250 billion dollars annually in U.S. energy ( i.e. oil, gas and nuclear fuel ) over a period of three years; but more importantly, for the European Union to also invest 600 billion dollars within the United States over that same three year period of time; according to a report published by the White House.

In essence, this agreement, while not quite an Article VI Treaty per se, nevertheless, is a bona fide international compact made between sovereign nations and is tantamount to a sole executive agreement. See ***United States v. Belmont – 301 U.S. 324 ( 1927)*** which held that the U.S. President has the power to initiate an international sole executive agreement with foreign states without the ratification or the advice and consent of the U.S. Senate. Hence, this latter case law citation completely undermines and vitiates Plaintiff's claims that the three Executive Orders herein are unconstitutional and "*ultra vires*"; simply because these two presidential directives ( i.e. the three Executive Orders herein and this recent European Tariff Trade Agreement ) are both inextricably intertwined. Accordingly, it also thus becomes an inescapable and undisputed fact that the United States, pursuant to this international sole executive agreement must logically speaking "***unleash,***" by exporting to the European Union $ 250 billion dollars, worth of oil, gas and nuclear fuel each year for the next three years.

Accordingly, the "***ripeness doctrine***" thus dictates that this case at bar, must involve an imminent realistic threat of harm fit for judicial determination to be made. Simply put, it means the dispute herein must involve real specific harm and not something hypothetical or speculative, which is to say it can't be just assumed to perhaps happen, as in only a mere possibility, but not a certainty for sure. It also thus becomes an undisputed fact that this international tariff compact, as a sole executive agreement involves purely ONLY "***exported***"

harm per se ( i.e. solely lying way outside the geographical boundaries of the United States;....at a very minimum 3,000 miles away ) and not just domestic harm ( i.e. solely within the United states ) Therefore, Plaintiff's must be able to now demonstrate that they are about to suffer ONLY real domestic harm; which this Honorable Court can definitely resolve in order to satisfy the *"ripeness"* requirement.

Hence, let's explore this *"ripeness doctrine"* more fully. Let's also assume arguendo that these next ensuing facts are potentially undisputed as well. **UNDISPUTED FACT # 1** – That a gallon of gasoline or natural LNG gas, explored off-shore, then produced, refined and transported to the U.S. and subsequently **exported** to Europe poses absolutely no imminent harm to Plaintiffs herein; ( which is 6,000 miles away ) . **UNDISPUTED FACT # 2** – That a gallon of gasoline or natural LNG gas, explored off-shore, then produced, refined and transported to the U.S. and subsequently shipped to the State of **Maine** poses also absolutely no imminent harm to Plaintiffs herein; ( which is 3,000 miles away ) **UNDISPUTED FACT # 3** – That a gallon of gasoline or natural LNG gas, explored off-shore, then produced, refined and transported to the U.S. and subsequently shipped to the State of **Idaho** poses also absolutely no imminent harm to Plaintiffs herein; ( which is several hundred miles away ) **UNDISPUTED FACT # 4** – That a gallon of gasoline or natural LNG gas, explored off-shore, then produced, refined and transported to the U.S. and subsequently shipped to the State of **Montana** poses also absolutely no imminent harm to Plaintiffs herein; ( due to the final state court judgment in *Held v. Montana* )

Accordingly, In all of these four hypothetical examples supra. it becomes quite obvious that Plaintiffs have filed a case or controversy regarding injuries that have yet to occur if at all; which must be considered as premature adjudication, thus rendering the alleged potential harm as purely speculative, hypothetical and wholly dependent on future uncertainties. A case becomes ripe for judicial review only when the facts have developed sufficiently to allow a court to make a conclusive and definitive judgment. It therefore asks whether this court has the power to hear this case which must be concrete and sharply focused. Rooted in Article III of the

Constitution it allows the courts to bypass cases or controversies which are based upon facts that are too speculative ( *which territory in fact receives the "unleashed" fossil fuels* ) or based upon unlikely events.  In sum and substance, **Executive Order # 14154** the *"unleashing"* of American Energy signed on January 20, 2025 is absolutely unripe for adjudication as being rife with facts that are wholly uncertain and speculative as not having the potential for any discernible concrete harm.

<u>**EXECUTIVE ORDER # 14154 "THE UNLEASHING OF FOSSIL FUELS"**</u>

**Amicus** has previously articulated that the *"**ripeness doctrine**"* requires any federal case to essentially possess (**1**) "<u>fully developed facts</u>" plus at a minimum a genuine (**2**) timely present dispute before a federal court can resolve that controversy by not needlessly involving a court to adjudicate upon hypothetical claims or harm which has not yet occurred. Therefore, from a fair interpretation of the contents of **Executive Order # 14154** it thus appears that the gravamen of said presidential proclamation centers upon the systematic "<u>dismantling</u>" of science. Accordingly, **Amicus** has previously demonstrated to this Court that the logical progression of producing one gallon of refined final fossil fuel product called automobile gasoline or home heating natural gas, thus began with an official Executive Order proclamation signed on January 20, 2025; which then progressed beginning with the exploration, extraction, production, transportation, and refining to an eventual point of purchase sale to the final automobile end user or building needing heat. This progressive period of time thus gradually evolves over 6-7 years in duration. Obviously not a (**2**) timely present dispute to say the very least.

