IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| EVA LIGHTHISER; *et al.*, | CV 25–54–BU–DLC |
| Plaintiffs, | |
| v. | ORDER |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| Defendants, | |
| STATE OF MONTANA; *et al.*, | |
| Defendant-Intervenors. | |

Before the Court are Plaintiffs' Motion for Preliminary Injunction (Doc. 24), Defendants' Motion to Dismiss (Doc. 42), and Defendant-Intervenors' Motion to Dismiss (Doc. 47). The Court held a hearing on the pending Motions on September 16 and 17, 2025, in Missoula, Montana. For the reasons herein, this case will be dismissed for lack of jurisdiction.

## BACKGROUND

This is an action for declaratory and injunctive relief brought by 22 youth Plaintiffs challenging three Executive Orders enacted during President Trump's first months in office (collectively, the "Challenged EOs"). (Doc. 1 ¶ 1.)

1

Plaintiffs first challenge Executive Order 14154 §§ 1–3, 5, 7, "Unleashing American Energy," issued on January 20, 2025. Section 1 of EO-14154 states that "[i]n recent years, burdensome and ideologically motivated regulations have impeded the development of these [energy and natural] resources, limited the generation of reliable and affordable electricity, reduced job creation, and inflicted high energy costs upon our citizens." 90 Fed. Reg 8353. Section 2 of EO-14154 announces the directive "to encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf[]"; "to establish [the United States's] position as the leading producer and processor of non-fuel minerals, including rare earth minerals[]"; "to eliminate the 'electric vehicle ('EV') mandate'"; and posits "that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law[,]" amongst other provisions. *Id*. Section 3 of EO-14154 further directs heads of "all agencies" to "begin implementing action plans to suspend, revise, or rescind all agency actions" that place an undue burden on "identification, development, or use of domestic energy resources—with particular attention to oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear resources[.]" *Id.* at 8354.

Section 5 of EO-14154 directs Defendants and "any other relevant agencies" to "undertake all available efforts to eliminate all delays within their respective permitting processes[.]" *Id.* at 8355. Finally, Section 7 of EO-14154 directs all

2

agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for [EV] charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program," and to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds" in order to ensure "consistency with the law and policy outlined in Section 2 of this order." *Id.* at 8357.[1]

Plaintiffs next challenge EO-14156, "Declaring a National Energy Emergency," also issued on January 20, 2025. EO-14156 states that "[t]he energy and critical minerals ('energy') identification, leasing, development, production, transportation, refining, and generation capacity of the United States are all far too inadequate to meet our Nation's needs." 90 Fed. Reg at 8433. Section 2 of EO-14156 directs agencies to invoke emergency powers "to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources, including, but not limited to, on Federal lands." *Id.* at 8434.

---

[1] The U.S. District court for Rhode Island has preliminarily enjoined elements of the funding freeze in Section 7 of EO 14154. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 2025 WL 1116157, at *26 (D.R.I Apr. 15, 2025).

"Energy resources" is defined within the Order to include "crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and critical minerals, as defined by 30 U.S.C. [§] 1606(a)(3)." *Id.* at 8436.

Finally, Plaintiffs challenge EO-14261 §§ 2–3, 5–7, "Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241," issued on April 8, 2025. Section 2 of EO-14261 dictates that "[i]t is a national priority to support the domestic coal industry by removing Federal regulatory barriers that undermine coal production, encouraging the utilization of coal to meet growing domestic energy demands, increasing American coal exports, and ensuring that Federal policy does not discriminate against coal production or coal-fired electricity generation." *Id.* at 15517. Section 3 of EO-14261 "designate[s] coal as a 'mineral[,]'" entitling coal to the benefits provided for in EO-14241. *Id.*

Section 5 of EO-14261 further directs the Secretaries of the Interior and Agriculture to "prioritize coal leasing and related activities" on public lands and to "expedite coal leasing in these areas" through emergency powers. *Id.* Section 6 directs Federal agencies to consider revising or rescinding "any guidance, regulations, programs, and policies within their respective executive department or agency that seek to transition the Nation away from coal production and electricity generation." *Id.* at 15518. Section 7 of EO-14261 directs the Secretary of

4

Commerce to "take all necessary and appropriate actions to promote and identify export opportunities for coal and coal technologies and facilitate international offtake agreements for United States coal." *Id.*

Plaintiffs allege that Defendants have implemented, or will soon implement, the Challenged EOs in a manner injurious to them. Specifically, Plaintiffs allege that the 12 named Defendant agencies and their Secretaries, as well as the Executive Office of the President, have frozen congressionally appropriated funds, closed offices, terminated grants, initiated reconsideration of the Environmental Protection Agency's ("EPA") Endangerment Finding, fired personnel, withdrawn clean energy permits, issued exemptions for fossil fuels, fast-tracked coal projects, initiated expedited review of oil and gas leases, ordered that coal plants remain open, ceased updating dozens of climate datasets, dismantled climate research funding, and threatened to cancel the lease for the Mauna Loa observatory, amongst other actions. (Doc. 1 ¶¶ 132, 152–180, 188, 221, 224.) Plaintiffs further allege that, on May 5, 2025, Acting Administrator Clark directed all Defendant agencies to cease considering greenhouse gas emissions as part of their decision-making pursuant to EO-14154. (*Id.* ¶ 133.)