**Amicus** next must inform this Honorable Court exactly what is meant by (**1**) "<u>fully developed facts</u>" herein. By and large, when the Executive Branch of government embarks upon a methodical and systematic approach toward dismantling science, this concerted mission essentially involves a policy of intentional *"**forbearance.**"* Understandably then, this latter covert plan is characterized by a strategic and methodical *"**refraining**"* from the enforcement of a legal

40

right or administrative obligation which would be otherwise due and a proper matter of public policy. In legal parlance instead, it thus devolves into pure legal negligence.

This systematic failure of duty to care involves basically not collecting environmental data; not entering GHG emissions into a computer; not using environmental scientific instruments to measure; not reporting environmental observations; not publishing environmental critical information; not printing or disseminating scientific studies; not conducting scientific meetings and conferences. In sum and substance, the culmination of this latter *"forbearance"* is tantamount to non-conduct or blatant intentional omissions which will eventually thwart the disclosure of any (**1**) "fully developed facts" for legal discovery within said environmental lawsuit.

## POINT VIII

## CONFLICT OF LAWS

Under normal circumstances "Conflict of Laws" usually involves three different judicial viewpoints such as (**1**) proper jurisdiction to adjudicate; (**2**) choice of law; and (**3**) recognition and enforcement per se. Clearly in this case at bar, the latter viewpoint is of chief concern within this controversy. Therefore, to best illustrate this viewpoint, **Amicus** now offers this Honorable Court a physical description of the legal jurisdiction which encompasses the entire state of Montana. The state of Montana appears for the most part in the geometric shape of a trapezoid, whereby we can now graphically describe its shape using just five points for reference.

Points **A**, **B** and **C** each comprise 90- degree right angle configurations. Thus, Point **A** is at the extreme top left-hand side, while Point **B** is at the extreme top right-hand side, thus drawn as a horizontal straight line with a physical length of 550 miles; which comprises its northern-most border. Whereas, Point **B** continues and proceeds straight south ( downward 90 degrees ) 280 miles until it meets Point **C**;...... this vertical line represents the eastern-most border. Point **A** also continues and proceeds straight south ( downward 90 degrees ) but instead

41

only for <u>70 miles</u>;…. this vertical line represents the western-most border. Next Point **C** at the very bottom continues due west for <u>480 miles</u> ( i.e. to the left ) as a straight horizontal line thus ending at Point **D**; this represents its southern-most border. Finally, a diagonal line coursing northwest ( upward and to the left ) proceeds from Point **D** to Point **E** for <u>220 miles</u>, thus enclosing this entire geometric trapezoidal figure. Using pure geometry; we can now calculate that this entire latter trapezoidal shape representing the state of Montana thus encompasses a sum total of 147,000 square miles.

We can also now logically argue and agree that when Julia Olson, Plaintiff's attorney in ***Held v. Montana*** supra. evinced her final state court judgment in an agreement which represents a legal settlement, that on behalf of her ten youthful clients therein; that instead;… all of the inhabitants residing within the state of Montana are now entitled to breathe clean atmospheric air devoid of any Green House Gas pollutants or particulate matter. Now let's also envision this 147,000 square mile trapezoid as an identically shaped geometrical vertical column of clean air rising straight up over this entire state of Montana. However, suddenly, and much to the chagrin and dismay of the sovereign state of Montana government officials; along comes Defendant Trump who now claims to own the top-most layer of that very same 147,000 square mile trapezoidal shaped vertical column of clean air above Montana and that via Executive Order # 14154 therefrom, proclaims very loud and clear:….."***drill, baby drill***" for Big Oil to "***unleash***" its dirty fossil fuels above Montana's newly won clean trapezoidal column of clean air.

Therein lies the veritable "Conflict of Laws" !!!!!  By and large, Executive Order # 14154 and Montana's final state court judgment are legally incompatible with each other, thus creating a serious "Conflict of Laws. " This legal incompatibility essentially also involves the prudential concern for "***comity***" ! Comity between state and federal forums refers to the principles of respect, reciprocity and deference that the federal forum must show to the laws, judicial decisions and proceedings of courts within a separate and different state jurisdiction. This doctrine of "***comity***" is thus rooted in mutual respect and cooperation between separate

42

sovereign governments, which usually guides the federal forum from either abstaining or staying complex issues involving state laws. Essentially, it's not a binding rule but a self-imposed practice of judicial restraint!