Implementation of these EOs, Plaintiffs argue, "will increase fossil fuel pollution, threatening Plaintiffs' lives, health, and safety[,]" and curtail the availability of scientific research. (*Id.* ¶¶ 90, 312.) Plaintiffs allege that rising

atmospheric carbon dioxide, the primary pollutant from extracting and burning fossil fuels, will continue to cause temperatures to rise in Montana, California, Oregon, Hawaii, and Florida, exposing Plaintiffs to life-threatening conditions. (*Id.* ¶ 93.)

Plaintiffs bring six claims for relief. First, Plaintiffs assert substantive due process violations of their right to life. (*Id.* ¶¶ 251–61.) Second, Plaintiffs assert a substantive due process violation of their right to liberty on the theory that the Challenged EOs interfere with their right to enjoy state public trust resources. (*Id.* ¶¶ 262–71.) Third, Plaintiffs allege that the EPA's implementation of the Challenged EOs to "unleash" fossil fuel pollution and debilitate the EPA is *ultra vires*. (*Id.* ¶¶ 272–303.) Fourth, Plaintiffs allege that the "termination" of the National Climate Assessment ("NCA") is *ultra vires.* (*Id.* ¶¶ 304–07.) Fifth, Plaintiffs allege that Defendants' "wholesale suppression of climate science" is *ultra vires.* (*Id.* ¶¶ 308–21.) And sixth, Plaintiffs allege that the challenged actions are unconstitutional under the state-created danger doctrine. (*Id.* ¶¶ 322–29.)

In accordance with the above, Plaintiffs seek the following relief:

(1) [a] declaration pursuant to 28 U.S.C. § 2201 that Executive Orders 14154 §§ 1–3, 5, 7; 14156; and 14261 §§ 2–3, 5–7 and any implementing executive actions pursuant thereto are unlawful, unconstitutional, *ultra vires*, and invalid[;]

(2) [a] permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing

Executive Orders 14154 §§ 1–3, 5, 7; 14156; and 14261 §§ 2–3, 5–7[;]

(3) [a] permanent injunction mandating that Defendants rescind all agency-wide directives applying, implementing, and effectuating Executive Orders 14154 §§ 1–3, 5, 7; 14156; and 14261 §§ 2–3, 5–7 prior to this injunction[;]

(4) [a]ward Plaintiffs their costs in this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, or otherwise appropriate; and

(5) [g]rant such other relief as the Court deems just and proper.

(*Id.* at 125–26.)

On June 13, 2025, Plaintiffs filed a Motion for Preliminary Injunction seeking to prohibit Defendants from implementing the Challenged EOs. (Doc. 24.) Defendants filed a Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim on August 4, 2025 (Doc. 42), and Defendant-Intervenors filed a Motion to Dismiss for Lack of Jurisdiction on August 14, 2025 (Doc. 47). Included in Plaintiffs' Motion for Preliminary Injunction were 25 declarations from counsel, youth Plaintiffs, and several experts in the areas of climate change, energy, executive orders, and climate science. (*See* Docs. 25-1–25-25.)

The Court held a hearing on the Motions on September 16 and 17, 2025 (Docs. 86, 88), during which Plaintiffs argued the Challenged EOs are "unleashing" fossil fuels in three primary ways: (1) by directing all Federal agencies to support the fossil fuel industry by approving fossil fuel projects; (2) by

7

directing Federal agencies to suppress wind and solar projects; and (3) by dismantling the climate science and monitoring programs relied upon by the Government in carrying out bipartisan pollution laws. The effect, Plaintiffs argued, is more pollution in the nation's air and water, fewer clean renewable energy alternatives, and the suppression of climate science.

Plaintiffs presented fact testimony from Plaintiff Joseph Lee, Plaintiff J.M., Plaintiff Avery McRae, Plaintiff J.K., Plaintiff I.H., and Nicole Hughes, and expert testimony from Steven Running, Ph.D., John Podesta, J.D, Mark Jacobson, Ph.D., Geoffrey Heal, Ph.D., and Lori Byron, MD, MS. Defendants did not present any witness testimony.

## LEGAL STANDARD

Federal courts are courts of limited jurisdiction, and plaintiffs bear the burden of demonstrating a court has jurisdiction over their claims. *Badgerow v. Walters*, 596 U.S. 1, 7 (2022); *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). Article III standing "is a jurisdictional prerequisite to the consideration of any federal claim." *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008). A court reviews a motion to dismiss a complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1). *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). A jurisdictional attack under Rule 12(b)(1) may be "facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039

(9th Cir. 2004).