Unfortunately, the state court matter has officially ended, while this federal controversy is still ripe for adjudication. However, this legal incompatibility simply does not end here. More to the point, in 1970 via the Clean Air Act, Congress promulgated into law by ceding all control and enforcement regarding air pollution with progress toward a clean air environment to the individual states via **Title 42, Chapter 85, Section 7401 (a) (3)** by providing as follows:

*"that air pollution prevention ( that is, the reduction or elimination, <u>through any measures</u>, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of STATES and local governments."*

This Court must remember that all ten third non-party Big Oil companies are completely *"unfettered"* and fully autonomous to do whatever they so please. Hence, although this Honorable Court has judicial discretion to respect *"comity"*, it is nevertheless powerless to interfere judicially speaking, simply due to lack of personal jurisdiction over these ten non-parties not before the courts. Additionally, there is now an absolute moral dilemma confronting this Court. While that latter *"conflict of laws"* was the sheer incompatibility between two separate laws ( i.e. the three instant Executive Orders herein and the final state court Montana judgment ) ;......incompatibility can still persist with respect to one single statute or judicial ruling.

Hence, if this court were to apply the *"Rule of Law"* to this question of *"<u>incompatibility</u>"* it thus signifies a system of governance where all enacted laws must be (**1**) clear (**2**) consistently applied and (**3**) **"protect fundamental rights"**. At this juncture **Amicus** desires to have this Honorable Court take a journey through the last 54 years of environmental legislative *"<u>inertia</u>"* in order to obtain a sense of the amount of anesthesia our lawmakers induce within our collective consciousness just so to speak to <u>protect the fundamental rights</u> of the people who are governed.

## <u>1958</u>

We must begin this historic journey by stating a valuable fact. The year <u>1958 </u>was the first recorded concentration of carbon dioxide in the atmospheric air, which was recorded at

43

**313 parts per million.**

<u>1970</u>

Let's now begin this historic journey with the Clean Air Act of <u>1970.</u> The essence of this law was to empower the EPA to establish nationwide standards such as the National Ambient Air Quality Standards ( NAAQS ). In 1970 the concentration of carbon dioxide in atmospheric air was **325 ppm**; while ten years later in 1980 the reading was **339 ppm.**

<u>1990</u>

In <u>1990,</u> twenty years later, Congress passed an amendment to the Clean Air Act of 1970 which was supposed to lead to the reduction of fine particulate matter ( See page 29 ) and ozone pollution; and which also gave the EPA stronger authority to enforce the Clean Air Act, including the power to assess administrative penalties for non- compliance. In 1990 the concentration of carbon dioxide in atmospheric air was **354 ppm.**

<u>1994</u>

On March 21, 1994 after the 50th country ratified it, the United Nations Framework Convention on Climate Change came into force which served as a foundation for international cooperation to combat climate change by attempting to limit global temperature increases and also coping with the inevitable ravaging impacts of environmental threats. Needless to say despite the fact that this treaty was signed and ratified by the Senate; in 1992 the concentration of carbon dioxide in the atmosphere was recorded at **358.6 ppm.**

<u>1995</u>

The mission of the Conference of the Parties ( COP ) which was formed in March 1995 was to assess and guide international efforts to combat climate change by reviewing the above UNFCCC to adopt and negotiate new agreements to stabilize greenhouse gas concentrations. This treaty was also signed and ratified by the U.S. However, in 1995 the concentration of carbon dioxide in the atmosphere was recorded at **360.8 ppm.**

<u>1998</u>

The Kyoto Protocol objective was an international compact or mission among 200 nations to combat global warming by legally binding these industrialized countries to reduce their greenhouse gas emissions by an average of 5 % below the 1990 levels, thereby setting individual reduction targets for these developed nations to achieve this goal. In a sense it recognized that the more developed industrialized nations bore more responsibility for past,

present and future emissions by establishing market-based emissions trading mechanisms. The U.S. signed this Kyoto protocol in November 1998; while the U.S. Senate refused to consent citing economic concerns for ratification as an Article VI treaty. In 2005 it entered into force globally while the U.S. became a non-party to it. Also recognize that in 1998 the concentration of carbon dioxide in the atmosphere was **366 ppm.**

## 2007

Moreover, in 2007 the U.S. Supreme Court reached what some characterize as a landmark decision in ***Massachusetts v. EPA*** **549 U.S. 497 ( 2007 )** wherein that holding provided:.................................................................................
*"greenhouse gases are air pollutants under the Clean Air Act and the EPA has the authority to regulate their emissions from motor vehicles."*

This Court must also recognize that in 2007, the concentration of carbon dioxide in the atmosphere was **383 ppm.**