Where a jurisdictional attack is facial, the court must determine whether the allegations in the complaint are sufficient on their face to invoke federal jurisdiction, accepting all material allegations as true and construing them in favor of the party asserting jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "Although the defendant is the moving party on a motion to dismiss brought under Rule 12(b)(1), the plaintiff is the party invoking the court's jurisdiction. As a result, the plaintiff bears the burden of proving that the case is properly in federal court." *Brooke v. Kashl Corp.*, 362 F. Supp. 3d 864, 871 (S.D. Cal. 2019) (citing *McCauley v. Ford Motor Co.*, 264 F.3d 952, 957 (9th Cir. 2001)).

## DISCUSSION

Plaintiffs have presented overwhelming evidence that the climate is changing at a staggering pace, and that this change stems from the rise in atmospheric carbon dioxide, caused by the production and burning of fossil fuels. (Doc. 25-24 ¶¶ 1–15, 19, 29.) The record documents that 2024 was the warmest year ever recorded on Earth, and that the ten warmest years ever recorded were the last ten years. (*Id.* ¶ 20.) This excess heat, or energy imbalance, causes rising atmospheric temperatures and stronger heatwaves, extreme rainfall and floods, earlier snowmelt, more intense droughts and greater fire risk, and mass loss from glaciers and ice sheets with attendant sea level rise. (*Id.* ¶ 26.) Indeed, the

frequency of deadly heatwaves has increased in the western United States; where what would be a one in 100-year event now occurs approximately every 20 years. (*Id.* ¶ 30.)

The record further demonstrates that climate change and the exposure from fossil fuels presents a children's health emergency. (*See* Doc. 25-3 ¶ 12.) Specifically, the extraction and burning of fossil fuels—the primary driver of climate change—accounts for most of the airborne particulate pollution that has a detrimental effect on air quality and on children's health and lives. (*Id.*¶ 16.) Plaintiffs have presented overwhelming evidence that implementation of the Challenged EOs will increase the concentration of atmospheric carbon dioxide, thereby exacerbating the harms Plaintiffs experience from an already-warming climate. (Doc. 25-24 ¶ 17; Doc. 25-20 ¶ 9.) Specifically, Plaintiffs' expert Jesse Jenkins, Ph.D., estimates that the Challenged EOs will result in an immediate rise in carbon dioxide. By 2027, Plaintiffs estimate the Challenged EOs will generate an additional 205 million annual metric tons of carbon dioxide-equivalent; by 2035, this number will rise to 510 million metric tons annually. (Doc. 25-20 ¶¶ 21, 9, 18.)

Yet while this Court is certainly troubled by the very real harms presented by climate change and the Challenged EOs' effect on carbon dioxide emissions, this concern does not automatically confer upon it the power to act. *See*

*Washington Env't Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013) (courts may only act where the Constitution permits) (citation omitted). With this understanding in mind, the Court reluctantly concludes, for the reasons set forth below, that it cannot grant Plaintiffs the relief they seek.

## I.    Standing

Defendants argue that Plaintiffs lack Article III standing and thus cannot pursue their Constitutional claims. (Doc. 43 at 17.) To establish Article III standing, a plaintiff must demonstrate (1) a concrete and particularized injury that (2) is caused by the challenged conduct and (3) is likely redressable by a favorable judicial decision. *Friends of the Earth, Inc. v. Laidlaw Envt. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citation omitted). The Court will address each element in turn.

### A. Injury in Fact

To establish an injury in fact, a plaintiff must plausibly allege injuries that are concrete, particularized, and actual or imminent. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In an environmental case, a plaintiff cannot establish injury in fact by alleging only injury to the environment; rather, Article III requires a showing of injury to the plaintiff. *Laidlaw*, 528 U.S. at 181. Here, Defendant-Intervenors assume, for the purposes of the present Motions to Dismiss, that at least one Plaintiff has pled sufficient facts to show that he or she satisfies the

11

injury-in-fact requirement. (Doc. 48 at 5, n. 1.) Defendants, however, argue that Plaintiffs advance a "novel" theory of injury. (Doc. 43 at 27.) The Court disagrees.

Plaintiffs have filed several sworn declarations attesting to a broad range of personal injuries that they allege are caused by climate change and will imminently worsen due to the Challenged EOs. For example, Plaintiff Delaney Reynolds attests that increased fossil fuel development and the associated greenhouse gas emissions will worsen the extreme heat, flooding, coral bleaching, and storm systems that she presently experiences living in South Florida. (Doc. 25-1 ¶ 3.) Reynolds further attests that South Florida's worsening heat and heatwaves have forced her to curtail outdoor activities, and, as a Ph.D. candidate studying climate resilience strategies, the dismissal of researchers working on the NCA will negatively affect her education. (*Id.* ¶¶ 4, 7.)