## 2009

Further, in 2009, the *"Endangerment Finding"* was a formal determination by the U.S. Environmental Protection Agency ( EPA ) which promulgated that greenhouse gases ( GHG ) contribute to air pollution and endanger public health and welfare. This gave the EPA the legal wherewithal to implement regulations on GHG emissions from cars and power plants. In 2009 the concentration of carbon dioxide in the atmosphere was **386.8 ppm.**

## 2016

The notoriously famous "Paris Climate Accord's " mission was to limit global warming to well below 2 degrees Celsius; and preferably to 1.5 degrees, compared to pre-industrial levels, by reducing greenhouse gas emissions and increasing resilience to climate change impacts. Another aim was to align financial flows with a low-emission, climate resilient pathway to provide support to small developing nations. Each signatory country had to submit its own NDC data in order to level the playing field among the major well- known polluters. As of February 2023, 195 countries signed this international compact plus the entire European Union; which is to say that all 197 members of the above UNFCCC formally adopted it except the United States. It was never submitted for the advice and consent of the U.S. Senate for ratification simply because it was strongly anticipated that the 23 Republican controlled oil producing western state dual senators would not ratify it. In 2016 the concentration of carbon dioxide in the atmosphere was **403.3 ppm.**

## 2020

On November 4, 2020 the Trump administration formal withdrawal of the United States from the global Paris Agreement went into effect. It was contended without the submission of any evidence that this international accord would seriously *"undermine"* the U.S. economy, and put the U.S. at a permanent disadvantage. Among the many reasons given were the following: ( 1 ) unfair economic burden (2) hampering energy production (3) China & India advantage ( 4 ) negligible climate impact (5) withdrawal prioritizes domestic interests. In 2020 the concentration of carbon dioxide in the atmosphere was **412.5 ppm.**

### 2021

On February 19, 2021 former president Joe Biden signed an Executive Order to effectively have the United States rejoin the Paris Climate Accord and align itself with the other 197 member nations. In 2021 the concentration of carbon dioxide in the atmosphere was **414.7 ppm.**

### 2025

On January 20, 2025 via Executive Order # 14162 Defendant Trump set in motion the legal mechanism for formal withdrawal of the United States from this prestigious Paris Climate Accord which will become effective sometime in January 2026. In 2025 the concentration of carbon dioxide in the atmosphere was **430 ppm.** This executive *"musical chairs"* farce on the entire world environmental stage pales in comparison to the hypocritical image we must now portray before 200 nations; hiding behind the ratification charade of the *"advise and consent"* western oil and gas producing state senators.

This Honorable Court must now appreciate this scientific fact; that in 67 years ( 1958-2025) the concentration of carbon dioxide has been increasing gradually and steadily in **"parts per million".** ( See bold numbers above ) This is attributable to the Law of Conservation of matter; which states that in a closed system, matter cannot be created or destroyed, only changed from one form to another. This means that no atoms during combustion are lost or gained, they are only rearranged. Hence, octane ( gasoline ) containing only eight carbon atoms and eighteen hydrogen atoms combines with two oxygen atoms for combustion to take place in the automobile; whereby carbon dioxide suddenly evolves as a by-product of combustion energy and is not created but simply becomes rearranged from that octane compound. The carbon dioxide emission is not created but is simply produced as a rearranged by-product of combustion. Therefore, what goes into the car as liquid gasoline (octane) comes out the tailpipe as gaseous carbon dioxide emission which was not created but simply produced ( i.e. only the carbon and oxygen atoms are rearranged and combined )

due to combustion. By and large, we can also conclude that since $CO_2$ can't be destroyed, and cars will continue to be driven and buildings will continue to be heated; then carbon dioxide will keep on increasing in "**parts per million**" year after year; unabated forever into the future……ever increasing in amount and concentration

Perhaps another important fact for this Court to deliberate upon is the amount of millions of tons of carbon dioxide per year which are emitted by five leading countries in the world. China: 11,472; USA: 5,007; India: 2,710; Russia; 1,756; and Japan: 1,067. It can also be concluded from this foregoing narrative supra. that the United States has a vested selfish economic motivation in having the three main branches of government thwart and forestall climate change regulation via legislative inertia and anesthesia over this protracted period of fifty-five years ( i.e. 1970-2025 )

However, there is one glaring and alarming finding of fact hidden within this "**parts per million**" data disclosure herein presented before this Honorable Court. Yes, this Court has the sound discretion to dismiss this controversy outright, predicated solely upon **Amicus's** eleven dispositive points herein submitted. Yet, a judicial moral dilemma and obligation silently awaits behind **Amicus** disclosure of facts within this legal brief. To learn more, it is imperative that this Court review the medical description of the physiology and chemistry of just how human beings with lungs breathe on page 7 under Point II.