Plaintiff Joseph Lee attests that his love of nature and physical outdoor exercise is an integral part of his life; however, the increasingly severe heat and wildfires in California prevent him from hiking and backpacking outdoors, thereby harming Lee's physical and mental well-being. (Doc. 25-13 ¶¶ 3, 6, 11.) Lee has asthma, and he asserts that if Defendants continue to "unleash" fossil fuels, the long-term effects from wildfire smoke exposure will jeopardize his health and lifespan. (*Id.* ¶ 11.) Plaintiff Avery McRae similarly alleges adverse health, recreational, and emotional impacts caused by the increased occurrence and

12

intensity of heat and wildfires, in addition to worsening allergies. (Doc. 25-9 ¶¶ 3–
6, 18.) McRae also had to evacuate due to three hurricanes in South Florida in the
past year (*Id.* ¶¶ 7–8), and Plaintiff J.M.'s family veterinary clinic in Livingston,
Montana, was flooded following a severe flood event in 2022 (Doc. 25-21 ¶ 7).
Lastly, Plaintiffs Eva Lighthiser, Ripley Cunningham, and J.M. live near the coal
trains transporting coal from the Spring Creek Mine in Montana, which received a
modification to extend coal production by 16 years under EO-14154, thereby
extending these Plaintiffs' exposure to pollutants associated with coal
transportation. (Doc. 1 ¶¶ 176–77.)

According to Plaintiffs' expert Dr. Byron, climate change and exposure to
pollution from fossil fuels presents a health emergency for children and youth,
including the Plaintiffs to this action. (Doc. 25-3 ¶ 12.) Specifically, dust from coal
trains such as those from the Spring Creek Mine in Montana is associated with
mortality, hospitalization for cardiovascular and respiratory disease, asthma
exacerbation, loss of work, and days of restricted activity. (*Id.* ¶ 18.) And higher
average temperatures will exacerbate air pollution, which in turn aggravates
existing cases of asthma experienced by several Plaintiffs. (*Id.* ¶ 19.) Children and
youth with chronic health conditions such as asthma or allergies—including
Plaintiffs Lee and McRae—are more susceptible to poor air quality, which may
result in more visits to the emergency room and hospital admissions. (*Id.* ¶ 20.)

13

Extreme heat can also exacerbate respiratory problems, and ongoing exposure to harmful air pollution from wildfire smoke results in an elevated risk of mortality to Plaintiffs. (*Id.* ¶¶ 24, 26.)

Plaintiffs allege that rising atmospheric carbon dioxide, the primary pollutant from extracting and burning fossil fuels, will continue to cause temperatures to rise and expose Plaintiffs to further life-threatening conditions. (Doc. 1 ¶ 93.) Plaintiffs' expert testimony relates their injuries to increased exposure to atmospheric carbon dioxide caused by the Challenged EOs. According to Plaintiffs' expert Dr. Running, every additional ton of carbon dioxide emitted into the atmosphere will further warm the planet, worsening occurrences of heatwaves, droughts, wildfires and smoke, storms, floods, and sea level rise. (Doc. 25-25 ¶ 58.) As noted, Plaintiffs' expert Dr. Jenkins estimates that by 2027, the Challenged EOs will generate an additional 205 million annual metric tons of carbon dioxide-equivalent; by 2035, this number will rise to 510 million metric tons annually. (Doc. 25-20 ¶¶ 9, 18.) This increase in carbon dioxide, Dr. Running testified, is scientifically significant and will worsen Plaintiffs' climate-related injuries.

At oral argument, Defendants asserted two primary issues with the 205 million metric tons estimate: first, Defendants argued this number represents a fraction of 1% of the total global energy emissions, which are over 37 gigatons;

14

and second, this estimate relies on assumptions that have not been borne out by events. Specifically, these emissions are attributed to several regulatory changes that have not yet occurred, such as the rescission of various appliance efficiency standards. The Court is not persuaded. Plaintiffs need not wait for all harm from the Challenged EOs to be complete to acquire standing. *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 151–52 (9th Cir. 2000); *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2358 (2025) ("[W]hen a deprivation of [fundamental constitutional] rights is at stake, a plaintiff need not wait for the damage to occur before filing suit."). At any rate, with respect to Dr. Jenkins' estimations, the increase in carbon dioxide is attributed in large part to the revitalization of the coal industry, particularly the exemption granted to the Colstrip Mine in Montana. (Doc. 25-20 ¶ 17.)

Plaintiffs have alleged overwhelming evidence that climate change is affecting them now in concrete ways, and that these effects will imminently worsen as a result of the Challenged EOs. "[A]n increased risk of harm can itself be injury in fact sufficient for standing." *Pacific Lumber Co.*, 230 F.3d at 1151 (citing *Laidlaw*, 528 U.S. at 181); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending' or if there is a 'substantial risk that the harm will occur."). Plaintiffs have shown the Challenged EOs will generate an additional 205

million metric tons of carbon dioxide annually by 2027, an increase which Plaintiffs convincingly allege will expose them to imminent, increased harm from a warming climate. Indeed, Plaintiffs allege that higher average temperatures and increasing heat waves will increasingly occur should more fossil fuels be "unleashed," exacerbating air pollution and worsening Plaintiffs' injuries. (Doc. 25-3 ¶ 19.) Therefore, because at least some of the Plaintiffs claim injuries that are both concrete and particularized, they have satisfied this first inquiry. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").[2]

### B. Causation

A plaintiff must show the injuries alleged are "'fairly traceable' to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). A "causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous, and remain plausible." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012) (citations and

---

[2] The Court declines Defendants' invitation to "incorporate by reference and preserve" arguments made in their *Juliana* appeal brief. (Doc. 43 at 29 n. 5.) "[I]t is wholly improper to incorporate by reference an opposition brief filed in another case." *Whitlock v. Pepsi Americas*, 681 F. Supp. 2d 1116, 1120 (N.D. Cal. 2010).

quotations omitted) (Pro, J., Concurring). "Nor does standing require the defendant's action to be the sole source of injury." *Bellon*, 732 F.3d at 1142 (citation omitted).