It is a fact that atmospheric air contains 78 % nitrogen; 21 % oxygen and just **0.04 %** carbon dioxide. Understandably, our divine creator was brilliant by incorporating this extremely very low concentration of carbon dioxide in the outside air we exhale into. It thus enables us as human beings, and all other mammals with lungs, to exhale automatically and without difficulty. Accordingly, in human metabolism, our lungs breathe in this 21 % oxygen within atmospheric air for our billions of cells to carry on its life sustaining cycles of converting nutrients to energy and eliminating all waste products. Thus, carbon dioxide is produced in the body as an undesirable waste product. This measured concentration of $CO_2$ in our lungs as a waste product is instead **0.4 %;** ( ten times greater than outside air ) whereas the measured partial pressure of $CO_2$ outside the lungs, in atmospheric air is ten times less or **0.04 %** . Therefore, the law of equilibrium of gases dictates that as we exhale, this ten times greater concentration of $CO_2$ within our lungs will automatically escape into the outside atmosphere. However, caution prevails, for if this $CO_2$ is not eliminated from the body then a human being will soon die from "**metabolic acidosis**".

What is metabolic acidosis? When lungs fail from the body's inability to exhale carbon

dioxide, the latter gas builds up internally within the systemic blood stream thus causing a condition called *"hypercapnia"* ( excessive $CO_2$ in the blood ) which leads to respiratory acidosis; which is a dangerous life threatening condition where the blood becomes too acidic. This excess acidity ( low pH reading ) and this concomitant $CO_2$ buildup will eventually impair brain function, thus leading to confusion, then fatigue, then coma. The body then experiences shortness of breath, rapid heart rate, organ shut-down with damage, then finally cardiac arrest followed by death. This is not speculation but real demonstrable evidence where a blood gas chemistry test will show a low blood pH; low bicarbonate acid level ( $HCO_3$ ) and high level of anions in the blood ( too acidic ) resulting from **"metabolic acidosis".**

Once again **Amicus** must stress to this Court that the amount of carbon dioxide build-up in our pulmonary blood as a waste product of metabolism can be measured as **0.40 $pCO_2$** which is ten times greater than the concentration of $CO_2$ outside our lungs within the exterior ambient atmospheric air, is instead **0.04 $CO_2$**. Hence, due to chemical equilibrium and the automatic voluntary muscular exhalation process; this high concentration of $CO_2$ in our lungs escapes immediately into the atmosphere. Accordingly, here comes the moral dilemma for this Court to evaluate. It is a known fact that the measurements of the concentration of $CO_2$ indicated above as **"parts per million"** were measured five miles above ground in the upper atmospheric air using weather meteorological balloons. Therefore, any measurements taken at ground level, where automobile tailpipe emissions are produced would understandably be much greater.

Nevertheless, the following facts constitute sound probative legal reasoning. That in 67 years (1958-2025) the concentration of carbon dioxide in atmospheric air went from **313 ppm to 430 ppm;** which is an increased amount of 117 **"parts per million"** within those same 67 years. Therefore, it becomes axiomatic to state that a ten-fold increase in $CO_2$ from **313 ppm** in 1958 to **3,130 ppm** 500 years from now would logically translate into the same chemical equivalent of outside atmospheric air increasing from the present normal value of **0.04 %** to the existential deadly value of **0.40%** ( ten- fold increase ). That deadly outcome would logically result in metabolic acidosis and death. This logical factual outcome can be effectively reproduced with a laboratory mouse positioned within a controlled enclosed air-tight container with a glass window by steadily introducing increased concentrations of $CO_2$;.... similar to our 1958 to 2025 data observation. This enlightening experiment enables this Court to not wait around for 500 years to pass. It would just take perhaps 30 minutes or less for this mouse to die from **"metabolic acidosis"..**

48

If this Honorable Court were to perhaps contemplate the value of such a dramatic experiment it would then underscore the past fifty-five years of government inertia surrounding the quintessential **Rule of Law** which guarantees to each of us the protection of the fundamental right to LIFE !!! What is this Court's dilemma? It is knowing from the foregoing that we the governed, are passively allowing our three main branches of government to knowingly and intentionally KILL and commit mass genocide and extinction upon our great, great, great- grandchildren or our posterity 15 generations from now; just so that we can replace China as the world's leading carbon dioxide polluter of fossil fuels. Yes! It is all about money from oil and gas revenue.

## POINT IX

### POLITICAL QUESTION

Embarking upon a fair interpretation of the gravamen of this entire controversy at bar, thus culminates, where Plaintiffs herein are seeking to declare these three underlying presidential Executive Orders as "***unconstitutional***" or "***ultra vires***";...... whereby this latter dispute in simple legal terms involves a justiciable approach which chief complaint purports to declare that said three executive mandates were signed beyond the incumbent president's legal authority or power to enact. In other words, has Defendant Trump acted outside the scope of his presidential job description, thus promulgating into executive law, three legal directives not actually allowed under our existing fabric of law?