Relying on *Bellon*, 732 F.3d 1131, and *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020), Defendants argue that Plaintiffs must demonstrate the Challenged EOs are a "substantial factor" in their alleged climate injuries. (Doc. 43 at 30.) And because Plaintiffs cannot establish that the Challenged EOs provide "a 'meaningful contribution' to global greenhouse gas levels," Defendants conclude, they fail to satisfy their burden. (*Id.* at 30 (quoting *Bellon*, 732 F.3d at 1146).). Plaintiffs respond that traceability is straightforward: the Challenged EOs "unleash" more fossil fuels; fossil fuels cause pollution that harms Plaintiffs' lungs and bodies; and fossil fuels trap heat in the climate systems where Plaintiffs live. (Doc. 50 at 21 (citing Doc. 1 ¶¶ 62–68, 87, 97–105, 173, 183, 195).).

In *Bellon*, the Ninth Circuit examined a case alleging climate injuries related to regulatory standards and greenhouse gas pollution from five oil refineries. 732 F.3d at 1146. The court found that plaintiffs failed to satisfy causation for several reasons, most relevant were that (1) plaintiffs offered "only vague, conclusory statements" with respect to the regulatory standards and their contribution to greenhouse gas emissions; and (2) while there were numerous independent sources of greenhouse gas emissions, the five refineries were responsible for 5.9% of

17

emissions in Washington State—this amount, according to the defendant's expert, rendered a "scientifically indiscernible" effect on global climate change. *Id.* at 1143–44. "Because a multitude of independent third parties are responsible for the changes contributing to [p]laintiffs' injuries," the court concluded, "the causal chain is too tenuous to support standing." *Id.* Conversely, in *Juliana*, the Ninth Circuit concluded that plaintiffs sufficiently established the causal chain; in reaching this conclusion, the court observed that plaintiffs' alleged injuries were caused by carbon emissions from fossil fuel production, extraction, and transportation, the United States's emissions accounted for over 25% of worldwide emissions from 1850 to 2012, and, at the time *Juliana* was decided, United States emissions accounted for approximately 15% of worldwide emissions. 947 F.3d at 1169.

Plaintiffs distinguish *Bellon* on the grounds that the Ninth Circuit faulted those plaintiffs for failing to provide any evidence connecting their climate injuries to the state regulator's failure to require greenhouse gas controls at refineries. (Doc. 50 at 23.) This is indeed unlike the facts before this Court, which establish concrete evidence that the Challenged EOs themselves will increase greenhouse gas emissions and, in turn, worsen the climate-related injuries alleged here.

Plaintiffs further argue that *Massachusetts v. EPA*, 549 U.S. 497 (2007), supports causation. (Doc. 50 at 23.) There, several states, local governments, and

private organizations alleged the EPA abdicated its responsibility under the Clean Air Act to regulate greenhouse gas emissions, including carbon dioxide. *Id.* at 505. In finding causation satisfied, the Supreme Court observed that "[j]udged by any standard," United States automobile emissions—which, at the time, accounted for more than 6% of worldwide carbon dioxide emissions—"make a meaningful contribution to greenhouse gas concentrations and hence, according to petitioners, to global warming." *See id.* at 525.

Plaintiffs' reliance on *Massachusetts* is misplaced. As observed by the court in *Bellon*, *Massachusetts* "relaxed the standing requirement" based on two factors. 732 F.3d at 1144. First, Massachusetts was exercising a procedural right challenging the rejection of its rulemaking petition, which permitted "assert[ion of] that right without meeting all the normal standards for redressability and immediacy." *Id.* at 1144 (citing *Massachusetts*, 549 U.S. at 520). Second, *Massachusetts* emphasized "the special position and interest of Massachusetts" as a "sovereign state." *Id.* (citing *Massachusetts*, 549 U.S. at 518). Here, because the youth Plaintiffs are private citizens alleging substantive constitutional claims, the Court cannot "extend [] the holding of *Massachusetts v. EPA* to the present circumstances." *Id.*

That notwithstanding, the Court ultimately concludes that Plaintiffs' injuries are both sufficiently tied to the Challenged EOs and meaningfully contribute to

global greenhouse gas concentrations such that causation is satisfied. The predicted

emissions from the Challenged EOs are certainly greater than those from five oil

refineries in Washington State, and although not as substantial as the 50-year

energy policy of the United States at issue in *Juliana*, the increase is—at least

according to Plaintiffs' experts—still scientifically significant. The Court finds

Plaintiffs' experts sufficiently establish that the Challenged EOs will render a

meaningful contribution to atmospheric carbon dioxide levels. *See Massachusetts*,

549 U.S. at 525. The fact that a step may be incremental does not mean it "can

never be attacked in a federal judicial forum." *Id.* at 524.