Notwithstanding this justiciable issue; said latter legal argument or question also automatically now triggers into consideration the binding legal question of whether this controversy has inherently instead, a rather restricted or predetermined outcome, such that it prevents this Honorable Federal Court from ruling inherently on a "***political question,***" which is deemed more appropriate for the other two branches of government. Which is to say, that this latter resolution should be deemed instead somewhat inappropriate for adjudication, simply because one of those two branches is herein Defendant Trump himself. Unquestionably then, this instant case at bar thus does not in fact beg for any "***political question***" as being wholly not

justiciable in scope.

By and large then, it is now well settled in law that the federal courts are guided by six prime factors before deciding to abstain from ruling upon any "***political question***" pursuant to these following judicial guidelines. (1) First, does the Constitution explicitly assign this potential "***political*** "dispute in question to another branch of government?  That answer is clearly no, not at all ! (2) Moreover, the second prong of this inquiry focuses upon whether this case encompasses organized rules, procedures and principles which govern how this controversy must be litigated and decided. That answer is unquestionably in the affirmative. (3) Next, the third prong asks whether this Court would have to make any "***policy determination*** " or decision which lies completely outside the scope of the judiciary. This latter consideration involves a situation where a court must make a decision on the broader implications for government policy, way beyond the scope of the specific facts of the case now before it;….. which will have a significant impact on public policy. That certainly is not the case here.

Accordingly, then, this Court will now have to review the specific actions of Defendant Trump acting upon his granted legal authority or enumerated powers to make those three Executive Orders. Hence, in order to also analyze the conventional wisdom of these three-pronged foregoing questions supra. **Amicus** now offers this Court the following reasoning by way of analogy. By and large, there are three prime underlined factors which control and govern the outcome of these three Executive Orders. First there are the three Executive Orders per se which ostensibly are merely written proclamations meant to "***unleash***" underground fossil fuels, thus signed by Defendant Trump. Second there is the anticipated conduct to engage in interstate commerce by third "***unfettered***" and fully autonomous non-party national Big Oil conglomerates. Finally, Third, there is the statutory authorization by Congress for this third non-party to proceed to "***unleash***" underground fossil fuels via the Constitution's "Interstate Commerce Clause" among the 50 individual states.

Therefore, perhaps the best clarification to explicate for this Court the absence

50

of any *"unconstitutional"* violation, with reference toward these three Executive Orders, is to posit a very pertinent metaphorically analogous illustration impinging upon these three prime underlined aforementioned factors. Let's now envision Defendant Trump as a certain designated racing official poised at the starting line of some imaginary marathon long distance race, holding in his hand a starting pistol straight up into the air, whereupon he fires said pistol to have the runners begin their long- distance marathon race. Accordingly, there are five running tracks representing the five running lanes for the five major Big Oil national conglomerates, viz. Exxon Mobil, Chevron, BP, Conoco Phillips, and EOG Resources. These five running track designated lanes represent the congressionally approved statutes dealing with the Constitution's "Interstate Commerce Clause" for each one of the five Big Oil marathon runners. The finish line is 6-7 years into the future as alluded to earlier supra. Additionally, these five individual, *"unfettered"* Big Oil marathon runners can either decide to run and participate in the race or perhaps choose not to run at all;......thus being fully autonomous.

      Simply put, since the runners are considered fully autonomous; then all Defendant Trump is guilty of is firing the starting pistol into the air to begin this race;… ( thus, representing a rather totally innocuous proclamation ). Unquestionably then, the latter must be considered only as an official announcement, proclamation or declaration and definitely not at all *"unconstitutional"*; nor *"ultra vires,"* as Plaintiff's attorney Julia Olson would have this Court believe. Therefore, said three Executive Orders are merely representative of a clarion call to continue the congressionally approved exploration and production of fossil fuel energy via the "Commerce Clause" dealing with interstate commerce, which has existed for the last 155 years since Standard Oil first began this same approved process under federal law.

      Accordingly, in furtherance of ***Amicus "political question"*** analysis is the <u>fourth</u> prong which begs the question (4) of whether a court decision would interfere with the roles and powers of the other two branches of government. It is therefore a well settled fact that Congress has passed numerous laws granting the president broad authority to negotiate trade

51

agreements and adjust tariff rates in the interest of either unfair trade practices or to protect national security. Hence, *Amicus* can now argue that the... "Joint Statement on Trade and Investment" signed on July 28, 2025, supra. was the framework or symbolic political agreement made between the U.S. and the European Union for the latter to purchase $250 billion dollars of oil, gas and nuclear energy for the next three years.

      Thus, few can dispute the obvious fact that said three Executive Orders were signed into law in the furtherance of that landmark tariff agreement made with the blessings of Congress. Therefore, no court ruling in this case at bar can interfere with the powers of both Congress and the executive branch of government.