### C. Redressability

When analyzing redressability, district courts must assume its existence.

*Juliana*, 947 F.3d at 1170 (citing *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir.

2018).). However, that assumption merely begins the analysis, "because 'not all

meritorious legal claims are redressable in federal court.'" *Id.* (quoting *M.S.*, 902

F.3d at 1083). To establish Article III redressability, "plaintiffs must show that the

relief they seek is both (1) substantially likely to redress their injuries; and (2)

within the district court's power to award." *Id.* (citing *M.S.*, 902 F.3d at 1083). In

other words, redressability is governed by two inquiries, "one of efficacy and one

of power." *Id.* at 1181 (Stanton, J., Dissenting).

Defendants maintain this matter is "on all fours with" *Juliana v. United*

*States*, a 2020 Ninth Circuit decision that Defendants argue forecloses redressability in the present matter. (Docs. 34 at 24; 43 at 18–19.) The Court agrees.

In *Juliana*, several youth plaintiffs argued the United States had violated their substantive due process rights under the Fifth and Fourteenth Amendments by "promot[ing] fossil fuel use despite knowing that it can cause catastrophic climate change," thereby depriving them of their "right to a climate system capable of sustaining human life." 947 F.3d at 1164, 1169 (internal quotations omitted). Plaintiffs sought a declaration that the Government violated the Constitution as well as an injunction requiring that it both cease authorization of fossil fuel use and "prepare a plan subject to judicial approval to draw down harmful emissions." *Id.* at 1170. The Ninth Circuit, reluctantly, concluded that plaintiffs lacked standing because they failed to demonstrate their requested relief was "both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Id.* at 1164, 1170.

## 1. Substantial Likelihood of Redress

In *Juliana*, the Ninth Circuit expressed skepticism that plaintiffs' requested relief would redress their asserted climate injuries. *Id.* at 1170. First, the court found that a declaration, though likely to benefit plaintiffs psychologically, "[was] unlikely by itself to remediate their alleged injuries absent further court action." *Id.*

21

The court further reasoned that an injunction, specifically an order requiring the Government to cease permitting, authorizing, and subsidizing fossil fuel use and to prepare a plan to draw down harmful emissions, would not—at least according to plaintiffs' experts— "suffice to stop catastrophic climate change or even ameliorate their injuries." *Id*.

Plaintiffs, several of whom were parties to *Juliana*, argue this case is distinct because (1) *Juliana* sought relief from 50 years of Federal policy, whereas Plaintiffs seek relief from three EOs issued this year; and (2) unlike *Juliana*, Plaintiffs do not seek a remedial plan. (Doc. 50 at 26–28.) Plaintiffs urge this Court to instead look to two recent United States Supreme Court cases: *Diamond Alternative Energy, LLC v. Environmental Protection Agency*, 145 S. Ct. 2121 (2025), and *Gutierrez v. Saenz*, 145 S. Ct. 2258 (2025). (Doc. 50 at 26; 30–32.)

In *Gutierrez*, the Supreme Court clarified in a 42 U.S.C. § 1983 procedural due process case that removing even one legal barrier to a plaintiff's real-world relief suffices to establish redressability. 145 S. Ct. at 2268. And in *Diamond Alternative*, fuel producers challenged the EPA's approval of state regulations requiring automakers to "manufacture more electric vehicles and fewer gasoline-powered vehicles," arguing that invalidating such regulations would "substantially ameliorat[e]" their injuries. 145 S. Ct. at 2131. Because "commonsense economic inferences about the operation of the automobile market" meant that invalidating

22

the state regulations "would likely mean more gasoline-powered automobiles, which would in turn likely mean more sales of gasoline and other liquid fuels by the fuel producers," the Supreme Court found the fuel producers had successfully established redressability. *Id.* at 2137–39. The Supreme Court observed that "[e]ven 'one dollar' of additional revenue for the fuel producers would satisfy the redressability component of Article III standing." *Id.*

Relying on *Gutierrez*, Plaintiffs first argue that a declaration invalidating the Challenged EOs is sufficient, even if Defendants were to devise alternative justifications for "unleashing" fossil fuels. (Doc. 50 at 31.) In the Court's view, however, *Gutierrez* merely reflects the long-applied redressability principles for procedural due process claims not at issue here. This understanding aligns with *Juliana*, wherein the Ninth Circuit recognized a distinction between substantive and procedural due process claims. There, the district court relied on *Massachusetts*, 549 U.S. 497, to find "the redressability requirement satisfied because the requested relief would likely slow or reduce emissions." *Juliana*, 947 F.3d at 1171. Though the Ninth Circuit did not explicitly reject the district court's conclusion, it did observe that *Massachusetts* involved a procedural due process claim, whereas *Juliana* pertained to substantive due process rights. *Id.* at 1171.