      Next comes the <u>fifth</u> prong (5) which questions whether there is a need by this Court to respect a previous <u>political</u> decision made on this same matter. Accordingly, as a general rule in the federal forum the next level of judicial review is the Circuit Court of Appeals, whereupon the next advanced level after that, is the highest Court in the nation,...... the U.S. Supreme Court. Therefore, with about 7,000 petitions per year for a "*writ of certiorari*" , the vast majority of these Supreme Court petitions for review are denied, where typically only those cases with broad national implications or legal significance are selected by the High Court for review. More to the point, a similar landmark environmental clean air quality case involving ***Juliana v. United States*** **947 F. 3d 1159 ( 9ᵗʰ Cir 2020 )** was first initiated by Plaintiff's same attorney, Julia Olson in 2015 under a **501( c ) ( 3 )** called **"Our Children's Trust"** which was finally heard by the Ninth Circuit Court of Appeals located in San Francisco and which issued rulings that <u>twice </u>commanded the lower District Court in Oregon to dismiss the case, citing initially Plaintiff's "*lack of standing* " to sue.

      However, in 2020 this landmark case supra. was finally dismissed a second time by the Ninth Circuit, thus ruling that the issue presented therein was essentially a "***political question***" for the other branches of government to resolve, and not the lower court. Interestingly enough however, the U.S. Supreme Court in March 2025 also denied Plaintiff's "***writ of***

*certiorari"* for review to the High Court. Thus, in comparison with this case at bar, however, said ultimate dismissal by the Ninth Circuit under the *"political question"* doctrine is both poignant and telling, since its legal impetus possessed the same environmental overtones as this instant matter herein.

Hence, the litany and eventual outcome of ***Juliana v. United States*** supra. is somewhat instructive for this Court, since the Appellate Court found the *"political question"* definitely dispositive. Finally, the <u>sixth</u> prong asks the *"political question"* of whether there is the presence of any risk of conflicting pronouncements from different branches of government on the same environmental issue having different views. Unquestionably, upon a quick revisit to **Amicus** argument under prong <u>four</u> supra. it becomes quite clear that both Congress and the executive branch are each aligned under the same economic and political agenda with each one having the same views.

## POINT X

## <u>FAILURE TO JOIN A NECESSARY PARTY FRCP-19</u>

Of all the eleven enumerated dispositive Points explicated herein supra. for this Honorable Court to deliberate upon; perhaps **FRCP-19 "<u>Failure To Join a Necessary Party</u>"** thus becomes the controlling principle in law, because *"redressability"* under the well settled doctrine of "<u>Standing To Sue</u>" thus becomes patently unavailable to Plaintiffs herein. This latter principle was painfully articulated within the case law citation supra. under **Lujan v. Defenders of Wildlife 504 U.S. 555 ( 1992 );** wherein the late Justice Anton Scalia opined as follows:....

*".the essential elements of standing depends upon the **<u>unfettered choices</u>** made by **<u>independent actors</u>** not before the courts and whose exercise of broad discretion the courts cannot presume to control or to predict."* Moreover, the High Court further elaborated therein;................. *"in that circumstance, **<u>causation</u>** and **<u>redressability</u>** ordinarily hinge on the response of the regulated third party to the government action or inaction and the response of others as well."*

Therefore, in this case at bar ( not Lujan ) what the U. S. Supreme Court was alluding to is that the *"**<u>unfettered choices</u>**"* are clearly the *"unleashing"* of fossil fuels via the three Executive Orders; while the *"**<u>independent actors not before the courts</u>**"* are clearly the non-party Big Oil companies who were not joined, nor made defendants in this action.

53

Moreover, "***standing to sue***" requires "causation" which is essentially for the alleged concrete harm of GHG emissions to be fairly traceable to these non-party Bid Oil Companies, and not in fact Defendant Trump. Hence, the linch-pin herein, thus hinges on "***redressability***" which becomes woefully unavailable to the Plaintiffs by virtue of the fact that the culpable responsible third non-parties, who are in fact the real immediate proximate cause, were not at all joined in this lawsuit.

Accordingly, sound judicial policy with regard to this matter now becomes reduced to a two-step analysis of whether this case should be dismissed due to the absent necessary third parties; or perhaps in the alternative, allowed to proceed without the absent ten third non-parties. Therefore, under **FRCP 19 (a)** a party is considered "necessary" if in their absence this Court cannot grant complete relief to the twenty-two youthful Plaintiffs. It thus becomes blatantly obvious that complete relief can't be obtained for them. Further analysis dictates or also questions whether the non-party Big Oil companies have an interest in this action which could become impaired. Clearly that answer is in the affirmative because a permanent injunction against any Big Oil company would not only hinder corporate revenues, but also cause a grave cataclysmic economic adverse effect on the world energy markets.