It is therefore not apparent that Plaintiffs' request for declaratory relief is, on its own, sufficient to establish redressability. *See G.B. v. EPA*, 2024 WL 3009302,

23

at *3 (C.D. Cal. May 24, 2025) (relying on *Juliana* to find declaratory judgment unlikely to redress youth plaintiffs' climate-related injuries). As was made clear during oral argument, at the heart of Plaintiffs' request is that the Court wind back the clock to the regulatory framework that existed on January 19, 2025. However, it is unlikely that a declaration of the Challenged EOs illegality, absent further Court action, would revert the entirety of the United States's energy policy back to January 19, nor would it necessarily invalidate all the implementing regulations, some of which appear to rely on more than one authority. *See Juliana*, 947 F.3d at 1170 ("A declaration, although undoubtedly likely to benefit the plaintiffs psychologically, is unlikely by itself to remediate their alleged injuries absent further court action."); *see also Reeves v. Nago*, 535 F. Supp. 3d 943, 955 (D. Haw. 2021) ("Plaintiffs have not adduced facts suggesting that [d]efendants or a third party would redress the situation based solely on the issuance of the requested declaration.").

Whether *Diamond Alternative* provides sufficient support for Plaintiffs' request for injunctive relief remains unclear. While *Juliana* did not definitively resolve the question of whether an amelioration of environmental injuries was sufficient, in the context of economic harm, *Diamond Alternative* looked favorably upon the fuel producers' argument that their "injuries would be substantially ameliorated" if the challenged actions were "set aside." 145 S. Ct. at 2131; *Juliana*,

24

947 F.3d at 1171. *Diamond Alternative* may, therefore, edge Plaintiffs in the right direction. Indeed, unlike *Juliana*, the expert testimony in this matter demonstrates that injunctive relief would likely ameliorate Plaintiffs' potential climate-related injuries. (*See* Doc. 25-20 ¶ 18.) Indeed, if one dollar of relief is sufficient, the reduction of 205 million metric tons per year—and, by 2035, 505 million metric tons—of injury-causing greenhouse gas should be, too. (*See id.*, ¶¶ 17, 18.)

Yet whether Plaintiffs' request for injunctive relief satisfies the first redressability prong under *Diamond Alternative* is, ultimately, of no consequence. *Diamond Alternative* did not reach the limits on Article III power that underpinned *Juliana*, and thus cannot help Plaintiffs surmount this final, dispositive hurdle.

### 2. Article III Power

To begin, the undersigned must ask the following question: what is it, exactly, that the Court is being asked to do? The answer, according to Plaintiffs, is merely to grant "(1) a traditional injunction prohibiting Defendants from implementing or enforcing the [C]hallenged EOs; and (2) a permanent injunction against all agency-wide directives implementing the [C]hallenged EOs entered prior to the injunction." (Doc. 1 at 119.) This "traditional" prohibitory injunctive relief, Plaintiffs maintain, is materially distinct from *Juliana*—wherein the plaintiffs challenged 20 years of Government policy and sought an order requiring the Government to "phase out fossil fuel emissions and draw down excess

atmospheric carbon dioxide"—and is well within the power of an Article III court to issue. (Doc. 50 at 28.)

The Court does not share this view. Though Plaintiffs do not seek the sort of remedial plan that was central to the holding in *Juliana*, the two cases nonetheless share several important characteristics. First, the *Juliana* plaintiffs sought not only a remedial plan, but also a declaration that the defendants had violated their Constitutional rights and an injunction prohibiting further Constitutional violations. The Ninth Circuit, however, did not parse these forms of relief: it dismissed the entire complaint due to lack of standing.

Second, and most importantly, it is the Court's view that the relief sought here raises the same Article III concerns at issue in *Juliana*. Granting Plaintiffs' injunction would require the Defendant agencies and—ultimately—this Court, to scrutinize every climate-related agency action taken since January 20, 2025, to determine whether it was implemented pursuant to the Challenged EOs or to some other Government policy. In other words, this Court would be required to monitor an untold number of federal agency actions to determine whether they contravene its injunction. This is, quite simply, an unworkable request for which Plaintiffs provide no precedent. *See Juliana*, 947 F.3d at 1172 (observing that the court would be required to supervise the Government's compliance for several decades); *Nat. Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1300 (9th Cir. 1992)

("Injunctive relief could involve extraordinary supervision by this court [and] may be inappropriate where it requires constant supervision."); *Rucho v. Common Cause*, 139 S. Ct. 2484, 2500–02 (2019) (a proposed standard involving a mathematical comparison to a baseline election map is too difficult for the judiciary to manage).

Moreover, the Court is troubled by Plaintiffs request to return to the regulatory status quo as it existed on January 19, 2025. In making such a request, Plaintiffs are effectively asking that this Court order the United States to return to the environmental policy of the previous administration. Even should an injunction issue, the current administration may nonetheless rely upon other considerations to continue to, in Plaintiffs' view, prioritize fossil fuels and suppress renewable energy, in effect side-stepping the Challenged EOs. As a result, in monitoring Defendants' actions, this Court would be required "to pass judgment on the sufficiency of the government's response to [its] order, which necessarily would entail a broad range of policy making." *Juliana*, 947 F.3d at 1172. It is beyond the power of an Article III court to create environmental policy, which is left "for better or worse, to the wisdom and discretion of the executive and legislative branches." *Id.* at 1171–72. "[R]edressability questions implicate the separation of powers," and the courts "have no commission to allocate political power and influence" absent standards to guide them. *Id.* at 1173 (quoting *Rucho*, 39 S. Ct. at

2508).