Accordingly, productive discovery within this case at bar becomes greatly impaired or totally absent, since this Court lacks the required personal jurisdiction over these ten third non-parties. More to the point, this Court having to deal with the possibility of an additional ten extra defendants representing the absent third non-parties, thus would find it extremely difficult during any expected discovery phase of this litigation to be able to discern which Big Oil company exclusively exported their fossil fuel products outside of the boundaries of the United States; as opposed to which companies confined their sales efforts solely to the state of Maine; or perhaps even Idaho. In particular, along a similar probe; could this Court also be able to differentiate which Big Oil company would be guilty of shipping fossil fuel products to the state of Montana, in express violation of that state's final court judgment evinced in ***Held v. Montana*** supra.

It thus becomes self-evident that attributable to the complete absence of these non-joined third parties; the absence of the compulsory elements or requirements "***causation***" and "***redressability***" becomes a foregone conclusion; whereby the legal doctrine of "***standing to sue***" becomes a complete illusion in the eyes of Plaintiff's attorney.

## POINT XI
## "TAKE CARE CLAUSE"

The main thrust and objective of this **Amicus Curiae** brief is for this Honorable Court to accede to honor the **"*Take Care Clause*"** ;.. which is a provision pursuant to Article II Section 3 of the U.S. Constitution which requires the President of the United States to "***take care that the laws be faithfully executed.***" The latter two words are often the subject of ongoing debate as it involves not only just the written words within the laws passed by Congress, but also the purpose and policy intended by Congress when said laws were passed. Accordingly, perhaps one of the most important safeguards available to all Americans is that of National Security. While metabolic acidosis caused by a ten-fold increase in the atmospheric concentration of carbon dioxide is a total apocalyptic annihilation; where all living organisms will die; nuclear war instead, if waged, can often spare some survivors. Therefore, beside reigning in the existential threat from unrelenting fossil fuel emissions;.....safeguarding our national security becomes the second most sacred policy objective for the United States.

Thus, viewed through the lens of **Amicus** eleven dispositive Points supra. it becomes far and away patently clear that this instant lawsuit is both frivolous and vexatious; where time spent by the executive branch of government is best served safeguarding our national security instead! Hence, few can disagree that these latest bullet-point events below on the geopolitical stage of the world are far more important than time spent on this instant case at bar. Here, enumerated before this Court are ten pressing vital geopolitical issues which the office of the president must concentrate his valuable time on in order to safeguard our national security.

- Greenland is a vital strategic acquisition worthy of pursuit by the United States
- Iran's nuclear ambition by this terrorist antisemitic rogue state must be averted
- World cargo shipping thru Strait of Hormutz must be safe-guarded
- Illegal immigration in the USA must be averted and stopped
- Israel and Gaza war problem must be resolved at any cost
- Trade tariffs must be strongly and reciprocally negotiated
- Ukraine v. Russia conflict must be resolved peacefully and fairly
- China' aggressive view toward Taiwan as world's vital semiconductor chip manufacturer
- Alliance of Russia, China and North Korea as a nuclear threat combination
- Drug trafficking from Carribean and South American countries must be stopped

55

**WHEREFORE, Amicus** herein prays that this Honorable Court will dismiss this entire cause of action predicated upon either one or perhaps all of the eleven dispositive controlling Points in law enumerated supra. or in the first alternative grant removal of this controversy to the proper state court in Montana for Plaintiffs to file an amended complaint in the case recently adjudicated captioned *Held v. Montana supra.* or in the second alternative order *sua sponte,* compulsory joinder of JERRY CASTELLE pursuant to **FRCP 19** whereby **Amicus'** absence would risk prejudice to existing parties and which will also ensure a complete and fair adjudication of this case by aiding with the commencement of discovery for preparatory trial purposes, or for whatever relief this Honorable deems just and proper.

Dated : September 9, 2025
      Old Bethpage, New York

Sworn to before me this
_1 2_ day of September 2025

_Abigail McKinley_
NOTARY PUBLIC

ABIGAIL MCKINLEY
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01MC6430073
Qualified in Nassau County
Commission Expires March 7, 2026

Respectfully submitted

JERRY CASTELLE, Pro Se
P.O. Box 791
Old Bethpage, New York 11804
(516) 639-3478
Jcastelle3@gmail.com

To: Plaintiff's attorney Julia Olson
    Defendant Donald Trump
    Defendant Russell Vought
    Defendant Jeffrey Bossert Clark
    Defendant Lee Zeldin
    Defendant Doug Burgum
    Defendant Chris Wright
    Defendant Sean Duffy
    Defendant William H. Graham,Jr
    Defendant Janet Petro
    Defendant Howard Lutnick
    Defendant Laura Grimm
    Defendant Brian Stone
    Defendant Robert F. Kennedy Jr.
    Defendant Jayanta Bhattacharya