A final issue is that of scope. By asking that this Court prohibit Defendants from "implementing" the three Challenged EOs, Plaintiffs effectively seek to enjoin not just three executive orders, but also tens—if not hundreds—of policy decisions, regulations, and projects promulgated by 12 Federal agencies and the Executive Office of the President. For example, it appears that Plaintiffs seek to enjoin the EPA's decision to reconsider the 2009 Endangerment Finding, the Bureau of Land Management's decision to lease 34 parcels totaling 25,038 acres for oil and gas, the Department of the Interior's approval for a modification to the Spring Creek Mine in Montana, and the Department of Transportation's decision to rescind guidance for implementation of the National Electric Vehicle Infrastructure Program, which provides congressionally-approved funding to states for EV charging infrastructure. (Doc. 1 ¶¶ 154, 174, 176, 198.) And while the Complaint and supporting declarations name several regulations and actions allegedly taken pursuant to the Challenged EOs, it is unclear how many actions may ultimately be swept up in any order. In the Court's opinion, this surpasses the framework for a "traditional" injunction; indeed, it appears that Plaintiffs' request effectively amounts to hundreds of lawsuits being brought in a single case. The Court is unaware of any authority that supports such a sweeping ruling.

Scope becomes even more problematic when, inevitably, the Court must

determine whether an agency action was in fact "implemented," "applied," or "effectuated" pursuant to one of the Challenged EOs. For example, several of the exhibits attached to Plaintiffs' declarations do not mention any one of the Challenged EOs, whereas some rely upon a Challenged EO in addition to other authorities. (*See* Doc. 25-25 Ex. B) (Presidential Memorandum, issued pursuant to section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), withdrawing wind energy leasing within the Offshore Continental Shelf, with no mention of any Challenged EO); (Doc. 25-25 Ex. I) (outlining, amongst other budget matters, funding cuts to EPA's Categorical Grant programs, EPA's Superfund Program, eliminating EPA's environmental justice program, and cancelling over $15 billion in "Green New Scam" funds committed to build renewable energy and ending "taxpayer handouts" to EV makers, with no apparent reference to any Challenged EO); (Doc. 25-25 Ex. F) (Memorandum requiring Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements, relying on several executive orders issued in January 2025, including *Unleashing American Energy*).

What, then, constitutes "implementation"? Is it enough that a regulation shares the same spirit and intent of a Challenged EO, i.e., to "unleash" fossil fuels? Does a regulation violate the injunction if it relies on a Challenged EO in addition

to other authorities? The answers to these questions, it seems, are not so obvious. An injunction may only issue if its terms are specific and describe in reasonable detail the acts to be restrained or required; such an amorphous understanding of "implementation" does not suffice. *See* Fed. R. Civ. P. 65(d).

In consideration of the above, the Court reluctantly concludes that while Plaintiffs do not seek a remedial plan, their request is nonetheless of the type that concerned the court in *Juliana*. As the Ninth Circuit observed, "[n]ot every problem posing a threat—even a clear and present danger—to the American Experiment can be solved by federal judges." *Juliana*, 947 F.3d at 1174. Rather, Plaintiffs' compelling case for redress must be made to the political branches or to the electorate; "[t]hat the other branches may have abdicated their responsibility to remediate the problem does not confer on Article III courts, no matter how well-intentioned, the ability to step into their shoes." *Id.* at 1175.

Accordingly, because Plaintiffs cannot establish Article III standing, this matter must be dismissed. And because the Court is without jurisdiction, it need not address any of the remaining arguments.

## II.    Dismissal with Prejudice

Leave to amend generally must be granted unless one of the following factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing

party, and (5) futility of amendment. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Dismissal with prejudice is appropriate only when the complaint cannot be saved by amendment. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). It is the Court's view that an amendment in this matter would be futile. Pursuant to *Juliana*, the relief sought in this case is beyond the bounds of this Court's Article III authority, a fact that cannot be cured by amendment. Therefore, this matter will be dismissed with prejudice.

## CONCLUSION

As is likely clear from the foregoing analysis, the Court reads *Juliana* to mandate this outcome. If the Ninth Circuit disagrees, the undersigned welcomes the return of this case to decide it on the merits. Accordingly, for the reasons stated above,

IT IS ORDERED that Defendants' Motion to Dismiss (Doc. 42) and Defendant-Intervenors' Motion to Dismiss (Doc. 47) are GRANTED. This case is DISMISSED with prejudice.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Preliminary Injunction (Doc. 24) is DENIED as moot.

The Clerk is directed to close this case file.

DATED this 15th day of October, 2025.

Dana L. Christensen, District Judge
United States District Court